Brewster H. Jamieson, ASBA No. 8411122
Shannon W. Martin, ASBA No. 0105028
LANE POWELL LLC
301 West Northern Lights Boulevard, Suite 301
Anchorage, Alaska 99503-2648
Telephone: 907-277-9511
Facsimile: 907-276-2631
Email:      jamiesonb@lanepowell.com
Attorneys for Defendant

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ALASKA AT ANCHORAGE

| | |
|---|---|
| FOREST OIL CORPORATION, | |
| Plaintiff, | |
| v. | Case No. 3:05-cv-00078-RRB |
| UNION OIL COMPANY OF CALIFORNIA d/b/a UNOCAL ALASKA, | **MOTION FOR PARTIAL SUMMARY JUDGMENT RE: PARAGRAPH 22, TOOL RENTAL** |
| Defendant. | |

Defendant Union Oil Company of California (Unocal), by and through counsel, moves this court for an order granting partial summary judgment on the claims contained in paragraph 22 of the Complaint [Docket 1] regarding "charges for the rental of equipment owned by Unocal." The Complaint alleges that the charges were "wasteful and improper," and evidence of "Unocal's imprudent operatorship."

The allegations relating to rental of the equipment (hereafter, "tool rental") have no basis in fact, and Forest Oil cannot present any evidence in support. Summary judgment should be granted to Unocal because:

(1)    Under the contracts between the parties, plaintiff expressly agreed that Unocal could choose one of two methods for accounting for tool rental;

(2)    Unocal did not breach the contracts in deciding which accounting method to choose;

(3)    Unocal did not breach the contracts in the way it actually accounted for tool rental;

LANE POWELL LLC
301 West Northern Lights Boulevard, Suite 301
Anchorage, Alaska 99503-2648
Telephone 907.277.9511 Facsimile 907.276.2631

(4)     The total gross alleged overcharge for tool rental amounts to only $2,537; such a miniscule amount was not, as a matter of law, wasteful or evidence of any imprudence by Unocal; and

(5)     Finally, even if Forest Oil could present evidence in support of its allegations, Unocal's conduct, as a matter of law, did not amount to "gross negligence or willful misconduct" as contemplated by the Trading Bay Unit Operating Agreement and the Trading Bay Field Operating Agreement.

## I.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when there are no genuine issues of material fact and a party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  One of the primary purposes of the summary judgment procedure is to "isolate and dispose of factually unsupported claims or defenses."  *Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986).  The U.S. Supreme Court has stated:

> . . . the plain language of Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

*Id.*, 477 U.S. at 322.

As the movant, defendant has the initial burden of establishing the absence of a genuine issue of material fact.  *Id.*, 477 U.S. at 323.  All justifiable inferences of fact are to be drawn in the favor of plaintiff, the non-movant.  *E.g. Dufay v. Bank of America N.T. & S.A. of Oregon*, 94 F.3d 561, 564 (9th Cir. 1996).  However, once a properly supported motion for summary judgment is made by defendant, the burden shifts to plaintiff to "set forth specific facts showing that there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A mere "scintilla" of evidence will not be sufficient to defeat defendant's motion; instead, plaintiff must introduce some "significant probative evidence" tending to support the complaint.  *Id.*, 477 U.S. at 249, 252; *Summers v. A. Teichert & Sons, Inc.*, 127 F.3d 1150, 1152 (9th Cir. 1997).  If plaintiff's evidence is merely colorable or not significantly probative, summary judgment should be entered for defendants. *Eisenberg v. Insurance Co. of North America*, 815 F.2d 1285, 1288 (9th Cir. 1987). Moreover, plaintiff's evidence must be admissible in order to defeat summary judgment.  *Beyene v. Coleman Sec. Servs., Inc.*, 854 F.2d 1179, 1181-82 (9th Cir. 1988).

**LANE POWELL** LLC
301 West Northern Lights Boulevard, Suite 301
Anchorage, Alaska 99503-2648
Telephone 907.277.9511  Facsimile 907.276.2631

## II. FACTS

### A. History of ownership in the Trading Bay Properties leading to Common Equity.

Forest and Unocal own working interests in several offshore oil and gas leases located in Alaska's Cook Inlet, which were awarded by the State of Alaska to Unocal in the late 1960s, and which make up the Trading Bay Properties. The four agreements that govern the relationship between Forest and Unocal in regard to development and operation of the Trading Bay Properties ("the Trading Bay Agreements") are as follows:

1. The Trading Bay Unit Operating Agreement ("TBUOA") (Exhibit A);

2. The Trading Bay Field Operating Agreement ("TBFOA") (Exhibit B).

3. The Unit Agreement for the Development and Operation of the Trading Bay Unit Area, State of Alaska ("TB Unit Agreement") (Exhibit C)[1];

4. The Alignment Agreement Trading Bay Field / Trading Bay Unit (Alignment Agreement) (Exhibit D).

The TBUOA and the TBFOA will be collectively referred to herein as the "Operating Agreements." Unocal was originally designated and has remained the Operator under the Trading Bay Agreements. As the Operator, Unocal is charged with "the exclusive right and duty to conduct operations according to plans and procedures as specified by the Parties and to do all things necessary and consistent therewith." *See* TB Unit Agreement, at ¶ 8; TBUOA, at Articles VII and VIII; and TBFOA, at Articles VI and VII.

The Trading Bay Agreements were negotiated and entered into by and among Unocal and Forest (and/or their predecessors-in-interest) in the late 1960s, and have been amended several times over the years. Up until the 1990s, there were multiple working interest owners in the Trading Bay Properties and multiple parties to the Trading Bay Agreements. Additionally, the Trading Bay Properties were comprised of numerous working interest participating areas ("WIPAs"),[2] with

---

[1] The State of Alaska is also party to the Unit Agreement along with all working interest owners, i.e. Unocal, Forest and Marathon.

[2] A WIPA is essentially a pool or underground reservoir containing, or appearing to contain, a common accumulation of oil or gas, which is designated as such by the parties to the Agreements for purposes of allocating and apportioning costs and production for royalty purposes. *See* Article 3.18 and 3/28 of the TBUOA.

**LANE POWELL** LLC
301 West Northern Lights Boulevard, Suite 301
Anchorage, Alaska 99503-2648
Telephone 907.277.9511  Facsimile 907.276.2631

ownership among the working interest owners in each WIPA being slightly different.  In 1996, Unocal and Forest became the sole working interest owners of the *oil* assets underlying the Trading Bay Properties including all oil WIPAs.

By way of the Alignment Agreement dated January 1, 2002, Unocal and Forest aligned their respective working interests in the Trading Bay Properties, including all WIPAs except for and excluding the Grayling Gas Sands WIPA.[3]  Since the alignment of interests (otherwise referred to as "Common Equity")[4], Unocal maintains a 53.20% working interest ownership, and Forest maintains a 46.80% working interest ownership, in all oil WIPAs comprising the Trading Bay Properties.  *See* Alignment Agreement.

