A CONFORMED VERSION OF THE

UNIT OPERATING AGREEMENT

TRADING BAY UNIT

COOK INLET, ALASKA

INCORPORATING

THE FIRST THROUGH EIGHTH AMENDMENTS

AND

THE FIRST THROUGH THIRD SUPPLEMENTAL AGREEMENTS

# TABLE OF CONTENTS

**Page**

ARTICLE I           CONFIRMATION OF UNIT AGREEMENT ................................... 2

  1.1   Confirmation of Unit Agreement ................................................. 2

ARTICLE II          EXHIBITS -- APPENDICES ................................................. 2

  2.1   Exhibits ....................................................................................... 2

  2.2   Appendices ................................................................................. 2

  2.3   Revision of Appendices ............................................................. 3

ARTICLE III         DEFINITIONS .................................................................... 3

  3.1   Unit Agreement .......................................................................... 3

  3.2   Acre-Feet of WIPA Pay .............................................................. 3

  3.3   Basic Participating Interest ........................................................ 3

  3.4   Costs .......................................................................................... 3

  3.5   Deepen or Plug Back .................................................................. 3

  3.6   Development Well ....................................................................... 3

  3.7   Drill, Drilled or Drilling ............................................................ 4

  3.8   Drilling Party ............................................................................. 4

  3.9   Effective Participating Interest .................................................. 4

  3.10  Exploratory Well ....................................................................... 4

  3.11  Gross Working Interest .............................................................. 4

  3.12  Injection Well ............................................................................ 4

  3.13  Lease Burdens ............................................................................ 4

  3.14  Market Value ............................................................................. 4

  3.15  Net Working Interest ................................................................. 4

  3.16  Non-Drilling Party ..................................................................... 4

  3.17  Party .......................................................................................... 4

  3.18  Pool ........................................................................................... 5

3.19 Production ................................................................................................ 5

3.20 Royalty Interest Participating Area ...................................................... 5

3.21 Specified Redetermination ..................................................................... 5

3.22 Sub-Operator ........................................................................................... 5

3.23 Subsequent Redetermination ................................................................. 5

3.24 Surface Acreage ....................................................................................... 5

3.25 Tract .......................................................................................................... 5

3.26 Unit Operator .......................................................................................... 5

3.27 Working Interest ...................................................................................... 5

3.28 Working Interest Participating Area ..................................................... 5

ARTICLE IV    SUPERVISION OF OPERATIONS BY PARTIES ..................... 6

4.1 Over-all Supervision ................................................................................. 6

4.2 Particular Powers and Duties .................................................................. 6

ARTICLE V    MANNER OF EXERCISING SUPERVISION ............................. 7

5.1 Designation of Representatives ............................................................... 7

5.2. Meetings ................................................................................................... 7

5.3 Voting Procedure ...................................................................................... 8

5.4 Additional Voting Provisions ................................................................. 9

5.5 Absentee Voting ........................................................................................ 9

5.6 Poll Votes ................................................................................................... 9

5.7 Vote Binding on Parties ........................................................................... 9

ARTICLE VI    INDIVIDUAL RIGHTS OF PARTIES .................................... 10

6.1 Reservation of Rights ............................................................................. 10

6.2 Specific Rights ........................................................................................ 10

ARTICLE VII    UNIT OPERATOR AND SUB-OPERATORS ........................ 10

7.1 Initial Unit Operator .............................................................................. 10

7.2 Sub-Operator ........................................................................................... 10

7.3 Resignation or Removal of Unit Operator and Selection of Successor ............... 10

7.4 Resignation or Removal of Sub-Operators and Selection of Successors ............. 11

Unit Operating Agreement
#41015/76-216

ARTICLE VIII       AUTHORITIES AND DUTIES OF UNIT
                   OPERATOR AND SUB-OPERATORS ......................................... 12
  8.3  Unit Operator and Sub-Operators ......................................................... 13
ARTICLE IX        DETERMINATION OF WORKING INTEREST PARTICIPATING
                  AREAS AND BASIC PARTICIPATING INTERESTS ................. 14
  9.1  Hemlock WIPA and BPI .......................................................................... 14
  9.2  Initial Determination of WIPA .............................................................. 14
  9.3  Determination of Initial BPI ................................................................. 15
  9.4.  Redeterminations of WIPA and BPI ..................................................... 15
  9.5  Effective Date ......................................................................................... 15
  9.6  Manner of Redetermination of WIPA and BPI ..................................... 16
  9.7  Arbitration .............................................................................................. 16
ARTICLE X        APPORTIONMENT OF COSTS AND OWNERSHIP OF
                 PRODUCTION AND PROPERTY ............................................. 17
  10.1 Apportionment and Allocation of Production for Royalty Purposes ..................... 17
  10.2 Apportionment and Ownership Within a WIPA ................................... 17
ARTICLE XI       INITIAL AND FUTURE ADJUSTMENTS OF COSTS,
                 PRODUCTION AND PROPERTY ............................................. 18
  11.1 Adjustments on Initial Determination and Specified
       Redeterminations of WIPA or BPI ..................................................... 18
  11.2 Adjustments on Subsequent Redeterminations ................................... 18
ARTICLE XII      PLANS OF DEVELOPMENT .................................................... 19
  12.1 Wells and Projects Included ................................................................. 21
  12.2 Notice of Proposed Plan ....................................................................... 21
  12.3 Cessation of Operations under Plan .................................................... 21
ARTICLE XIII     DRILLING, DEEPENING, PLUGGING BACK OR
                 ABANDONMENT OF EXPLORATORY,
                 DEVELOPMENT AND INJECTION WELLS ............................... 21
  13.1 General Provisions for Exploratory, Development and Injection Wells .............. 21
  13.2 Exploratory Wells .................................................................................. 23
  13.3 Development Wells ................................................................................ 24

Unit Operating Agreement
#41015/76-216

13.4 Relinquishment and Reversion of Interests .................................................. 24

13.5 Abandonment of Production Wells ................................................................ 25

13.6 Injection Wells ................................................................................................ 26

ARTICLE XIV        REQUIRED WELLS .................................................................. 26

14.1 Definition ........................................................................................................ 26

14.2 Election to Drill ............................................................................................. 26

14.3 Alternatives to Drilling ................................................................................. 27

ARTICLE XV        ESTABLISHMENT, REVISIONS AND CONSOLIDATION
                  OF ROYALTY INTEREST PARTICIPATING AREAS ............... 27

15.1 General ............................................................................................................ 27

15.2 Procedure ....................................................................................................... 27

15.3 Revised Proposal .......................................................................................... 28

ARTICLE XVI        PLATFORMS AND PRODUCTION FACILITIES ...................... 28

16.2 Costs ............................................................................................................... 28

16.3 Use of Wells, Platforms, or Production Facilities ..................................... 28

ARTICLE XVII        CONSTRUCTION OF CERTAIN PLATFORMS,
                   PIPELINES AND OTHER FACILITIES ................................... 29

17.1 General ............................................................................................................ 29