**B.    Background Facts Regarding Using And Charging For Drilling Tools.**

**1.    What Are "Tools"?**

As used in this motion, the term "tools" is a generic term broadly describing tools and equipment used in the drilling of a well.  Exhibit E, Declaration of Donald A. Page at ¶ 2.[5]  Tools used in the Trading Bay Fields may be owned by either Unocal or by the Trading Bay Unit itself.  *Id.* The rental for tools used in the Trading Bay Fields, and any credits relating to those tools, were charged to the Joint Account for the Unit.  *Id.*

**2.    Established Industry And Unocal Practice Allow Drilling Personnel Wide Discretion In Bringing Tools To The Site And Returning Them.**

In the drilling industry, it is almost universal practice for the drilling engineer and the drilling foreman to make the decisions as to what tools will be used at the drill site and when to

---

[3] Unocal and Forest Oil aligned their interests in all *oil* horizons underlying the Trading Bay Properties, excluding the gas, and more specifically, the Grayling Gas Sands (GGS) and the GGS WIPA, in which ownership is shared between Unocal (48.80%) and Marathon (51.20%).

[4] In general, the purpose of Common Equity was to create common assets, including all WIPAs (excluding the GGS WIPA), in which ownership would be shared by and between Unocal and Forest Oil according to a pre-negotiated working interest percentage that would apply to all production, revenue, and costs associated with the Trading Bay Properties.  Thus, Common Equity dramatically reduced the administrative burden of breaking down production, revenue, and costs according to multiple WIPAs with varying percentages of ownership in each.

[5] *See also* the following on-line glossaries of oilfield terminology: *http://oilrigwork.netfirms.com/ Glossary.htm* ("'oil tools': Any drilling bit or other special tool to drill or configure a well."); *http://www.spwla.org/* (tool defined as: "Downhole tool or downhole instrument package. A complete subsurface service device. A number of tools can be run simultaneously as a combination service. The combination of tools will also be a tool.").

LANE POWELL LLC
301 West Northern Lights Boulevard, Suite 301
Anchorage, Alaska 99503-2648
Telephone 907.277.9511  Facsimile 907.276.2631

order the tools to be delivered.  Exhibit F, Declaration of Tim Brandenburg at ¶ 2.  Considerations include: the cost and availability of the tool; lead time to secure the tool if available; transportation time and cost to bring the tool to the drill site; the cost of idling the rig and drilling operation if an item is overlooked because attention is diverted by drilling activities requiring immediate attention; possible acceleration of the project if things go better than planned; the insurance value of having tools on hand to meet unanticipated needs; and many other considerations, some of which are unique to the individual drilling employee and drill site, such as the remote nature of the drill site and the weather.  *Id.*

In conformity with this industry practice, Unocal entrusts the drilling personnel in the Trading Bay Fields with the decision as to when to bring tools out and when to return them.  *Id.* at ¶ 3.  Further, Unocal has never communicated to its employees that it would be in the company's best interest to "warehouse" tools on a platform during drilling operations.  *Id.*  In fact, performance evaluations of drilling personnel include cost per foot considerations.  Drilling personnel thus have an incentive to manage all costs to provide efficient results.  *Id.*  Every drilling project is reviewed by drilling management to confirm that the involved employees have performed for the maximum benefit to the project objectives.  *Id.*  Efficient tool management is part of the drilling personnel's job, but is only one part of the overall balancing act of running the entire drilling operation in the most efficient way possible.  *Id.*  For instance, paying special attention to a tool that costs $5 or $50 per day to rent so that it will be delivered just in time or made ready for the next boat or helicopter to return it to the beach is a poor use of the drilling foreman's time on an active rig project costing in the range of thousands of dollars per hour.  *Id.*

   3.   **It Is Established Industry Practice To Charge For Tools Even If They Are Not Being Used.**

Third-party vendors who rent the tools used on the drilling sites usually, as a matter of policy, base their rental charges on the days in which the equipment is not in their hands.  *Id.* at ¶ 4.  This practice means that as soon as an item leaves the vendor's yard the charges begin and do not stop until the item is returned to the vendor's yard.  *Id.*  By contrast, for "early order" items (*i.e.,* items delivered to the well site in advance of the commencement of drilling operations) Union Oil's practice is to not charge rental until installation of the blowout preventer stack on the wellhead; for

**LANE POWELL** LLC
301 West Northern Lights Boulevard, Suite 301
Anchorage, Alaska 99503-2648
Telephone 907.277.9511  Facsimile 907.276.2631

items delivered during the job, charges begin only when the tool reaches the well site. *Id.* Unocal's charges for tool rental cease upon removal from the well site or removal of the blowout preventer form the well head, whichever occurs first. *Id.* As a result, Unocal's tool rental charges are at least consistent with, and in many instances more generous than the standard rental policies of third party tool rental vendors. *Id.* Further, unlike nearly all third-party vendors, Unocal has neither established minimum rental periods nor instituted premiums for short-term use. *Id.*

C.  **Facts Regarding The Specific Tool Rental Charge As Alleged In Paragraph 22.**

Forest Oil's allegations in paragraph 22 regarding the charges for tool rental are based on its Audit Exception No. 6. *See* Page Dec. at ¶ 3, and Exhibit E-1 to Page Dec.; Brandenburg Dec. at ¶ 5. Audit Exception No. 6 pertains to drilling operations at Unocal's Monopod platform well, which was a $17 million project. Brandenburg Dec. at ¶ 5. Those drilling operations experienced several unanticipated problems and delays. *Id.* The cost of running the entire drilling program ran in the area of several thousand dollars per hour—totaling anywhere from $50,000 to $100,000 per day. Any delays in the drilling program were therefore extremely costly. *Id.*

1.  **The Alleged "Over $1 Million" Charge.**

There are two classes of tools at issue here. The first class of tools are those owned by the Trading Bay Unit itself. Each tool in this class is owned jointly by Unocal and Forest. These will be referred to in this motion as "TBU-owned tools." If a TBU-owned tool is sent to a drilling site in the Trading Bay Unit, the Joint Account is charged for its rental just like any other type of tool. However, because the Working Interest Owners own the tool, each owner's account is credited its share of the rental fee, resulting in a wash transaction. For example, the joint account would be charged $100 for rental of a TBU-owned tool, and the owners would be charged their respective percentages of that rental fee—Unocal $53.20 and Forest $46.80. Simultaneously, each working interest owner would be credited their respective percentage of the rental fees. At the end of the day, each owner is credited the exact amount they are charged for rental of TBU-owned tools used on TBU drilling projects. If a TBU-owned tool is used on a 100% Unocal project (say, in a different unit or field), however, then Unocal would be charged the full rental (in this example, $100), and Forest would receive a credit (here, $46.80) for its percentage of that rental.

**LANE POWELL** LLC
301 West Northern Lights Boulevard, Suite 301
Anchorage, Alaska 99503-2648
Telephone 907.277.9511  Facsimile 907.276.2631

LANE POWELL LLC
301 West Northern Lights Boulevard, Suite 301
Anchorage, Alaska 99503-2648
Telephone 907.277.9511  Facsimile 907.276.2631

The second class of tools is owned 100% by Unocal.  These are referred to in this motion as "Unocal-owned tools."  Where Unocal-owned tools are used on TBU projects, the Joint Account is charged the full rental price, resulting in a charge to each owner for its percentage of the rental.  For example, if the rental charges are $100, Unocal would pay itself $53.20, while Forest would pay Unocal $46.80.