17.2 Sub-Operator to Conduct Operations ........................................................ 29

17.3 Notice of Proposed Construction ................................................................ 29

17.4 Response to Notice ....................................................................................... 29

17.5 Participation ................................................................................................... 29

17.6 Relinquishment and Reversion of Interests ............................................... 29

ARTICLE XVIII        RIGHT TO TAKE IN KIND AND FAILURE TO
                    TAKE IN KIND - UNDERLIFTING .......................................... 31

18.1 Taking in Kind ............................................................................................... 31

18.2 Underlifting of Liquid Production ................................................................ 31

18.3 Underlifting or Balancing of Gas Production ............................................. 33

18.4 Indemnity ....................................................................................................... 35

ARTICLE XIX      UNIT EXPENSE ................................................................. 35

19.1  Basis of Charge to Parties ................................................................. 35

19.2  Budgets ................................................................................................ 36

19.3  Advance Billings ................................................................................. 36

19.4  Commingling of Funds ....................................................................... 36

19.5  Lien of Unit Operator and Sub-Operator ....................................... 36

ARTICLE XX       TITLES ................................................................................ 37

20.1  Warranty and Indemnity ................................................................... 37

20.2  Failure Because of Unit Operations ................................................ 37

ARTICLE XXI      RENTALS AND LEASE BURDENS ................................... 37

21.1  Rentals ................................................................................................. 37

21.2  Lease Burdens ..................................................................................... 37

21.3  Payments to be Borne by Parties ..................................................... 38

ARTICLE XXII     TAXES ................................................................................ 38

22.1  Taxes Upon Unit Property and Operations ..................................... 38

22.2  Other Taxes ......................................................................................... 38

22.3  Transfer of Interests .......................................................................... 38

22.4  Notices and Returns ........................................................................... 38

ARTICLE XXIII    INSURANCE ....................................................................... 39

23.1  Required Insurance ............................................................................. 39

23.2  Individual Insurance .......................................................................... 39

23.3  Contractors' Insurance ...................................................................... 39

23.4  Notice of Losses and Claims ............................................................. 40

ARTICLE XXIV    RELEASE FROM OBLIGATIONS AND SURRENDER ........... 40

24.1  Surrender or Release Within a WIPA ............................................... 40

24.2  Procedure on Surrender Outside a WIPA ........................................ 40

24.3  Accrued Obligations ........................................................................... 40

ARTICLE XXV     FORCE MAJEURE ............................................................... 41

25.1  Force Majeure ..................................................................................... 41

Unit Operating Agreement
#41015/76-216

v

ARTICLE XXVI    NOTICES ................................................................................ 41
    26.2 Proper Addresses .................................................................................. 41
ARTICLE XXVII    LIABILITY, CLAIMS AND SUITS ..................................... 42
    27.1 Individual Liability ............................................................................... 42
    27.2 Settlements ........................................................................................... 42
ARTICLE XXVIII    INTERNAL REVENUE PROVISIONS ............................... 42
    28.1 Internal Revenue Provisions ................................................................ 42
ARTICLE XXIX    EFFECTIVE DATE AND TERM ......................................... 43
    29.1 Effective Date ....................................................................................... 43
    29.2 Term ...................................................................................................... 43
ARTICLE XXX    NON-DISCRIMINATION .................................................... 43
ARTICLE XXXI    OTHER PROVISIONS .......................................................... 43
    31.1 Audits .................................................................................................... 43
    31.2 Laws and Regulations .......................................................................... 43
    31.3 Additional Burdens ............................................................................... 44
    31.4 Successors and Assigns ........................................................................ 44
ARTICLE XXXII    EXECUTION ......................................................................... 44
    32.1 Counterparts ......................................................................................... 44
    32.2 Ratification ............................................................................................ 44

# A CONFORMED VERSION OF THE

# UNIT OPERATING AGREEMENT

# TRADING BAY UNIT

# COOK INLET, ALASKA

# INCORPORATING

# THE FIRST THROUGH EIGHTH AMENDMENTS

# AND

# THE FIRST THROUGH THIRD SUPPLEMENTAL AGREEMENTS

THIS AGREEMENT, entered into as of the 27th day of February, 1967, by and between the Parties who have signed the original of this instrument, a counterpart thereof, or other instrument agreeing to be bound by the provisions hereof;

## W I T N E S S E T H :

THAT WHEREAS, the Parties hereto as Working Interest Owners have executed or ratified an agreement entitled "UNIT AGREEMENT FOR THE DEVELOPMENT AND OPERATION OF THE TRADING BAY UNIT AREA, STATE OF ALASKA", herein referred to as "Unit Agreement", covering the lands described in Exhibit "B" attached thereto, which lands are referred to in the Unit Agreement and in this Agreement as the "Unit Area";

WHEREAS, said Unit Agreement was approved by the Commissioner of the Department of Natural Resources of the State of Alaska effective as of February 27, 1967;

WHEREAS, numbered Paragraph 7 of the Unit Agreement provides for the Working Interest Owners to enter into a separate agreement in order to carry out the purposes of the Unit Agreement;

NOW, THEREFORE, in consideration of the mutual agreements herein set forth, it is agreed as follows:

# ARTICLE I

## CONFIRMATION OF UNIT AGREEMENT

1.1    <u>Confirmation of Unit Agreement</u>.  The Unit Agreement, together with all exhibits thereto, is hereby confirmed and adopted in its entirety.  If there is any conflict between this Agreement and the Unit Agreement, the Unit Agreement shall govern.

# ARTICLE II

## EXHIBITS -- APPENDICES

2.1    <u>Exhibits</u>.  The following exhibits are attached hereto and by this reference are made a part hereof:

A.    <u>Exhibit "A"</u>, which contains the methods of calculation of Basic Participating Interest, Royalty Share, Royalty Correction Factor, and Effective Participating Interest.

B.    <u>Exhibit "B"</u>, which contains a hypothetical example of the calculations described in Exhibit "A".

C.    <u>Exhibit "C"</u>, which is the Accounting Procedure for the determination of costs and expenses incurred in the conduct of operations under the Unit Agreement and this Agreement.  If there is any conflict between this Agreement and Exhibit "C", this Agreement shall govern.

2.2    <u>Appendices</u>.  The following appendices are or may hereafter be attached hereto and by this reference are made a part hereof:

A.    <u>Appendix "A</u> (containing Sub-Appendices "A-1", "A-2", et seq.), which contains maps of each Working Interest Participating Area heretofore or hereafter established by the Parties in accordance with this Agreement.  Any reference in this Agreement to Appendix "A", unless otherwise stated, shall mean that Sub Appendix of Appendix "A" applicable to the relevant Working Interest Participating Area.

B,    <u>Appendix "B"</u> (containing Sub-Appendices "B-1", "B-2", et seq.), which contains schedules of the Basic Participating Interests of each Party within each Working Interest Participating Area and descriptions of the Pools for which such Working Interest Participating Areas are established as heretofore or hereafter determined by the Parties in accordance with this Agreement.  Any reference in this Agreement to Appendix "B", unless otherwise stated, shall mean

that Sub-Appendix of Appendix "B" applicable to the relevant Working Interest Participating Area.