Forest Oil's claim in paragraph 22 of the Complaint that Unocal charged "over $1 million" in tool rental charges was derived from Audit Exception No. 6's exception to what Forest Oil claimed was $1,009,682.19 in charges for tool rental.  Page Dec. at ¶ 3.  However, Forest did not distinguish between charges for TBU-owned tools and Unocal-owned tools, which leads to a significantly overstated claim.  *Id.* at ¶ 4.  In fact, each and every usage charge for TBU-owned tools which Forest Oil objected to in its Audit Exception No. 6 was matched by an equal, dollar-for-dollar offsetting credit to the Trading Bay Unit.  *Id.* at ¶ 5.  The total amount of credits was $239,987.80.[6] *Id.* at ¶ 7.  Thus, charges for the Trading Bay tools ended up as a wash as far as the whole Trading Bay Unit was considered, with the charges exactly equaling the credits and resulting in a net cost to the Trading Bay Unit (and therefore to Forest Oil, as a working interest owner) of zero.  *Id.* at ¶ 6.  Despite the fact that the charges for the Trading Bay tools were a wash, Forest Oil's Audit Exception No. 6 included charges for the Trading Bay tools without subtracting the offsetting credits.  *Id.* at ¶¶ 6-8.

### 2.    Rental Charges For Tools Not Being Used.

Paragraph 22 of the Complaint also alleges that Unocal charged for tools being kept at the drill site when they were not being used.  This claim was also derived from Audit Exception No. 6, which alleged an "excess charge" for tool rental of five specific items that Forest Oil claims were not being used.  Brandenburg Dec. at ¶ 6.

The facts relating to each of these specific tool items (as shown by the Brandenburg Dec. at ¶ 6(a) - (e)), are as follows:

---

[6] Out of the $1,009,682.19 billed to the Trading Bay Unit, $157,958.92 was credited to the Trading Bay Unit for the usage charges representing Trading Bay Unit tools.  Further, an additional $82,028.88 of credits were issued to the Trading Bay Unit for tool rental charges to non-Trading Bay Unit properties.  Adding the credits together equals a total amount of credits issued for the 2002 tool rental of $239,987.80.  Page Dec. at ¶¶ 6-7.

(a)     Forest Oil's auditor wrote: *"12 ¼" Breaker Bit charge for the entire month. Per the Drilling report 9 5/8" casing was run January 8, 2002 and charges should have stopped."*

The referenced bit breaker is a very low cost item at $5/day (20.8 cents per hour). The alleged over expenditure/over charge gross for the 12 ¼" Bit Breaker equals $110. The 12 ¼" Bit Breaker is a low priority item and when not in use is normally placed out of sight on the drill floor or other locations. It is not uncommon for a variety of bit breakers to be resident on a drilling rig throughout the drilling of a well.

(b)     Forest Oil's auditor wrote: *"8 ½" Breaker Bit charged for the entire month of January. Again 9 5/8" casing was not run until January 8, 2002 and bit would not be used until after that date."*

This bit breaker was also a low cost, $5/day (20.8 cents per hour) tool. Unocal believes that the any alleged overcharge from the auditor's perspective would be that the tool was on location eight days early. Calculating the overcharge at eight days x $5/day rental = $40 gross alleged overcharge for the 8½" bit breaker. Further, this item, as with all of the other items mentioned below, even though low cost, was essential to the drilling project; when this item was needed, it was needed immediately. It would have been extremely cost prohibitive to stop the very expensive drilling operations in order to obtain and ship to the platform a $5/day tool every time it was needed. It was far more cost effective to keep the item on the platform, even when it was not being used, so that it would be handy when necessary.

(c)     Forest Oil's auditor wrote: *"3 ½" and 4 ½" Rams charged for the entire month. Per the Drilling Report 4 ½" casing was not run until March 21, 2002 and 3 ½" and 4 ½" tubing was run March 23, 2002."*

The rams in dispute belonged to the Trading Bay Unit and so, as described above, both the charges <u>and dollar-for-dollar off-set credits for the charges</u> went to the Trading Bay Unit. Thus, the net Unit cost (to Forest Oil) was zero for the rams.

(d)     Forest Oil's auditor wrote: *"3 ½" and 4 ½" Sub Box X Pin charged for the entire month. Per the Drilling Report 4 ½" casing was not run until March 21, 2002 and 3 ½" and 4 ½" tubing was run March 23, 2002."*

**LANE POWELL** LLC
301 West Northern Lights Boulevard, Suite 301
Anchorage, Alaska 99503-2648
Telephone 907.277.9511  Facsimile 907.276.2631

LANE POWELL LLC
301 West Northern Lights Boulevard, Suite 301
Anchorage, Alaska 99503-2648
Telephone 907.277.9511  Facsimile 907.276.2631

The gross alleged over charge for the subs totals $992 (31 days x $32/day total rental for all of the subs).  Given their specialized role (i.e. mating two pieces of pipe with different threads and/or sizes), it is common and extremely prudent industry practice (especially on remote locations) to keep an assortment of crossover subs available in order to deal with unexpected or unplanned events.  In many cases redundant crossovers are available in the event that one should be damaged. It is entirely possible to shut down an entire drilling operation at a cost of $50,000 to $100,000 per day simply because the necessary crossover is not available on the rig.

(e)     Forest Oil's auditor wrote:  *"Valve, Lower Kelly, Box X Pin charged for the entire month.  Per the Drilling Report 4 ½" casing was not run until March 21, 2002 and 3 ½" and 4 ½" tubing was run March 23, 2002."*

The total rental charge for this tool in January 2002 was $1,395 (rental at $45/day for a total of 31 days).  The "Lower Kelly Valve" was being used as a "Floor Safety Valve."  Such a valve is required by Alaska Law (20 AAC 25.035) to be available on the rig floor at all times for each pipe size in use so as to secure the drill string.  Because this tool was required by law to be on site, it was "in use" for the entire month of January 2002.

Therefore, the total alleged gross overcharge for all of the items listed by Forest Oil in its Audit Exception No. 6—which are the only examples given to support Forest Oil's claim that Unocal improperly charged for tools not being used—equals $2,537.[7]

Finally, Mr. Brandenburg's declaration at ¶ 6 shows that Audit Exception No. 6's claims regarding the specific tool items were in error because Forest Oil's auditor overlooked or ignored the following facts: (1) the 3 ½" drill pipe was used throughout the entire month of March, 2002, so the tools used on that pipe (i.e., the rams and subs) were also needed throughout the month; (2) a prudent driller would have all of these tools on hand before they were needed to avoid costly delays in the drilling program; (3) the industry practice is to charge for tools from shop gate to shop gate; (4) lost time in the drilling program caused by the above-mentioned delays could not have been

---

[7] The total sum of the rental charges for all the following tools listed in Audit Exception No. 6 is as follows: 12 ¼" Bit Breaker ($110 alleged overcharge); 8 ½" Bit Breaker ($40 alleged overcharge); 3 ½" and 4 ½" Rams (zero overcharge); 3 ½" and 4 ½" Subs ($992 alleged overcharge); Lower Kelly Valve ($1,395 alleged overcharge) = $2,537 total alleged overcharge.

anticipated by Unocal; and (5) a month is by no means an excessive or inappropriate amount of time for the tools listed in the Audit Exception remained on the platform, given the nature of the work being performed.

### III.  ARGUMENT

The allegations in paragraph 22 of the Complaint regarding tool rental are part of Forest Oil's breach of contact claim.  As a matter of law, the tool rental charges did not violate the contracts, i.e., the Operating Agreements.  Absent any breach of contract, there are no grounds for plaintiff's claims regarding the tool rentals.  Therefore, for the reasons discussed below, all claims in the complaint based on a charge for tool rental should be dismissed as a matter of law.