2.3 . Revision of Appendices. Appendix "A" and Appendix "B" shall be revised from time to time as provided in this Agreement. Unit Operator shall also revise said appendices as required to conform to changes in ownership of which Unit Operator has been notified as provided in the Unit Agreement.

ARTICLE III

DEFINITIONS

3.1    Unit Agreement. The definitions contained in the Unit Agreement are adopted for all purposes of this Agreement. In addition, each term listed below shall have the meaning stated therefor whenever used in this Agreement.

3.2    "Acre-Feet of WIPA Pay" shall mean, as to any area designated pursuant to this Agreement, the number of productive acres multiplied by the thickness (in feet) of the Pool containing Unitized Substances, determined in accordance with sound engineering principles; provided further, if oil and free gas are originally in place in the same Pool, then Acre-Feet of WIPA Pay of free gas will be multiplied by a factor which will equate ·Acre-Feet of WIPA Pay of free gas to Acre-Feet of WIPA Pay of oil on a recoverable hydrocarbon value basis.

3.3    "Basic Participating Interest" (herein sometimes referred to as "BPI" and determined as set forth in Article IX) shall mean that percentage upon which Costs and ownership of property are allocated to the interest of each Party in each individual Tract within a Working Interest Participating Area.

3.4    "Costs" shall mean all costs and expenses, other than Lease Burdens, incurred in the development and operation of each Working Interest Participating Area pursuant to this Agreement or the Unit Agreement and all other expenses that are herein made chargeable as Costs, determined in accordance with the Accounting Procedure set forth in Exhibit "C" hereto.

3.5    "Deepen or Plug Back" shall mean to perform all operations reasonably necessary and incident to Deepen or Plug Back a well, including testing, and completing or recompleting and equipping for production or injection, or plugging and abandoning.

3.6    "Development Well" shall mean any well other than an Injection Well Drilled to a location within any Working Interest Participating Area and projected to the Pool for which such Working Interest Participating Area was established.

3.7    "Drill", "Drilled" or "Drilling" shall mean to perform all operations reasonably necessary and incident to the drilling of a well, including testing, and completing and equipping for production or injection, or plugging and abandoning.

3.8    "Drilling Party" shall mean the Party or Parties obligated to bear the Costs of Drilling, Deepening or Plugging Back a well in accordance with this Agreement at the commencement of such operations.

3.9    "Effective Participating Interest" (herein sometimes referred to as "EPI") shall mean that percentage of Production from a WIPA allocated to each Party's interest in a particular Tract by this Agreement, less the Royalty Share (as defined in Exhibit "A") of Production allocated to that Party's interest in that Tract pursuant to Subsection 10.2B of this Agreement, and shall be determined as provided in Exhibit "A".

3.10   "Exploratory Well" shall mean any well other than a Development Well or an Injection Well.

3.11   "Gross Working Interest" (herein sometimes referred to as "GWI") shall mean each Party's Working Interest percentage in a particular Tract as shown on Exhibit "B" to the Unit Agreement.

3.12   "Injection Well" shall mean any well Drilled or taken over for the injection of substances for the purpose of disposal or conducting pressure maintenance or secondary recovery operations.

3.13   "Lease Burdens" shall mean the royalty reserved to the lessor in an oil and gas lease, an overriding royalty, a production payment and any other burden upon the Working Interests.

3.14   "Market Value" shall mean the arithmetical average price upon which the State of Alaska's royalty is paid and finally accepted on the Production during the relevant period from the applicable Working Interest Participating Area.

3.15   "Net Working Interest" (herein sometimes referred to as "NWI") shall mean that percentage figure obtained by deducting from 100% the basic royalty percentage for a particular Tract as shown on Exhibit "B" to the Unit Agreement.

3.16   "Non-Drilling Party" shall mean the Party or Parties who have had the right to participate in the Costs of Drilling, Deepening Or Plugging Back a well in accordance with this Agreement at the commencement of such operation and who have elected not to participate therein.

3.17   "Party" shall mean a party to this Agreement, including a party acting as Unit Operator or Sub-Operator when acting as an owner of a Working Interest.

3.18   "Pool" shall mean an underground reservoir containing, or appearing to contain, a common accumulation of oil or gas.  Each zone of a structure which is completely separated from any other zone in the same structure is a Pool.

3.19   "Production" shall mean, as to any area designated pursuant to this Agreement, all Unitized Substances produced and saved from such area, except so much thereof as is used in the conduct of operations under the Unit Agreement and this Agreement within or for the benefit of such area.

3.20   "Royalty Interest Participating Area" (herein sometimes referred to as "RIPA") shall mean any participating area established pursuant to numbered Paragraph 11 of the Unit Agreement.

3.21   "Specified Redetermination" shall mean a redetermination so designated in Section 9.1 and Subsection 9.4A.

3.22   "Sub-Operator" shall mean any Party herein or hereafter designated as a Sub-Operator by the Parties, and its successors, acting in that capacity and not as Unit Operator or as the owner of a Working Interest.

3.23   "Subsequent Redetermination" shall mean a redetermination provided for in Subsection 9.4B.

3.24   "Surface Acreage" shall mean the number of surface acres within any area designated pursuant to this Agreement whether or not such area is deemed productive of oil and/or gas.

3.25   "Tract" shall mean each parcel of land shown as such and given a Tract number and described in Exhibits "A" and "B" to the Unit Agreement.

3.26   "Unit Operator" shall mean Union Oil Company of California and its successors, as the Unit Operator designated in accordance with the Unit Agreement, acting in that capacity and not as Sub-Operator or as the owner of a Working Interest.

3.27   "Working Interest" shall mean an interest in Unitized Substances, whether held under an oil and gas lease or otherwise, including a carried Working Interest, which interest is chargeable with and obligated to pay or bear, whether in cash or out of Production or otherwise, all or a portion of the Costs of operations conducted under the Unit Agreement and this Agreement.

3.28   "Working Interest Participating Area" (herein sometimes referred to as "WIPA") shall mean any such area and Pool established by the Parties in accordance with Article IX of this Agreement.  The Pool for which each such WIPA is established shall be identified on Appendix "B" to this Agreement.

# ARTICLE IV

## SUPERVISION OF OPERATIONS BY PARTIES

4.1    Over-all Supervision.  Parties shall exercise over-all supervision and control of all matters pertaining to the development and operation of the Unit Area pursuant to this Agreement and the Unit Agreement.  In the exercise of such power each Party shall act solely in its own behalf in the capacity of an Individual Working Interest owner and not on behalf of the Working Interest owners as an entirety.

4.2    Particular Powers and Duties.  The matters to be passed upon and decided by the Parties as provided herein or in the Unit Agreement shall include, but not be limited to, the following:

A.    The appointment, removal and selection of successor Unit Operators and Sub-Operators.

B.    The enlargement or contraction of the Unit Area or a WIPA.

C.    The determination of Basic Participating Interests.

D.    The subsequent joinder of any Working Interest owner to this Agreement or to the Unit Agreement.

E.    The appointment of committees or subcommittees and the designation of their duties, for any purpose in connection with operations hereunder; provided, however, each Party shall have the right to representation on each such committee or sub-committee.