### A.    The Operating Agreements Allowed Unocal To Choose The Accounting Method It Actually Utilized For Tool Rental.

#### 1.    The COPAS Procedures.

The Operating Agreements between plaintiff and Unocal for the Trading Bay Unit each expressly incorporated and made a part of each Operating Agreement an identical document titled "Accounting Procedure Offshore Joint Operations."[8]  The "Accounting Procedure Offshore Joint Operations" were developed by the Council of Petroleum Accountants Societies, known as COPAS, and will be referred to herein as the "COPAS Procedures."  *See Exxon Corp. v. Crosby-Mississippi Resources, Ltd.*, 40 F.3d 1474, 1476 (5th Cir. 1995) ("The COPAS accounting procedure 'allocates the liabilities and expenditures for which all parties to the Joint Operating Agreement will

---

[8] *See* TBUOA at Article 2.1.A.:

> 2.1 Exhibits.  The following exhibits are attached hereto and by this reference are made part hereof:
>
> A.    Exhibit "A", which contains the methods of calculation of Basic Participating Interest, Royalty Share, Royalty Correction Factor, and Effective Participating Interest.

*See* TBFOA at Article 1.1:

> 1.1    Exhibits
>
> The following exhibits are attached hereto and by this reference are made a part hereof:
>
> ...
>
> C.    Exhibit C, which is the Accounting Procedures for the determination of costs and expenses incurred in the conduct of operations under this Agreement. ....

**LANE POWELL** LLC
301 West Northern Lights Boulevard, Suite 301
Anchorage, Alaska 99503-2648
Telephone 907.277.9511  Facsimile 907.276.2631

be responsible and defines the ways in which an Operator will account for the costs incurred in operating an oil well.'").

Section 7 of the COPAS Procedures provides:

7. Equipment and Facilities Furnished by Operator.

A.    Operator shall charge the Joint Account for use of Operator-owned equipment and facilities, including Shore Based and/or Offshore Facilities, at rates commensurate with costs of ownership and operation.  Such rates may include labor, maintenance, repairs, other operating expense, insurance, taxes, depreciation and interest on gross investment less accumulated depreciation not to exceed twelve percent (12%) per annum.  In addition, for platform only, the rate may include an element of the estimated cost of platform dismantlement.  Such rates shall not exceed average commercial rates currently prevailing in the immediate area of the Joint Property.

B.    In lieu of charges in Paragraph 7A above, Operator may elect to use average commercial rates prevailing in the immediate area of the Joint Property less twenty percent (20%).  For automotive equipment, Operator may elect to use rates published by the petroleum Motor Transport Association.

By the express terms of Section 7 of the COPAS Procedures, Unocal could have chosen either Paragraphs 7A or 7B by which to account for tool rental.  Page Dec. at ¶ 9.  Unocal chose to use the methods in Paragraph 7B for the 2002 tool rental charges.  *Id.*  Moreover, rental charges made to the Joint Account for tools owed by Unocal were made in full conformity with the provisions of paragraph 7B of the COPAS Procedures. *Id.*  That is, the rental charge was calculated at the "average commercial rate" in the area of the Trading Bay Properties, less a discount of 20%. *Id.*

Therefore, as a matter of law, (1) plaintiff expressly agreed in the Operating Agreements that Unocal could choose one of two methods for accounting for tool rental, and (2) Unocal did in fact chose one of the accounting methods agreed to by plaintiff.

### 2.    Unocal's Choice Of Accounting Methods Did Not Breach The Contract.

The last section demonstrated that Unocal had the discretion to choose Paragraph 7B of the COPAS Procedures to account for tool rental.  This section will demonstrate that Unocal did not breach the Operating Agreements in its charges for tool rental under Paragraph 7B.

**LANE POWELL** LLC
301 West Northern Lights Boulevard, Suite 301
Anchorage, Alaska 99503-2648
Telephone 907.277.9511  Facsimile 907.276.2631

(a)    **The Proper Standard Of Care Is Not "Imprudence," But "Gross Negligence/ Willful Misconduct.**

In paragraph 22 of the Complaint, plaintiff alleges that the tool rental charges are evidence of Unocal's alleged imprudent operatorship. Even if this were true, "imprudence" is not the correct standard. Paragraph 8.3.A of the TBUOA provides:

> A. <u>Workmanlike Conduct</u>. Unit Operator and each Sub-Contractor shall conduct all Unit operations in a good and workmanlike manner. Unit Operator and Sub-Operators shall not be liable to the Parties for damages, unless such damages result from their gross negligence or willful misconduct.

Paragraph 7.2.A of the TBFOA provides:

> A. <u>Workmanlike Conduct</u>. Operator shall conduct all operations in a good and workmanlike manner. Operator shall not be liable to the Parties for damages, unless such damages result from Operator's gross negligence or willful misconduct.

As has been previously briefed to this court in detail[9], Unocal asserts that the gross negligence/willful misconduct standard established in the above-quoted exculpatory clauses applies to both operational decisions and any accounting disputes or breach of contract claims which arise under the Operating Agreements. *See Stine v. Marathon Oil Company*, 976 F.2d 254, 260-61 (5th Cir. 1992).

Regarding the definition of "gross negligence," the Alaska Supreme Court has stated:

> There is, in short, no generally accepted meaning [of "gross negligence"]; but the probability is, when the phrase is used, that it signifies more than ordinary inadvertence or inattention, but less than conscious indifference to consequences, and that it is, in other words, merely an extreme departure from the ordinary standard of care. W. Prosser, Torts, 183-84 (4th Ed. 1971).

---

[9] *See* Unocal's previously filed Motion for Partial Summary Judgment Re: Claims Relating to Naturally Occurring Radioactive Material ("NORM"), and the opposition and reply thereto.

**LANE POWELL** LLC
301 West Northern Lights Boulevard, Suite 301
Anchorage, Alaska 99503-2648
Telephone 907.277.9511 Facsimile 907.276.2631

*Storrs v. Lutheran Hospitals and Homes Society of America, Inc.*, 661 P.2d 632, 634 n. 1 (Alaska 1983).

Similarly, in *Aetna Cas. & Sur. Co. v. Marion Equipment Co.*, 894 P.2d 664, 671 (Alaska 1995), the Alaska Supreme Court discussed the definition of the term "willful misconduct:"

> A number of Alaska cases inferentially support the lower court's holding that actions undertaken with "reckless indifference to the interests, rights, and safety of others" constitute wilful misconduct. In *Van Biene v. ERA Helicopters, Inc.*, 779 P.2d 315 (Alaska 1989), we held that allegations of wilful misconduct were insufficient to make out a cause of action for an intentional tort. *Id.* at 318-19. In *Korean Air Lines Co. v. State*, 779 P.2d 333 (Alaska 1989), we noted that a defendant had been found guilty of wilful misconduct by a jury following this instruction:
>
> The defendants' behavior is wilful misconduct if they intentionally performed or failed to perform some act or series of acts either:
>   (1) with knowledge that such act or omission would probably result in injury or damage, or
>   (2) in a manner from which could be implied *reckless disregard* of the probable consequences of the act or omission.
>
> *Id.* at 337 and n. 3 (emphasis added). Finally, in *Borg-Warner Corp. v. Avco Corp.*, 850 P.2d 628 (Alaska 1993), we termed "persuasive" the view that in comparative negligence jurisdictions like Alaska, "wilful misconduct" should be considered a category of misconduct that "falls short of being intentional." We held that intentional tortfeasors are those who act with specific intent to cause an injury. We classified "wilful and wanton" actors as unintentional tortfeasors. *Id.* at 633.
>
> What we have implied in the aforementioned cases, we hold explicitly today in the context of AS 45.45.900: *"wilful misconduct" means volitional action taken either "with a knowledge that serious injury to another will probably result, or with wanton and reckless disregard of the possible results."* (emphasis added)

Although the *Marion Equipment* case dealt specifically with the term "willful misconduct" as used in AS 45.45.900, the definition of the term in that case was in no way limited to

**LANE POWELL LLC**
301 West Northern Lights Boulevard, Suite 301
Anchorage, Alaska 99503-2648
Telephone 907.277.9511 Facsimile 907.276.2631

that statute, and should therefore be applied to the term "willful misconduct" in the Operating Agreements.