F.    The kind, character and method of operation, including any type of pressure maintenance or secondary recovery program to be employed.

G.    The adoption or submission of any plan of further development and operation of the Unit Area to the Director, Commissioner, or any regulatory body.

H.    Except as otherwise provided herein or in the Unit Agreement, the drilling of any well within the Unit Area either for production of Unitized Substances, for use as an injection well, or for other purposes.

I.    The recompletion, workover, abandonment, or change of status of any well in any WIPA or RIPA or use of any such well for injection or other purposes.

J.    The making of any single expenditure in excess of One Hundred Thousand Dollars ($100,000.00) except in the case of an emergency involving the preservation of life or property.  **(Amended 10/6/75, 1/1/90)**

K.    The selling or otherwise disposing of any major item of surplus material or equipment, the current list price of new equipment similar thereto being Five Thousand Dollars ($5,000.00) or more; provided, however, surplus material or equipment classified as junk may be disposed of by Unit Operator or the applicable Sub-Operator at prevailing prices.

L.    The authorizing of charges to the joint account for services by consultants or any Party's technical personnel not covered by the charges set forth in Exhibit "C".

M.    The taking of periodic inventories under the terms of Exhibit "C".

N.    The designation of a representative to appear before any court or regulatory body in matters pertaining to operations hereunder; provided, however, that such designation shall not prevent a Party from appearing in person or from designating another representative in its behalf and at its own expense.

## ARTICLE V

## MANNER OF EXERCISING SUPERVISION

5.1    _Designation of Representatives_.  Each Party shall advise the Unit Operator in writing of the names and addresses of its representative and alternate authorized to represent and bind it in respect to any matter pertaining to the development and operation of the Unit Area.  Such representative or alternate may be changed from time to time by written notice to Unit Operator.  Unit Operator shall promptly advise all Parties of the names and addresses of each such representative and alternate.  In addition, any corporate Party may vote through its President, or any of its Vice Presidents.

5.2.    _Meetings_.  All meetings of the Parties for the purpose of considering and acting upon any matter pertaining to the development and operation of the Unit Area shall be called by Unit Operator upon its own motion or at the request of one or more Parties.  Except in case of a bona fide emergency, no meeting shall be called on less than fourteen (14) days' advance written or telegraphic notice, with agenda for the meeting attached.  The Parties attending such meeting may amend such items included in the agenda by unanimous vote of the Parties present.  Unless otherwise agreed, all meetings shall be held in Anchorage, Alaska.  The representative of Unit Operator shall be Chairman of each meeting.

5.3    Voting Procedure.

A.    General.  In the supervision of an operations conducted by Unit Operator or a Sub-Operator, the Parties chargeable with the Costs of such operation shall have the right to vote thereon in proportion to their respective obligations for such Costs.  The Parties having the right to vote on any other matter shall vote thereon on the basis of their respective BPI in the applicable WIPA as herein provided.  In the event such other matter does not involve any WIPA, the Parties shall vote thereon on the basis of their voting power in the Hemlock WIPA. Except as provided in the Unit Agreement and except as otherwise specified herein the voting requirements are as hereinafter provided in this Section 5.3.

B.    Determination of a WIPA.  The unanimous approval of the Parties to this Agreement shall be required for the determination of a WIPA.

C.    Determination of Acre-Feet of WIPA Pay.  The unanimous approval of the Parties in the WIPA shall be required for the determination of Acre-Feet of WIPA Pay therein.

D.    Use of Wells, Platforms or Production Facilities Pursuant to Section 16.3.  The affirmative vote of the Parties having eighty-five per cent (85%) or more of the voting power as to any well, platform, or production facility shall be required for the approvals set forth in Section 16.3; provided, however, if any Party entitled to vote thereon has fifteen per cent (15%) or more of the voting power, its negative vote or failure to vote shall not defeat the matter being voted on unless such Party is supported by one or more of the other Parties entitled to vote thereon.

E.    Major Expenditures.  The affirmative vote of the Parties having eighty-five per cent (85%) or more of the voting power shall be required for the approval of an expenditure for any single project exceeding One Million Five Hundred Thousand Dollars ($1,500,000.00).  In the event that more than one WIPA is to be served by such proposed expenditure, the affirmative vote of the Parties having eighty-five per cent (85%) or more of the voting power in each WIPA to be served shall be required for such approval.

Notwithstanding the provisions Of this Subsection 5.3 E, if any Party entitled to vote thereon has fifteen per cent (15%) or more of the voting power as to any such WIPA, its negative vote, or failure to vote, shall not defeat the matter being voted on unless such Party is supported by one or more of the other Parties entitled to vote thereon as to that WIPA.

F.    <u>Secondary Recovery and Pressure Maintenance Programs</u>. The affirmative vote of the Parties having eighty-five per cent (85%) or more of the voting power as above provided shall be required for the approval of secondary recovery and pressure maintenance projects; provided, however, if any Party entitled to vote thereon has fifteen per cent (15%) or more of the voting power, its negative vote or failure to vote shall not defeat the matter being voted on unless such Party is supported by one or more of the other Parties entitled to vote thereon.

G.    <u>All Other Matters</u>. Except as provided in Subsections 5.3B, 5.3C, 5.3D, 5.3E and 5.3F and except as to matters specifically delegated to Unit Operator or Sub-Operators by the Unit Agreement or this Agreement, the affirmative vote of Parties having eighty per cent (80%) or more of the voting power shall be required for approval of all other matters; provided, however, if any two Parties have a combined voting power of seventy-five per cent (75%) or more but less than ninety-five per cent (95%) on such matter, their affirmative votes must be supported by one or more other Parties having a combined voting power of at least five per cent (5%) on such matter; and provided further, if any Party entitled to vote thereon has twenty per cent (20%) or more of the voting power, its negative vote, or failure to vote, shall not defeat the matter being voted on unless such Party is supported by one or more of the other Parties entitled to vote thereon.

5.4    <u>Additional Voting Provisions</u>. A Party failing to vote shall be deemed to have voted in the negative. In all cases, if only two Parties are entitled to vote, the vote of the one with the greater relevant BPI shall prevail.

5.5    <u>Absentee Voting</u>. Any Party not represented at a meeting may vote on any item included in the agenda upon which that Party is entitled to vote. Such absentee vote shall be by letter or telegram addressed to the Chairman of the meeting provided such vote is received prior to the submission of such item to vote. Such vote shall not be counted with respect to any item on the agenda which is amended at the meeting.

5.6    <u>Poll Votes</u>. The Parties may decide any matter by vote taken by letter or telegram, provided the matter is first submitted to each Party entitled to vote thereon and no meeting on the matter is called as provided in Section 5.2 within ten (10) days after such proposal is dispatched to such Parties. Unit Operator will give prompt notice of the results of such voting to all such Parties. Any such Party failing to vote within the time stated in such letter or telegram shall be deemed to have voted in the negative.