   The following cases provide examples of when courts will or will not find negligence or willful misconduct: *Palace Exploration Co. v. Petroleum Development Co.*, 374 F.3d 951 (10 Cir. 2004) (finding no gross negligence or willful misconduct where the operator (1) located a well in an incorrect location although within the outer bounds of the legal description provided by the JOA; and (2) failed to inform the working interest owners that the location of the well had been moved); *IP Petroleum Co., Inc. v. Wevanco Energy, L.L.C.*, 116 S.W.3d 888, 897-98 (Tex.App. 2003) (finding no gross negligence or willful misconduct despite a litany of errors and questionable actions by the operator);[10] *Gifford Operating Co. v. Indrex, Inc.*, 1992 U.S.Dist. LEXIS 22505 *12

---

[10] The court in *IP Petroleum* wrote:

 Here, the plaintiffs, who were seeking monetary lost profits, summarize the evidence to support the jury's finding of gross negligence as follows:

  IP apparently did not prepare a written drilling plan for the E-2, which is the normal procedure, and could not explain its failure to do so.

  IP got stuck during the drilling operation because of its failure to use drilling mud and spent over $100,000 trying to get unstuck.

  IP did not run a drill stem test on the E-2, which many witnesses testified would be the customary, reasonable and prudent thing to do and Wevanco's witnesses testified would have shown that the well was not in the Lower Ellenburger.

  IP failed to tell Cox and Wevanco it thought setting pipe would mean the E-2 could not be deepened if it were not productive.

  IP told Cox and others that it was considering deepening the E-2 well when it had absolutely no intention of doing so.

  IP allowed the farmout to expire while it was still operating, discovered that fact, and did not do anything about it, requiring Cox to obtain a second farmout to protect the investors' rights in the E-2.

  IP, against the advice of Cox, unsuccessfully attempted to set an inflatable bridge plug down hole.

  IP obtained the P-4 on the well, which the jury could reasonably conclude was at best intended to hold up Wevanco over the issue of the unpaid drilling expenses and at worst a deliberate attempt to prevent Cox from deepening the E-2.

***While this may be legally sufficient evidence of negligence, this evidence does not rise to the level of gross negligence*** as defined in the jury charge. Nor was there evidence of willful misconduct.

**LANE POWELL** LLC
301 West Northern Lights Boulevard, Suite 301
Anchorage, Alaska 99503-2648
Telephone 907.277.9511  Facsimile 907.276.2631

(N.D.Tex) (finding no gross negligence in performing a hydraulic fracture treatment on a well which caused the well to stop producing); *Hamilton v. Texas Oil & Gas Corp.*, 648 S.W.2d 316 (Tex.App. 1982) (finding gross negligence where operator relocated a well without notice to the non-operators where the well location was specified in the agreement with detailed coordinates).

> **(b)    Using COPAS Paragraph 7B Did Not Violate The Standard of Care.**

Forest Oil, as 46.8% owner of the Trading Bay Unit, could not expect to receive the benefits of Unocal-owned tools used at the Trading Bay Properties without paying its fair share for the rental of those tools. Section 7 of the COPAS Procedures addresses this situation and allows an Operator such as Unocal to charge the Joint Account for its tools used for the benefit of the Unit. The Operating Agreements expressly incorporated the COPAS Procedures, including Section 7, and expressly gave Unocal the discretion to choose Paragraph 7B. The contracts' authorization to use Paragraph 7B to account for tool rental means that Unocal could not have breached the contract, much less have been grossly negligent or acted with willful misconduct, in doing exactly that. Indeed, because the use of Paragraph 7B is expressly allowed by contract, the decision to do so cannot even have risen to the lower standard of negligence or imprudence, as Forest Oil complains.

> **(c)    Any Violation Of COPAS Was By Forest Oil's Auditor.**

It must be noted that Forest Oil's auditor's failure in Audit Exception No. 6 to acknowledge the credit offsets is a violation of the COPAS Procedures. COPAS's Accounting Guide (AG)-19 provides in Section II(A)(2)(g): "The Lead Auditor's responsibilities for work at the Operator's office include the following ... (g) Informing the Operator of observations that may lead to adjustments favorable to the Operator." Page Dec. at ¶ 10, and Exhibit E-2 to Page Dec. Forest Oil thus should have called attention to the credit offsets associated with the tool rental exception, but did not. One of the defining traits of a professional Joint Venture auditor is that he/she will always include bookings that understate charges to the Joint Account, when documenting and quantifying a recurring exception that in total overstates charges to the Joint Account. Page Dec. at ¶ 10. Unocal's Joint Venture auditors always do so. It is not only the right thing to do; it goes a long way toward establishing credibility with the Operator. *Id.*

---

*IP Petroleum Co., Inc.*, 116 S.W.3d at 897-98 (emphasis added).

LANE POWELL LLC
301 West Northern Lights Boulevard, Suite 301
Anchorage, Alaska 99503-2648
Telephone 907.277.9511  Facsimile 907.276.2631

LANE POWELL LLC
301 West Northern Lights Boulevard, Suite 301
Anchorage, Alaska 99503-2648
Telephone 907.277.9511 Facsimile 907.276.2631

**B.    Unocal's Charge For Tool Rental Did Not Breach The Operating Agreements.**

The complaint in this matter, in Claim I ("Breach of Contract – Imprudent Operations"), alleges that Unocal has exhibited poor and imprudent management of the Trading Bay Properties, and alleges at paragraph 22:

> Unocal's wasteful and improper charges for the rental of equipment owned by Unocal itself provides another example of Unocal's imprudent operatorship. For example, in 2002 alone, Unocal charged to the Properties joint account over $1 million for the rental of Unocal-owned equipment. Review of these charges disclosed that Unocal frequently was charging a daily rental for equipment beginning at the start of drilling operations and continuing until completion of the drilling operations. Prudent operations would require the operator to bill for only the actual operating time the equipment was used and not the full time period the well was being drilled. Unocal's "warehousing" of idle rental equipment at an operating site and charging daily rental rates during the period of non-use appears to be solely for Unocal's benefit of improving utilization time for Unocal-owned equipment, at the expense of Forest.

Paragraph 22 thus combines two claims regarding tool rental as evidencing breach of contract: (1) that in 2002 Unocal charged the Joint Account $1 million for rental for tools owned by Unocal, and (2) Unocal charged for keeping tools at the drilling site when they were not being used. As a matter of law, both claims should be dismissed.