5.7    <u>Vote Binding on Parties</u>. Any approval, direction, consent, determination, redetermination, agreement, stipulation, designation or other decision of the Parties provided for in this Agreement which receives the affirmative vote herein specified shall be deemed given by and shall be binding upon all Parties to this Agreement, except as otherwise specified herein.

## ARTICLE VI

## INDIVIDUAL RIGHTS OF PARTIES

6.1    Reservation of Rights.  The Parties severally reserve to themselves all their rights, except as otherwise provided in this Agreement and the Unit Agreement.

6.2    Specific Rights.  Each Party owning a Working Interest in a WIPA shall have, among others, the following specific rights:

A.    Access to WIPA.  Access to such WIPA and operations being conducted for the benefit thereof at all reasonable times to inspect such operations, wells, and the records and data pertaining thereto.

B.    Reports.  The right to receive from Unit Operator or from Sub-Operator copies of all reports to any governmental agency, reports of crude oil runs and stocks, inventory reports, well logs, engineering and geological data and all other information pertaining to operations hereunder.  All such reports and information shall be limited to factual and not interpretative data, unless accomplished by or charged to the Parties.  The cost of gathering and furnishing information not ordinarily furnished by Unit Operator or Sub-Operator to the Parties shall be charged to the Party who requests the information.

## ARTICLE VII

## UNIT OPERATOR AND SUB-OPERATORS

7.1    Initial Unit Operator.  Union Oil Company of California is hereby designated as Unit Operator.

7.2    Sub-Operator.  Union Oil Company is hereby designated as Sub-Operator of the following facilities and pipelines:

Dolly Varden Platform and Pipelines;
Grayling Platform and Pipelines;
North McArthur River (King Salmon) Platform and Pipelines;
Steelhead Platform and Pipelines; and
Trading Bay Unit Production Facility and Pipelines.
**(Amended 12/1/94)**

7.3    Resignation or Removal of Unit Operator and Selection of Successor.  Unit Operator may resign or be removed for good cause and a successor Unit Operator shall be selected as provided in numbered Paragraphs 5 and 6 of the Unit Agreement.

7.4    <u>Resignation or Removal of Sub-Operators and Selection of Successors</u>. Any Sub-Operator shall have the right to resign at any time, but such resignation shall not become effective so as to release such Sub-Operator from its duties and obligations and terminate its rights as such for a period of six months after notice of intention to resign has been served by a Sub-Operator on all Parties, unless a new Sub-Operator shall have been selected and approved and shall have taken over and assumed the duties and obligations of that Sub-Operator prior to the expiration of said period.

In all instances of resignation or removal, until a successor Sub-Operator is selected and approved as hereinafter provided, the Parties shall be jointly responsible for performance of the duties of that Sub-Operator, and shall not later than 30 days before such resignation or removal becomes effective appoint a common agent to represent them in any action to be taken hereunder.

The resignation of a Sub-Operator shall not release that Sub-Operator from any liability for any default by it hereunder occurring prior to the effective date of its resignation.

Any Sub-Operator may, upon default or failure in the performance of its duties or obligations hereunder be subject to removal by a vote representing eighty-five per cent (85%) or more of the voting power of the Parties in the Hemlock WIPA. Such removal shall be effective upon notice thereof to the Parties

The resignation or removal of a Sub-Operator under this Agreement shall not terminate its right, title, or interest as the owner of a Working Interest or other interest in Unitized Substances, but upon the resignation or removal of a Sub-Operator becoming effective such Sub-Operator shall deliver possession of all equipment, materials, and appurtenances used in conducting the Unit operations and owned by the Parties to the new duly qualified successor Sub-Operator or to the owners thereof if no such new Sub-Operator is elected, to be used for the purpose of conducting Unit operations hereunder. Nothing herein shall be construed as authorizing removal of any material, equipment and appurtenances needed for the preservation of any wells.

Whenever the Sub-Operator shall resign, or shall be removed as hereinabove provided, or a change of a Sub-Operator is negotiated by the Parties, the Parties in the Hemlock WIPA shall, by a vote of eighty-five per cent (85%) or more of their voting power, select a successor Sub-Operator. Such selection shall not become effective until a Sub-Operator so selected shall accept in writing the duties and responsibilities of Sub-Operator.

## ARTICLE VIII

## AUTHORITIES AND DUTIES OF UNIT OPERATOR AND SUB-OPERATORS

8.1    Unit Operator.

A.    General Duties.  Unit Operator shall coordinate the activities of the Sub-Operators and all committees and subcommittees in accordance with plans and procedures approved as herein provided.  Unit Operator shall be responsible for submitting all required reports to the State of Alaska and other regulatory authorities and shall, subject to Subsection 4.2N, represent the Parties at hearings or other meetings held by any regulatory bodies pertaining to operations hereunder.

Unit Operator shall keep advised of daily activities being carried out within or for the benefit of the Unit Area; make recommendations of its own or submit those of any Party, Committee or Sub-Committee to the Parties; coordinate transportation, communication and other operations and services among the various Sub-Operators, platforms, pipelines, and shore sites; and carry out any other duties or assignments given to Unit Operator by the Parties.

B.    Records.  Unit Operator shall be responsible for keeping correct books, accounts and records of Unit operations, coordinating any accounting work being done by various Sub-Operators, and sending to each Party, in accordance with the Accounting Procedure in Exhibit "C", a statement incorporating cost and production accounting.

C.    Reports.  Unit Operator shall furnish reports of Unit operations as required by the Parties.

8.2    Sub-Operators.

A.    General Duties.  Pursuant to the provisions of this Agreement, Sub-Operators shall have the exclusive right and duty to conduct Unit operations according to plans and procedures as specified by the Parties and to do all things necessary and consistent therewith, including the execution of all contracts as Sub-Operator which affect drilling, reworking and servicing of wells, construction of facilities, and the purchasing of supplies, and shall prepare or assist in the preparation of any and all applications, reports, or other documents required by any governmental agency.

B.    Records and Reports.  Each Sub-Operator shall keep correct books, accounts and records and shall furnish the Parties with periodic reports of operations conducted by it pursuant to this Agreement.

C.    Wells Drilled, Deepened or Worked over by Sub-Operator.  All wells drilled by Sub-Operators through independent contractors shall be at not more than the usual rates prevailing in the area.  A Sub-Operator may employ its own tools and equipment, but the charge therefor shall be at actual cost, but not to exceed the prevailing rate in the area, and the work shall be performed by that Sub-Operator under terms and conditions customary in the area in contracts of independent contractors doing work of a similar nature.

8.3    Unit Operator and Sub-Operators.

A.    Workmanlike Conduct.  Unit Operator and each Sub-Operator shall conduct all Unit operations in a good and workmanlike manner.  Unit Operator and Sub-Operators shall not be liable to the Parties for damages, unless such damages result from their gross negligence or willful misconduct.

B.    Liens and Encumbrances.  Unit Operator and each Sub-Operator shall endeavor to see that the lands and leases in the Unit Area are kept free from all liens and encumbrances occasioned by Unit operations, except the liens of Unit Operator and Sub-Operators granted hereunder.