**1.    The Claims Relating To The "$1 Million Charge" For Tool Rental Should Be Dismissed; The Charges For Unocal-Owned Tools Did Not Breach The Contract.**

As discussed above in the Facts Section at Section II(C)(1) and in the Declaration of Donald A. Page, the allegation in paragraph 22 of the Complaint that Unocal charged "over $1 million" for Unocal-owned tools is factually incorrect. Forest Oil's claim in paragraph 22 that Unocal charged "over $1 million" in tool rental charges was derived from Audit Exception No. 6's exception to what Forest Oil claimed was $1,009,682.19 in charges for tool rental. However, Forest did not distinguish between charges for TBU-owned tools and Unocal-owned tools, leading to a significantly overstated claim. In fact, each and every usage charge for *TBU-owned* tools to which Forest Oil objected in its Audit Exception No. 6 was offset by an equal, dollar-for-dollar credit to the Trading Bay Unit, totaling $239,987.80. Thus, charges for the TBU-owned tools resulted in a wash as far as the whole Trading Bay Unit was considered, with the charges exactly equaling the credits

and resulting in a net cost to the Trading Bay Unit of zero.  Despite the fact that the charges for the Trading Bay tools were a wash, Forest Oil's Audit Exception No. 6 erroneously added in the charges for the Trading Bay tools without subtracting the offsetting credits. This accounting error on Forest Oil's part resulted in a 24% overstatement of its claim.  Page Dec. at ¶ 8.

In addition to this accounting error, Forest Oil will not be able to submit any evidence tending to show that the charges for Unocal-owned tools constituted gross negligence or willful misconduct, much less rise to the level of negligence or "imprudence" as alleged by Forest Oil.  As a matter of law, therefore, the tool rental charge complained of by Forest Oil did not breach the Operating Agreements.

    **2.**    <u>**The Claims Relating To Rental Charge For Tools Not Being Used Should Be Dismissed.**</u>

    **(a)**    <u>**Forest Oil's Claim That It Is Improper To Charge For Tools Left At The Drilling Site And Not Being Used Is Without Factual Basis And Does Not Constitute A Breach Of Contract.**</u>

Paragraph 22 of the Complaint, and Audit Exception No. 6 on which paragraph 22 was based, both presuppose that it is *per se* improper to leave tools at the drilling site when they are not being used, and to charge rental for those tools.  This ignores basic, undisputed, and inherently prudent practice in the drilling industry regarding renting tools, the use of rental tools at the drilling site, and Unocal and Forest Oil's legitimate interest in maximizing the economics and efficiency of the drilling program.  In fact, Unocal followed standard industry practice of (1) keeping the tools on site when they were not being used, and (2) charging for those tools even when they were not being used.   As such, Unocal's charging for tools on site but not being used does not constitute a breach of contract as a matter of law.

Forest Oil's auditor concluded in Audit Exception No. 6:

> Prudent operations would seem to require the Operator bill for only the actual operation time not the whole time the well was being drilled.  It appears that the Operator choose [sic] to send and return the rental equipment at one time for the Operator's convenience not due to drilling operations.

The auditor's first sentence is incorrect because it ignores the fact that the charge for a tool rental is not based on its use.  Standard industry practice in this area is that the rental charge

**LANE POWELL** LLC
301 West Northern Lights Boulevard, Suite 301
Anchorage, Alaska 99503-2648
Telephone 907.277.9511  Facsimile 907.276.2631

runs from the time the tool leaves the shop until the time it is returned, regardless of whether or when it is used in the interim.  Brandenburg Dec. at ¶ 4.  Therefore, a proper tool rental charge under COPAS Procedure paragraph 7B includes the entire time the tool is on site, not just the time it is being used, as that is the "average commercial rate" for tool rental in the Trading Bay Properties area.  Moreover, the auditor ignores that Unocal's rental for its own tools is more generous than that of the third-party vendors, in that Unocal (1) does not charge from the time the tool leaves and is returned to its yard, but the earlier of when the blowout preventer stack is installed or tool reaches the well site, and (2) has not established minimum rental periods or instituted premiums for short term use of tools.

The auditor's second sentence is also incorrect because it ignores the very real benefits of maximizing efficiency and productivity at the drill site.  Audit Exception No. 6 alleges that Unocal did what was "convenient" to it, but the facts demonstrate that the notion of "convenience" cannot be separated from what was good for the drilling program.  Having these tools "convenient"—that is, on-site and ready for immediate use when necessary—promoted the efficient use of the drilling personnel's time, and was also cost effective compared with the expense of shutting down the entire drilling operation if a tool needed to be retrieved from the shop.

Audit Exception No. 6 ignores that it is the established practice of the drilling industry in general, and Unocal in particular, to allow the on-site drilling personnel the discretion—taking a variety of factors into consideration, including the cost of the tool and the cost and status of the drilling operation—in deciding what tools to use, when to order the tools delivered to the site, and when to have those tools removed.  It is also Unocal's established practice to give drilling personnel the incentive to manage the costs of the drilling operations to maximize efficiency and the project objectives.  Efficient tool management is part of the drilling personnel's job in the overall balancing act of running the entire drilling operation in the most efficient way possible.  The facts above show that it would have been an extremely unproductive use of the drilling manager's time to worry about removing such very low cost tools from the platform whenever they were not needed.  The facts above also show that it would have been extremely cost prohibitive to stop the very expensive drilling project whenever such low cost tools were needed and wait until they were ordered from the shop and delivered to the site.  It was far more cost effective to have these low cost

**LANE POWELL** LLC
301 West Northern Lights Boulevard, Suite 301
Anchorage, Alaska 99503-2648
Telephone 907.277.9511  Facsimile 907.276.2631

**LANE POWELL** LLC
301 West Northern Lights Boulevard, Suite 301
Anchorage, Alaska 99503-2648
Telephone 907.277.9511 Facsimile 907.276.2631

tools on hand at the drill site so that they could be used when needed.  Therefore, Forest Oil's Audit Exception No. 6 (and thus the complaint itself) fails to take into account that keeping tools on site when not being used is not contrary in any way to industry practice or to Unocal's specific practice in the Trading Bay Fields.

For all of the above reasons, Forest Oil's blanket allegations about keeping tools on site and charging for tools not in use are thus baseless and do not constitute any breach of contract by Unocal.  Unocal's practice was not negligent, much less grossly negligent; it was prudent.  In fact, if Unocal had done as Forest suggests (*i.e.,* elevate bean counting over prudent drilling practices), and if a $50,000 per day drilling operation was halted for a day or two because the drilling superintendent decided to send a $5 per day tool to the beach prematurely, Unocal might rightly be accused of imprudence.  Keeping such items on hand, by contrast, shows only good judgment.

    **(b)**   **Forest Oil's Claims Regarding Specific Tools Are Without Factual Basis And Do Not Constitute A Breach Of Contract.**

The only specific examples Forest Oil has given about alleged overcharge for tool rental are in its Audit Exception No. 6.  All of Forest Oil's complaints about these specific tools rentals are groundless as a matter of law.

As was noted in the Facts section above, the specific tools mentioned in Audit Exception No. 6 are very low cost ($5/day), low priority tools.  The drilling project which is the subject of Forest Oil's complaints about tool rental charges was a $17 million project costing several thousand dollars per hour.  The project encountered unexpected and costly problems and delays.  However, Forest Oil complains about $5/day tools being left on the platform too long.  The total alleged gross overcharge for all of the items listed by Forest Oil in Audit Exception No. 6 equals $2,537.  In light of the multi-million cost of the overall project, the alleged overcharge is a trifling, *de minimis* amount which is not even evidence of a breach of contract, much less "imprudence" on the part of Unocal establishing that Unocal should be removed as Operator.