C.    Employees.  All individuals employed by Unit Operator and each Sub-Operator in conducting Unit operations shall be the employees of that party employing same, and their selection, hours of labor, compensation, and all other matters relating to their employment shall be determined by such party.

D.    Expenditure Approval.

1.    The Operator and Sub-Operators shall have the right to make expenditures up to an aggregate of one hundred thousand dollars ($100,000.00) for any single project of any kind without prior written consent of all Parties. (Amended 10/6/75, 1/1/90)

2.    For all projects exceeding twenty-five thousand dollars ($25,000.00), but less than one hundred thousand dollars ($100,000.00), an informational Authority for Expenditure (AFE) shall be prepared by the Operator or Sub-Operator and supplied by the Operator to all other Parties.  (Amended 10/6/75, 1/1/90)

3.    All projects exceeding one hundred thousand dollars ($100,000.00) shall require approval of the Parties.  An AFE shall be prepared by the Operator or Sub-Operator and supplied by the Operator to all other Parties for approval.  Response to a Request for Approval shall be given to the Operator within sixty (60) days after receipt of the request.  A party failing to vote shall be

deemed to have voted in the negative. The provisions of Article 26 shall apply hereto. **(Amended 10/6/75, 1/1/90)**

4.    If, at any time, it becomes apparent that expenditures for an AFE and any Supplemental AFE's for such item previously approved pursuant to this Subsection 8.3D will be or has exceeded the authorized limit by ten percent (10%) or fifty thousand dollars ($50,000.00) whichever is greater, or by one million dollars ($1,000,000.00), the Operator or Sub-Operator shall notify the Parties and shall, without delay, prepare a Supplemental AFE. A Supplemental AFE should also be prepared for an informational AFE if it becomes apparent that expenditures will have or have exceeded the $100,000.00 formal AFE threshold. The Supplemental AFE shall include reasons for the increased costs, and shall request approval for the additional commitment. The Operator or Sub-Operator shall give verbal notification to the Parties advising that a Supplemental AFE may be required. **(Amended 10/6/75, 1/1/90)**

5.    Unless otherwise stated in an AFE or Supplemental AFE, the approval granted for the project described in the AFE or Supplemental AFE will be cancelled if no work has been performed or money spent on the project six (6) months after the AFE or Supplemental AFE has received requisite approval, or six (6) months after proposed start date, whichever occurs first. **(Amended 10/6/75, 1/1/90)**

6.    If any emergency occurs, Operator or any Sub-Operator may immediately make or incur such expenditures as in its opinion are required to deal with the emergency. Operator or Sub-Operator shall report to the Parties as promptly as possible the nature of the emergency and the action taken and, as soon as practical, prepare an AFE if otherwise required by the provisions of this Sub-section 8.3D. **(Amended 10/6/75, 1/1/90)**

## ARTICLE IX

## DETERMINATION OF WORKING INTEREST PARTICIPATING AREAS AND BASIC PARTICIPATING INTERESTS

9.1    <u>Hemlock WIPA and BPI</u>. The initial determination of the WIPA and BPI for the Hemlock WIPA, as shown on appendices "A-1" and "B-1", respectively, have been made by the Parties. Specified Redeterminations for the Hemlock WIPA shall be made effective as of July 1, 1968 (First Redetermination), January 1, 1970 (Second Redetermination), July 1, 1971 (Third Redetermination) and January 1, 1973 (Fourth Redetermination).

9.2    Initial Determination of WIPA.  Upon the request of any Party, representatives of the Parties shall meet for the purpose of making the initial determination of a WIPA for each other Pool heretofore or hereafter discovered which is capable of producing Unitized Substances.  Each such WIPA shall be determined in accordance with sound engineering principles by unanimous agreement of the parties, and shall include all of each governmental quarter section if any portion thereof lies within the area reasonably deemed to be capable of producing Unitized Substances from that Pool. Each such WIPA and its effective date shall be shown on Appendix "A" hereto.

9.3    Determination of Initial BPI.  Upon the initial determination of each WIPA, representatives of the parties in that WIPA shall meet for the purpose of determining each Party's initial BPI in each Tract within that WIPA as provided in Subsection 1.A of Exhibit "A".  Each such BPI, each Party's total BPI in that WIPA, and the effective date thereof shall be shown on Appendix "B".

9.4.    Redeterminations of WIPA and BPI.

A.    Specified Redeterminations.  Specified Redeterminations, referred to as First Redetermination, Second Redetermination, and Third Redetermination, respectively, of the WIPA and BPI of each WIPA, other than the Hemlock WIPA, shall be made effective as of one and one-half years, three years, and four and one-half years subsequent to the effective date of the initial determination of that WIPA.

B.    Subsequent Redeterminations.  Subsequent Redeterminations, including those of the Hemlock WIPA and BPI, shall be made thereafter not more than once each calendar quarter upon the joint request of two or more Parties to the Unit Operator and not more than once each twelve months if such request is made by a single party, and shall be made only if based upon information and data obtained from the Drilling, Deepening, or Plugging Back of a well subsequent to the last prior redetermination.  Only Parties in a WIPA shall be entitled to request a redetermination of the BPI in that WIPA.

C.    Effect of Change of Unit Area.  No change shall be made in any WIPA or BPI solely as the result of contraction of the Unit Area, and, as among the Parties hereto, any WIPA lands excluded from the Unit Area shall continue to be subject to the terms and conditions of this Agreement and as among the Parties hereto shall continue to be a portion of the WIPA and no redetermination of Acre Feet of WIPA Pay in any such lands shall be made except as the result of information and data obtained from the Drilling, Deepening or Plugging Back of a well in the then Unit Area.

9.5    <u>Effective Date</u>.  Each initial determination and redetermination shall be effective as of 7:00 A.M. Alaska Standard Time on its effective date.  Each initial determination and all Subsequent Redeterminations shall be effective as of such time the first day of the month of the request therefor.

9.6    <u>Manner of Redetermination of WIPA and BPI</u>.

A.    <u>WIPA</u>.  Within thirty (30) days after each of the dates provided for in Sections 9.1, 9.4, and 9.5 for each Specified Redetermination and any Subsequent Redetermination of any WIPA, representatives of the Parties shall meet for the purpose of reviewing the information and data available as of the particular effective date and redetermining that WIPA in the same manner as provided for its initial determination in Section 9.2.  Appendix "A" shall be revised to reflect any such redetermination and its effective date.

B.    <u>BPI</u>.  Within thirty (30) days after each of the dates provided for in Sections 9.1, 9.4, and 9.5 for each Specified Redetermination and any Subsequent Redetermination of the BPI in a WIPA, representatives of the Parties in that WIPA shall meet for the purpose of reviewing the information and data available as of the particular redetermination date in order to redetermine such BPI.  Such redetermination shall be made as provided in Subsection 1.B of Exhibit "A".  Upon such redetermination Appendix "A" shall be revised to reflect such redetermination of each BPI in that WIPA, each Party's total BPI in that WIPA, and the effective date thereof, and appropriate adjustments will be made as provided in Article XI.