Further, the complaints about the specific tool rental charges listed in Audit Exception No. 6 are factually incorrect.  For instance, Mr. Brandenburg's declaration demonstrates that (1) contrary to Forest Oil's claim, some tools for the 3 ½" drill pipe (i.e., the rams and subs) were needed *throughout* the month of March, 2002; and (2) one tool (the "Lower Kelly Valve" being

LANE POWELL LLC
301 West Northern Lights Boulevard, Suite 301
Anchorage, Alaska 99503-2648
Telephone 907.277.9511  Facsimile 907.276.2631

used as a "Floor Safety Valve") was required by law to be on the site at all times.  As discussed in more detail above, Mr. Brandenburg's declaration also demonstrates that it was standard practice for low cost/low priority tools to be left on site, and so a prudent driller would have all of these tools on hand before they were needed to avoid costly delays in the drilling program.  Thus, Mr. Brandenburg states that the fact that the tools listed in the Audit Exception remained on the platform for the month is by no means excessive or inappropriate, given the nature of the work being performed.  Finally, as was also discussed above, Audit Exception No. 6 ignored the industry practice to charge for these tools from the time they left the shop yard until they were returned, regardless of whether they were being used.

Therefore, for all of the above reasons, the alleged overcharge for the specific tools in Audit Exception No. 6 did not rise to the level of a breach of the Operating Agreements, and any allegation in the complaint regarding those specific tools is baseless and should be dismissed.

### 3.    The Tool Rental Charges Did Not Violate The Gross Negligence/Willful Misconduct Standard.

The gross negligence/willful misconduct standard in the Operating Agreement applies to Forest Oil's claims regarding tool use at the drill site.[11]  Thus, even if Forest Oil could submit evidence of a question of fact on a specific charge pertaining to a particular tool rental, all of the tool rental claims would still be barred by the gross negligence/willful misconduct standard.

The purpose of the gross negligence/willful misconduct standard is to allow leeway in those areas where the Operator is given discretion to exercise its good faith judgment.  *See* Gary B. Conine, *The Prudent Operator Standard:  Applications Beyond the Oil and Gas Lease*, 41 Nat. Resources J. 23, 73-74 (Winter 2001) (emphasis added):

> When the exculpatory provisions are in effect because the operator is being sued for liability to the non-operators, the propriety of the operator's decision to act or not to act should be determined in the

---

[11]  Although Forest Oil has argued before in summary judgment proceedings before this court that the standard does not apply to accounting disputes, Forest Oil has conceded that the standard applies to operational decisions.  *See* Forest Oil's reply to Unocal's Motion for Partial Summary Judgment Re: NORM.  The decision whether to remove the tools and send them back to the shop or keep them on the platform so that they could be used when needed is a physical act, and thus an operational decision subject to the gross negligence/willful misconduct standard.  *See Stine*, 976 F.2d at 267 (applying the gross negligence/willful misconduct standard to both "administrative acts" and "physical operations").

same way that such a decision would be judged in a corporate setting. *As long as the operator' decision was made in good faith with adequate information and with an honest belief that the decision was in the best interests of the operator and non-operators, the courts should refrain from substituting their business judgment for that of the operator*. This assures that the operator, if it is to absorb the losses of the non-operators for an incorrect decision, will be liable only if its decision making was grossly negligent. *This is the only outcome that structures the operating agreement so that the extraordinary risks of petroleum operations are shared by the participants and negative incentives for serving and acting as operator are eliminated*.

The gross negligence/willful misconduct standard thus protects Operators when they make discretionary decisions in good faith but simply "guess wrong."

First, the *de minimis* amount of the alleged overcharge for the specific tools mentioned in Audit Exception No. 6 cannot be ignored. That alleged overcharge equaled only $2,537. That's not $2,537 per hour, or per day, but the <u>total</u> amount of alleged tool rental overcharge. Although Unocal disputes that it overcharged any amount for tool rental, even assuming for the sake of argument that Unocal did overcharge that amount, it is so minimal in the context of the overall project that, as a matter of law, charging that amount was not gross negligence or willful misconduct, much less negligence or "imprudence" as alleged by plaintiff.

Regarding the specific practice of charging for tools kept on the platform while not being used, paragraph 22 of the Complaint would require this court to (1) second-guess the drilling personnel's decision to keep the tools at the platform, (2) hold that the drilling personnel's decision was wrong, and (3) find that the tools had to be removed from the drill site and returned to the shop at the precise time declared by Forest Oil with the benefit of hindsight. The gross negligence/willful misconduct standard prohibits the court from doing so.

Unocal cannot have breached the Operating Agreements unless it can be proved that Unocal was grossly negligent or engaged in willful misconduct when it elected to leave any particular tool at the drill site instead of returning it to the shop. As a matter of law, no such showing can be made; the drilling personnel were well within the discretionary buffer zone allowed by the gross negligence/willful misconduct standard in making the judgment call to leave the tools on site,

**LANE POWELL** LLC
301 West Northern Lights Boulevard, Suite 301
Anchorage, Alaska 99503-2648
Telephone 907.277.9511  Facsimile 907.276.2631

or in deciding to use their time on more important matters. Mr. Brandenburg's declaration shows that drilling personnel cannot perfectly predict tool needs. A number of factors, including efficiency, economy and availability, go into the decision as to when tools will be used. Moreover, some of the tools which Forest Oil is complaining about rented for only $5 per day. In light of the millions of dollars at stake in the drilling operation, and the very expensive delays being experienced in that drilling program, it was not gross negligence or willful misconduct to decide that it would have been an extremely unproductive use of the drilling manager's time concern himself with removing very low cost tools from the platform whenever they were not needed.

Moreover, because the rental charges for the tool do not stop until it is returned to the shop, the drilling manager would have to make sure that each item was not just removed from the platform but transported and returned back to the shop. It was not gross negligence or willful misconduct to decide that this would also be an extremely unproductive use of the drilling manager's time.

In addition, even low cost tools were essential to the drilling project; when those items are needed, they are needed immediately. *See* Brandenburg Dec. at ¶ 6. It was not gross negligence or willful misconduct to decide that (1) it would have been extremely cost prohibitive to stop the very expensive drilling project every time a low cost tool was needed and wait until the tools were ordered from the shop and delivered to the site; and (2) it was far more cost effective to keep the item on the platform, even when it was not being used, so that it would be handy when necessary.

As discussed above, Forest Oil's auditor in Audit Exception No. 6 accuses Unocal of choosing not to return the tools for its own convenience. Even if this is true, the gross negligence/willful misconduct standard allows Unocal to make a good faith decision that having the tools on site was more convenient than returning them to the shop. Weighing the factors regarding efficiency and economics, and then finding that the balance of factors favored keeping the tools on site was not, as a matter of law, negligence or "imprudence" as alleged by Forest Oil, much less gross negligence or willful misconduct as those terms are defined under Alaska law.

Finally, as noted above, courts have refused to find gross negligence or willful misconduct where, for example: (1) the operator improperly located a well and did not tell the working interest owners about it (*Palace Exploration*); (2) the operator did not prepare a written

**LANE POWELL LLC**
301 West Northern Lights Boulevard, Suite 301
Anchorage, Alaska 99503-2648
Telephone 907.277.9511 Facsimile 907.276.2631

drilling plan, got a tool stuck in the hole, did not perform a standard test on the well, told investors that it was going to deepen the well when it had no plans to do so, allowed the farmout agreement to expire, unsuccessfully attempted to set a plug downhole, and may have acted to prevent the well from being deepened (*IP Petroleum*); and (3) the operator fractured a well causing it to cease performing (*Gifford Operating Co.*).  Unocal's alleged conduct regarding tools, even if true, do not even come close to the level of these examples, which courts have found to not constitute gross negligence or willful misconduct in any event.