9.7    <u>Arbitration</u>.  In the event the Parties fail, for a period of at least thirty (30) days after any meeting called pursuant to Sections 9.2, 9.3, or 9.6 has convened, to make any determination or redetermination for which that meeting has been called, any party who may be directly affected by the determination or redetermination may request in writing that the matter be submitted to arbitration, and, unless all such requests are withdrawn, such determination or redetermination shall be made by arbitration in accordance with the rules of the American Arbitration Association, and the award of the arbitrator, absent collusion or fraud, shall be conclusive and binding upon the Parties.  The Parties shall choose, in accordance with the applicable voting procedure set forth for this Article IX, as arbitrator one of the following consulting firms, including successor firms, which continues in existence and accepts appointment hereunder as arbitrator; J. J. Araps, Babson & Burns, Core Laboratories, Inc., DeGolyer & McNaughton, H. J. Gruy & Associates, James A. Lewis Engineering, Inc., or any other mutually agreeable firm; provided, if the Parties are unable to select an arbitrator in accordance with the applicable voting procedure, or if no firm which is selected accepts appointment hereunder as arbitrator, then a consulting firm of appropriate professional acumen and integrity shall be appointed by the Senior Federal Judge resident in Anchorage, Alaska, from the names of

consulting firms supplied by the parties. The parties shall supply full and adequate information to the arbitrator acting hereunder, and the Parties and arbitrator shall cooperate and act expeditiously, time being of the essence of the reference to arbitration hereunder, to the end that the award of the arbitrator shall issue not later than sixty (60) days after it commences its duties under this Section 9.7.

The arbitration procedures hereinabove provided shall apply only to such parameters or factors as to which the Parties are unable to agree and such arbitrator shall make a decision on the matters submitted to it for arbitration which are within the scope of its authority.

All costs of arbitration shall be borne by the parties in the relevant WIPA, in proportion to their respective BPI thereby determined.

## ARTICLE X

## APPORTIONMENT OF COSTS AND OWNERSHIP OF PRODUCTION AND PROPERTY

10.1    Apportionment and Allocation of Production for Royalty Purposes. Production for royalty purposes shall be allocated to each Tract of Unitized Land on the basis provided in the Unit Agreement and shall be paid by the Unit Operator to the State of Alaska from Production received from the parties for this purpose pursuant to Subsection 10.2B.

10.2    Apportionment and Ownership Within a WIPA. For each WIPA the apportionment of Costs and ownership of Production and property among the Parties in that WIPA shall be upon the following bases:

A.    Costs. All costs incurred in the development and operation of that WIPA for or in connection with Production of Unitized Substances from the Pool for which that WIPA is established shall be borne by the Parties in that WIPA upon the basis of their respective total BPI in that WIPA, determined as of the time such Costs are incurred; subject, however, to adjustments in accordance with Subsections 11.1A and 11.2A.

B.    Production. The Production from a WIPA shall be allocated separately to the parties therein on the basis of their respective BPI within that WIPA. Each Party receiving such Production shall pay to the Unit Operator, who shall in turn pay to the State of Alaska that proportionate part thereof representing the Royalty Share, or the amount received from the sale thereof if the State elects not to take in kind, as defined and calculated in the manner set forth In Exhibit "A" to this Agreement. In agreeing to this method of allocation, it is intended and

agreed by the parties that any difference in the total royalty rate applicable to the Production from any WIPA as opposed to what the total royalty rate applicable to that Production would have been if the State had accepted the method of allocation (BPI) adopted by the Parties will accrue to the parties in that WIPA, as a burden or as a benefit, as the case may be in the same proportion in which Production is allocated to such parties on the basis of BPI.

     C.    <u>Property</u>.  All material, equipment and other property, whether real or personal, the cost of which is chargeable as Costs and which are acquired in connection with the development and operation of that WIPA, or the proceeds from the sale thereof, shall be owned by the parties in that WIPA upon the basis of their respective total BPI within that WIPA; subject, however, to adjustments in accordance with Subsections 11.1C and 11.2C.

<u>ARTICLE XI</u>

<u>INITIAL AND FUTURE ADJUSTMENTS OF COSTS,
PRODUCTION AND PROPERTY</u>

    11.1   <u>Adjustments on Initial Determination and Specified Redeterminations of WIPA or BPI</u>.  Adjustments of Costs, Production and property on the initial determination and Specified Redeterminations of a WIPA or BPI shall be accomplished in the following manner:

     A.    <u>Costs</u>.  Within sixty (60) days after the Parties in a WIPA have completed the initial determination, and within sixty (60) days after each Specified Redetermination of BPI as set forth in Article IX and Exhibit "A" to this Agreement, Unit Operator and each Sub-Operator shall furnish the Parties in that WIPA with revised billings showing all Costs incurred and paid by it in the development and operation of that WIPA prior to the effective date of that initial determination or Specified Redetermination.  All such billings shall show the portion of these Costs to be borne by each Party upon the basis of its determined or redetermined BPI and the adjustment required between this amount and that actually paid by such Party.  Upon receipt of each such billing, each Party who has paid less than its determined or redetermined BPI share shall promptly pay in cash the amount of the adjustment required, together with interest thereon at the rate of one-half of one per cent (1/2 of 1%) per month from the month during which each portion of the Costs was paid.  Each such payment shall be made to Unit Operator who shall distribute the same to those Parties entitled thereto upon the basis of the advances made by such latter Parties for the account of the Parties who have paid less than their determined or redetermined BPI share.

B.    Production. Within thirty (30) days after each such initial determination and within thirty (30) days after each Specified Redetermination, Unit Operator shall furnish each Party in the WIPA a statement which sets forth: (1) the amounts of the EPI and BPI shares of Production actually taken by each Party; (2) the amounts of the EPI and BPI shares of Production each Party was formerly entitled to take; and (3) the amounts of Production that each Party was entitled to take on the basis of the initially determined or redetermined EPI and BPI. If, as a result of the revision of BPI, it is shown that a Party has been allocated more than its revised EPI share of Production, then that Party shall owe those Parties who have been allocated less than their revised EPI share of Production for the Production allocated in excess of such revised EPI share. A Party's failure to take or otherwise dispose of its proportionate share of Production shall be disregarded in computing such adjustments. Each owing Party shall have the option of making such adjustments immediately in cash or out of not less than twenty per cent (20%) of such Party's BPI share of future Production to the end that such adjustment shall be completed not later than three (3) years after the effective date of the relevant determination or redetermination. Such adjustments shall be made solely on the basis of volume and any adjustment out of future Production not completed at that time shall be completed immediately in cash. In the event such Party has no BPI as a result of such revision, such adjustment shall immediately be made in cash. The amounts of each adjustment shall be distributed among the Parties with increased EPI's in proportion to their respective increases therein, so that each such Party will receive its EPI share of Production or the value thereof.

Whenever such adjustments are made in cash, the value shall be the Market Value of the Production as of the effective date of the relevant determination or redetermination.