4.    **The Alleged Overcharge Of $2,537 Is A *De Minimis* Amount Not Arising To A Material Breach Of Contract.**

Finally, even assuming for the sake of argument that the tool rental charges did constitute a breach of contract by Unocal (which it was not as discussed above), as a matter of basic contract law that breach would not support removing Unocal as Operator as requested by Forest Oil.[12]

The Operating Agreements are governed by and construed in accordance with Alaska law.[13]  The Alaska Supreme Court has stated that a non-material breach of a contract, otherwise known as a "partial breach," does not allow the aggrieved party to prevent further performance under the contract by the breaching party.  *See Alaska Energy Authority v. Fairmont Ins. Co.*, 845 P.2d 420, 423 n. 3 (Alaska 1993):

> While the failure to bring suit within two years is a breach of the contract, *the breach is not material and is called a partial breach*. *A breach by non-performance gives rise to a claim for total breach only if it substantially impairs the value of the contract to the injured party*.  Restatement (Second) of Contracts § 243(4) (1981). *"For a partial breach the injured party can maintain action at once; but he is not permitted to stop further performance."* Arthur L. Corbin, *Contracts*, § 946 at 811 (1951).[14] "Although every

---

[12]  *See* Complaint, Relief Requested, p. 16: "WHEREFORE, Forest prays that the Court enter a judgment against Unocal ... (iii) removing Unocal and replacing Unocal with Forest or an independent, third-party contractor as the operator of the Properties ...."

[13]  *See* TBUOA at § 31.2; TBFOA at § 23.8.

[14]  The full quote from Corbin makes it even clearer that in a non-material, partial breach the aggrieved party may not prevent the breaching party from continuing to perform the contract: "For a partial breach the injured party can maintain action at once; *but he is not permitted to stop further performance by the wrongdoer* ...." *See* 9 Corbin on Contracts, § 946, p. 719 (Interim Edition) (emphasis added).

**LANE POWELL** LLC
301 West Northern Lights Boulevard, Suite 301
Anchorage, Alaska 99503-2648
Telephone 907.277.9511  Facsimile 907.276.2631

> breach gives rise to a claim for damages, ... [t]he injured party's remaining duties under the contract are not necessarily discharged." Restatement (Second) of Contracts § 236 cmt. b (1981).  (emphasis added)

*See also Colorado Structures, Inc. v. Insurance Co. of the West*, 106 P.3d 815, 820-21 (Wash.App. 2005) ("If the breach is slight or insubstantial, it is called a partial breach, for which plaintiff's damages are restricted to compensation for the defective performance."); *Turner v. Johnson & Johnson*, 809 F.2d 90, 102 (1st Cir. 1986) ("In short, plaintiffs failed to establish that Johnson & Johnson's technical breach of minor provisions of the agreement caused any compensable injury. *See* A. Corbin, 4 Corbin on Contracts § 946, at 813 ('If a contractor's failure of performance causes such slight harm that the courts will give no remedy therefore adopting and applying the maxim *de minimis non curat lex*, it is proper to say that there has been no breach of duty')"); *Times Mirror Magazines, Inc. v. Field & Stream Licenses Co.*, 103 F. Supp.2d 711, 721 (S.D.N.Y. 2000) ("The isolated contract breaches that occurred after the Settlement Agreement was executed are *de minimis* violations that do not constitute a material breach of that agreement").

The drilling project involved in Forest Oil's complaints about the tool rental charge was a $17 million project costing several thousand dollars per hour.  The project encountered unexpected and costly problems and delays.  However, Forest Oil complains about $5/day tools being left on the platform too long.  The total alleged gross overcharge for all of the items listed by Forest Oil in Audit Exception No. 6 equals $2,537.  In light of the multi-million dollar cost of the overall project, the alleged overcharge is a trifling, *de minimis* amount that does not "substantially impair[] the value of the contract" to Forest Oil.  See *Alaska Energy Authority*, 845 P.2d at 423 n. 3. The alleged overcharge could, at most, constitute only a non-material, partial breach of the Operating Agreements.

A partial breach of the Operating Agreements does not allow Forest Oil to prevent Unocal's performance under the Operating Agreements—in this case, Unocal's discharge of its duties as Operator.  Therefore, although Unocal does not believe it overcharged any amount for tool rental, even assuming for the sake of argument that $2,537 was overcharged to the Joint Account for tool rental, that figure is non-material and cannot support Forest Oil's attempt to remove Unocal as Operator or to prevent Unocal from continuing the contractual performance of its Operator duties.

LANE POWELL LLC
301 West Northern Lights Boulevard, Suite 301
Anchorage, Alaska 99503-2648
Telephone 907.277.9511  Facsimile 907.276.2631

LANE POWELL LLC
301 West Northern Lights Boulevard, Suite 301
Anchorage, Alaska 99503-2648
Telephone 907.277.9511  Facsimile 907.276.2631

The most Forest Oil would have is a claim for damages for the tool rental, and even that claim should be dismissed in any event because, as discussed above, nothing about the tool rental charge by Unocal breached the Operating Agreements or violated the gross negligence/willful misconduct standard.

## IV.  CONCLUSION

Under the Operating Agreements, Unocal is liable to Forest Oil only for gross negligence or willful misconduct.  Gross negligence is defined in Alaska as "an extreme departure from the ordinary standard of care."  *Storrs*, *supra*.  Willful misconduct is defined in Alaska as "volitional action taken either with a knowledge that serious injury to another will probably result, or with wanton and reckless disregard of the possible results."  *Marion Equipment*, *supra*.  The gross negligent/willful misconduct standard of care applies to Forest Oil's breach of contract claims, including such claims based on both operations (as conceded by Forest Oil) and accounting disputes. As a matter of law, no action of Unocal regarding the 2002 charge for tool rental either breached the Operating Agreements or violated the contractual standard of care, because:

A.    Unocal charged the Joint Account significantly less than the $1 million alleged by Forest Oil for rental of tools owned by Unocal.

B.    The charge for rental for Unocal's tools—including charging rental for tools while they were not being used—was allowed under the COPAS Procedures and was calculated in compliance with Paragraph 7B of the COPAS Procedures.

C.    Keeping tools at the drill site even when they were not being used was well within Unocal's discretion, based on Unocal's good faith belief that doing so was reasonable and prudent because it promoted the efficiency of the drilling personnel and the cost effectiveness of the drilling program.

D.    The total gross alleged overcharge for tool rental amounts to only $2,537.  In light of the $17 million  drilling project, the amount of alleged overcharge for tool rental is *de minimis*, and cannot support the removal of Unocal as Operator.

For the reasons stated above, Unocal respectfully requests that the court dismiss as a matter of law all allegations in the complaint relating to tool rental charges.

DATED this 17th day of March, 2006.

LANE POWELL LLC
Attorneys for Defendant


By  s/ Brewster H. Jamieson
    Brewster H. Jamieson, ASBA No. 8411122
    301 West Northern Lights Boulevard, Suite 301
    Anchorage, Alaska  99503-2648
    Tel:    907-277-9511
    Fax:   907-276-2631
    Email:  jamiesonb@lanepowell.com

I certify that on March 17, 2006, a copy of the
foregoing was served by ECF on:

Jeffrey M. Feldman, feldman@frozenlaw.com

  s/ Brewster H. Jamieson
017351.0040/152421.1

LANE POWELL LLC
301 West Northern Lights Boulevard, Suite 301
Anchorage, Alaska  99503-2648
Telephone 907.277.9511  Facsimile 907.276.2631