C.    Property. As of each of the effective dates of the initial determination and of each Specified Redetermination, all materials, equipment and other property, whether real or personal, the cost of which was chargeable as Costs and which were acquired in connection with the development or operation of that WIPA, or the proceed from the sale of any such materials, equipment or other property, shall be owned by the Parties upon the determined or redetermined basis, subject to adjustment as provided in this Agreement.

11.2    Adjustments on Subsequent Redeterminations. Adjustment of Costs, Production, and property on any Subsequent Redeterminations of a WIPA or BPI shall be accomplished in the following manner:

A.    Costs. Within sixty (60) days after the Parties in a WIPA have completed a Subsequent Redetermination of BPI, Unit Operator and each Sub-

Operator involved shall furnish the Parties in that WIPA with a billing showing all Costs incurred and paid by it in the development of that WIPA prior to the effective date of that Subsequent Redetermination, less the Costs of any well which has been abandoned, and not including "Operating" costs as defined in Exhibit "C". All such billings shall show the portion of such costs to be borne by each Party upon the basis of its redetermined BPI and the adjustment required between this amount and that actually paid by such Party, adjusted for depreciation as provided in this Subsection 11.2A. Upon receipt of each such billing, each Party who has paid less than its redetermined BPI share shall promptly pay in cash the amount of the adjustment required. Depreciation on such costs classified as tangible and intangible (in conformity with accounting procedures generally accepted in the industry) shall be computed at the following rates for each month from the month during which the property represented by such costs was usable:

(1) one-half of one per cent (1/2 of 1%) per month for a cumulative total of one hundred (100) months, and (2) zero per cent (0%) per month in excess of said cumulative total.

Each such payment shall be made to Unit Operator who shall distribute the same to those Parties entitled thereto upon the basis of the advances made by such latter Parties for the account of the Parties who have paid less than their redetermined BPI share.

B.    Production.  There shall be no adjustment of Production prior to the effective date of any Subsequent Redetermination as a result of such redetermination. Production subsequent to the effective date of each Subsequent Redetermination shall be adjusted in the manner provided for adjustments after the initial determination or Specified Redeterminations in Subsection 11.1B. Statements relating to Production which Unit Operator is required to furnish shall be limited to the period subsequent to the effective date of the relevant Subsequent Redetermination.

C.    Property.  As of the effective date of any Subsequent Redetermination, all materials, equipment and other property, whether real or personal, the cost of which was chargeable as Costs and which were acquired in connection with the development or operation of that WIPA, or the proceeds from the sale of any such materials, equipment or other property made subsequent to the effective date of that Subsequent Redetermination, shall be owned by the Parties upon the redetermined basis, subject to adjustment as provided in this Agreement.

## ARTICLE XII

## PLANS OF DEVELOPMENT

12.1    Wells and Projects Included.  Each plan for the development and operation of the Unit Area which is submitted by Unit Operator to the Director in accordance with the Unit Agreement shall make provision only for such Drilling, Deepening and Plugging Back operations and such other projects as have been approved by the parties as provided herein.

12.2    Notice of Proposed Plan.  At least thirty (30) days before submitting any such proposed plan to the Director, Unit Operator shall give each party written notice thereof, together with a copy of the proposed plan.  Within fifteen (15) days after receipt of the notice and plan, each Party shall advise Unit Operator of its approval or suggested revisions in those portions of the plan as to which it is entitled to vote pursuant to Article V of this Agreement.  If the plan receives the vote of approval required in Article V of this Agreement, then Unit Operator shall file the plan with the Director.  If the plan fails to obtain approval, Unit Operator will endeavor to make revisions that meet with approval of the parties.

12.3    Cessation of Operations under Plan.  If any such plan as approved by the Director provides for the cessation of any Drilling or other operations therein provided for on the happening of a contingency and if such contingency occurs, Sub-Operator shall promptly cease such Drilling or other operations and shall not incur any additional costs in connection therewith unless and until such Drilling or other operations are again authorized in accordance with this Agreement by the Parties chargeable with such Costs.

## ARTICLE XIII

## DRILLING, DEEPENING, PLUGGING BACK OR ABANDONMENT OF EXPLORATORY, DEVELOPMENT AND INJECTION WELLS

13.1    General Provisions for Exploratory, Development and Injection Wells.

A.    General.  The Drilling, Deepening, Plugging Back or abandoning of a well within the Unit Area shall be conducted only in accordance with the provisions of this Article XIII, except as provided in Article XIV and Article XVI. For the purposes of this Article XIII, reference to Parties shall mean all Parties to this Agreement in the case of Exploratory Wells and all parties in the relevant WIPA in the case of Development and Injection Wells.

B.    Sub-Operator to Conduct Operations.  All Drilling, Deepening, Plugging Back, and abandoning operations shall be conducted by the designated Sub-Operator; provided, however, if such operations are to be conducted from a

facility for which no Sub-Operator has been designated, the Parties participating in the Costs thereof shall designate the Sub-Operator.

C.    Notice of Proposed Operations.  Any Party may propose the Drilling, Deepening or Plugging Back or abandoning of a well by giving each of the other Parties written notice which, except in the case of abandoning operations, shall specify the surface location, bottom hole location (which location shall conform to any applicable spacing pattern theretofore adopted or then being followed or an authorized exception thereto), depth and estimated cost of the proposed well.  No Party shall propose the Drilling of a well hereunder the Drilling of which requires the construction of a permanent platform.

D.    Response to Notice.  Within thirty (30) days after receipt of such notice, each Party shall advise all other Parties, in writing, whether or not it approves and desires to participate in such operations.  If the Parties approve such operations, then the proposed operations shall be conducted by the designated Sub-Operator.  If any Party fails to respond to such notice within said thirty (30) day period, it shall be deemed to have failed to approve such proposed operation and to have elected not to participate therein.

Notwithstanding the provisions of the foregoing paragraph, if a drilling rig has suspended operations awaiting approval of redrilling, Deepening, Plugging Back or abandoning of a well, then the Parties receiving such notice shall have forty-eight (48) hours (exclusive of Saturdays, Sundays and legal holidays) after receipt thereof within which to notify the Parties giving such notice whether they approve and desire to participate in the proposed operations.  All such notices given under this paragraph shall be by telephone, telegraph or telewriter.

E.    Fewer Than All Parties.  Whenever all parties entitled to participate in approved operations fail to agree to participate, then within fifteen (15) days after expiration of said thirty (30) days' notice period or within twenty-four (24) hours (exclusive of Saturdays, Sundays and legal holidays) after expiration of said forty-eight (48) hour notice period, each such party who desires to participate in the approved operations shall give to the other Parties written notice (or in the case of the twenty-four (24) hour notice period, by telephone, telegraph, or telewriter) of election to participate in such approved operations.  Failure to give such notice shall be deemed an election not to participate.

Unless otherwise agreed by the parties, the entire cost, risk, liability and expense of the Drilling, Deepening, or Plugging Back of a Development or Exploratory Well by fewer than all the Parties shall be borne by the parties comprising the Drilling party in proportion to their respective interests in such operation as hereinafter provided.