No operations by fewer than all parties shall be conducted in such a manner as to interfere or conflict with any other Unit operations, except as provided in Article XIV.

F.    Abandonment of Non-Productive Well.  In the event the proposed operation is the abandonment of a non-productive well other than a Hemlock WIPA well, then the notice required in Subsection 13.1C shall also be given to the Parties in the Hemlock WIPA.  If the Parties in the Hemlock WIPA give notice of election, in the manner provided in Subsection 13.1D, to take over said well and if the parties participating in the Costs of said well approve the proposed abandonment, then the Parties in the Hemlock WIPA shall take over said well upon such terms and conditions as may be agreed, otherwise said well shall be abandoned as provided in Subsection 13.1D.

G.    Use of Equipment.  In the case of any Plugging Back or Deepening operation, the Drilling Party shall purchase, at salvage value, all casing, tubing and other equipment in the well.

13.2   Exploratory Wells.

A.    Right to Drill.  If any party desires to Drill, Deepen or Plug Back a well as an Exploratory Well, the it shall have the right to do so under the provisions of this Article XIII.

B.    Drilling from Floating Platforms.  The Drilling of an Exploratory Well from a floating platform or drilling barge shall be outside the scope of this Agreement, but except as provided in the last paragraph of Subsection 13.1E, nothing herein contained shall be deemed to prevent the Drilling of such a well on a Tract by a Party owning a Working Interest therein.

C.    Operations and Participation.  The Drilling, Deepening or Plugging Back of an Exploratory Well from any facility other than a floating platform or drilling barge shall be accomplished in the following manner:

In the event the proposed operation receives the approval of the Parties as provided in Subsection 13.1D or 13.1E, then each owner of a Working Interest in the Tract in which such operation is to be conducted shall have the right to participate in proportion to its Working Interest in that Tract.  Unless one or more of the Owners of Working Interests in that Tract elect to conduct such operations at its sole cost, risk and expense as provided in Subsection 13.1E, all Parties shall have the right to participate in such operations in proportion to their respective BPI in the Hemlock WIPA, in accordance with the provisions of Subsection 13.1E.

Notwithstanding the provisions of this Subsection 13.2C, no approval of the Parties shall be required for the Drilling, Deepening or Plugging Back of an Exploratory Well from a location on land if such operation is to be conducted by a Party owning a Working Interest in the Tract in which the bottom hole location is proposed.

13.3    Development Wells.

A.    Right to Drill.  If any Party desires to Drill, Deepen, or Plug Back a well as a Development Well, then it shall have the right to do so under the provisions of this Article XIII.

B.    Operations and Participation.  The Drilling, Deepening or Plugging Back of a Development Well shall be accomplished in the following manner:

In the event the proposed operation receives the approval of the Parties as provided in Subsection 13.1D or 13.1E, each Party in that WIPA shall have the right to participate therein in proportion to its BPI in that WIPA.

13.4    Relinquishment and Reversion of Interests.

A.    Operations by Less than All Parties.  In Order for the Drilling Party to receive the benefits of this Section 13.4, the proposed operations shall be commenced within one hundred twenty (120) days after the expiration of the notice period provided in Subsection 13.1D or 13.1E, whichever is the later date. Each Drilling Party shall participate in the proposed operations in the proportion that its BPI bears to the total BPI of all Drilling Party in the relevant WIPA.

B.    Relinquishment of Interest by Non-Drilling Party.  When a well which is Drilling, Deepening or Plugged Back by less than all Parties entitled to participate therein, is completed as a producer of Unitized Substances, each Non-Drilling Party shall be deemed to have relinquished to the Drilling Party all of its operating rights and Working Interest in and to such Well, and Drilling Party shall make, or cause to be made, payments for Lease burdens in respect of Production from said well, in accordance with Section 21.2.

C.    Reversion of Relinquished Interest.  The operating rights and Working Interests relinquished by a Non-Drilling Party shall revert to it at such time as the Market Value of that Non-Drilling Party's EPI share of the Production obtained from the well after such relinquishment (after deducting from such Market Value all taxes upon or measured by Production and all Lease Burdens other than the State's Royalty Share on said portion thereof) shall equal the total of the following:

(1)    One hundred per cent (100%) of that portion of the Costs incurred in operating the well (including the portion of costs of acquisition or use of platforms, pipelines or other facilities attributable to such operations by less than all Parties, but excluding the Costs provided for in Subsection 13.4C(2)) that would have been charged to such Non-Drilling Party had all Parties entitled thereto participated therein; and

(2)    Six hundred per cent (600%) in the case of an Exploratory Well, or four hundred per cent (400%) in the case of a Development Well, of that portion of the Costs incurred by Drilling Party in the Drilling, Deepening, or Plugging Back of said well, through and including the wellhead connections, that would have been chargeable to such Non-Drilling Party had all Parties entitled thereto participated therein.

D.    Effect of Reversion.  From and after reversion to a Non-Drilling Party of its relinquished interest in a well, such Non-Drilling Party shall share in the ownership of the well, the operating rights and Working Interest therein, the materials and equipment in or pertaining to the well, the Production therefrom and the Costs of operating the well as otherwise provided in this Agreement.

13.5   Abandonment of Production Wells.  No well which is producing or has once produced, shall be abandoned without approval of the Parties then owning a Working Interest therein.  If such approval is not obtained, then the Parties not desiring to abandon shall pay to such other Party the latter Party's proportionate share of the fair market value of the salvable material and equipment in and on such well determined at the time such abandonment is proposed, less such latter Party's estimated share of the cost of abandonment.  Upon receipt of said sum, the Party desiring to abandon said well shall assign to the other Parties, without warranty of title, all of its operating rights and Working Interest in the well and all subsequent Production therefrom, as to the Pool from which said well is then producing, or has once produced, but not as to any other Pool and all of its interest in the material and equipment in and on said well.  If such assignment or conveyance shall run in favor of more than one Party hereto, the interest covered thereby shall be shared by such Parties in the proportion that the interest of each Party assignee bears to the interest of all Parties assignee.

In the event the abandonment is of a well other than a Hemlock WIPA well, the Party proposing such abandonment shall give the notice required in Subsection 13.1C to the Parties in the Hemlock WIPA.  If the Parties in the Hemlock WIPA give notice of election, in the matter provided in Subsection 13.1D, to take over said well and if the Parties then owning a Working Interest in said well approve the proposed abandonment, the Parties in the Hemlock WIPA shall take over said well upon such terms and conditions as may be agreed.  Unless at the direction of the Parties the well is to be taken

over for use in Unit operations, the Sub-Operator shall plug and abandon the well for the account of the parties owning a Working Interest therein.

As used in this Section 13.5, "well" shall be deemed to apply separately to each Pool from which that well is then producing or has produced, and the value of the salvable material and equipment therein shall be attributed in proportion to the ownership thereof.

13.6    Injection Wells.  The Costs of Drilling, Deepening or Plugging Back, abandoning, or taking over a well as an Injection Well shall be borne by all the parties in the WIPA for which the well is to be used for the purpose of disposal or pressure maintenance or secondary recovery operations.  All parties in the relevant WIPA shall bear such Costs according to their respective BPI in that WIPA.

## ARTICLE XIV

## REQUIRED WELLS

14.1    Definition.  For the purposes of this Article, a well shall be deemed a required well if the Drilling thereof is required by the final order of an authorized representative of the Department of Natural Resources.  Such an order shall be deemed final upon expiration of the time allowed for appeal therefrom without the commencement of appropriate appeal proceedings, or, if such proceedings are commenced within said time, upon the final disposition of the appeal.  Whenever a Party receives any such order, it shall promptly mail a copy thereof to each of the other Parties; if any such order is appealed, the Party appealing shall give prompt written notice thereof to each of the other Parties, and upon final disposition of the appeal, Unit Operator shall give each of the Parties prompt written notice of the results thereof.

14.2    Election to Drill.  Any Party desiring to Drill, or participate in the Drilling of, a required well shall give to the other Parties written notice thereof as provided in Subsection 13.1C or within such lesser time as may be required by the order.  If such notice is given, the Parties electing to participate as provided in Subsections 13.1D or 13.1E shall designate a Sub-Operator in the manner provided in subsection 13.1B for the Drilling of that well.  Subject to the provisions of Section 16.3, the designated Sub-Operator shall Drill the required well for the account of such Parties, who shall bear all Costs incurred therein; provided, however, that if the required well is a Development Well, it shall not be drilled unless it receives the approval of the parties in the relevant WIPA.  The rights and obligations of such Parties with respect to the ownership of such well, the operating rights therein, the Production therefrom and the bearing of Costs incurred therein shall be the same as if the well had been Drilled for the account of such Parties under Article XIII either as a Development Well or Exploratory Well, as the case may be.

14.3    Alternatives to Drilling. If no Party elects to Drill a required well within the period allowed for such election or if such election is made but approval to drill is not obtained from the parties as provided under Section 14.2, and if any of the following alternatives is available, the first such alternative which is available shall be followed:

A.    Compensatory Royalties. If compensatory royalties may be paid in lieu of Drilling the well and if payment thereof receives, within said period, the approval of the Parties who would be chargeable with the Costs incurred in Drilling the well, if the well were Drilled as provided in Section 14.4, Unit Operator shall pay such compensatory royalties for the account of said Parties; or

B.    Contraction. If the Drilling of the well may be avoided, without other penalty, by contraction of the Unit Area, Unit Operator shall make a reasonable effort to effect such contraction with the approval of the Director in the manner provided in numbered Paragraph 2 of the Unit Agreement.

14.4    Required Drilling. If none of the foregoing alternatives is available, the required well shall be drilled under whichever of the following provisions is applicable:

A.    Development Well. If the required well is a Development Well, it shall be Drilled by the Sub-Operator designated in the manner provided in Section 14.2 for the account of all Parties in the WIPA in which the well is Drilled; or

B.    Exploratory Well. If the required well is an Exploratory Well, it shall be drilled by the Sub-Operator designated by and for the account of the parties in proportion to their respective Surface Acreage in the Unit Area.

ARTICLE XV

ESTABLISHMENT, REVISIONS AND CONSOLIDATION
OF ROYALTY INTEREST PARTICIPATING AREAS

15.1    General. All RIPA shall be established, revised or consolidated from time to time as provided in numbered Paragraph 11 of the Unit Agreement and in accordance with the procedure set forth in this Article XV.

15.2    Procedure. Whenever a Sub-Operator obtains information which may cause the establishment, revision or consolidation of a RIPA, then Sub-Operator shall promptly advise Unit Operator and furnish the data applicable thereto. Unit Operator, in turn, shall furnish all available data as it may have relative thereto, along with Unit Operator's proposal as to such establishment, revision or consolidation, to each of the Parties in the applicable WIPA. Within fifteen (15) days following receipt of such data and proposal, each Party shall advise Unit Operator in writing of its approval or objections to such proposal. If the proposal receives the approval of such Parties, then Unit Operator shall

promptly prepare and file with the Director the necessary documents and data supporting such establishment, revision or consolidation. The failure of any party to advise Unit Operator of its position shall be regarded as a vote against the proposal submitted. If the proposal does not receive the approval of such Parties, then Unit Operator shall submit to the Parties a revised proposal taking into consideration the written comments made as to the initial proposal. If such revised proposal fails to receive the approval of such Parties, then Unit Operator shall file with the Director a proposal that reflects the position of the greatest percentage of interest of the Parties within the applicable WIPA.

15.3    Revised Proposal. If any such proposal filed by Unit Operator with the Director is rejected or requested to be revised, then Unit Operator shall submit a revised proposal to the Parties in the WIPA involved for their approval in accordance with the procedure set forth above. any Party may submit its objections or comments to the Director as to any proposal filed by the Unit Operator with the Director.

### ARTICLE XVI

### PLATFORMS AND PRODUCTION FACILITIES

16.1    Prior Commitments. Prior to the effective date of this Agreement, the parties have agreed to the design, construction and installation of the platforms, pipelines and production facilities referred to in Section 7.2 for the primary purpose of the development and operation of the Hemlock WIPA. The Parties further agreed that the Costs thereof would be initially shared on the basis provided in appendix "B-1", subject to the right to audit and adjustments as herein provided.

16.2    Costs. All costs and expenses incurred in connection with the design, construction and installation of the said platforms, pipelines and production facilities to the extent that said production facilities are used solely for or allocated to the Trading Bay Unit, shall be deemed Costs for the purposes of this Agreement.

16.3    Use of Wells, Platforms, or Production Facilities. No well, platform, or production facility (including a pipeline) shall be used for other than that upon which ownership thereof is based without the approval of the Parties owning such well, platform, or production facility, as provided in Subsection 5.3D. Upon such use, a fair and equitable apportionment of risks and liabilities, investment, and operating and other costs shall be made between the Parties therefor. Such use shall include but not be limited to the Drilling of wells, multiple completion of wells and the production, transportation and handling of Unitized Substances. (See **First, Second and Third Supplemental Agreements to Unit Operating Agreement**)

## ARTICLE XVII

## CONSTRUCTION OF CERTAIN PLATFORMS, PIPELINES AND OTHER FACILITIES

17.1    General.  The construction of any platforms, pipeline, or other facilities not provided for in Section 16.1 and not related to secondary recovery or pressure maintenance programs, the cost of which exceeds One Million Five Hundred Thousand Dollars ($1,500,000.00), referred to in this Article XVII as "Such Construction", shall be conducted in or for the benefit of the Unit Area only in accordance with the provisions of this Article XVII.  For the purposes of this Article XVII, reference to parties shall mean all parties in the WIPA to be served by the proposed platform, pipeline, or other facility.

17.2    Sub-Operator to Conduct Operations.  Such Construction shall be conducted by the Sub-Operator designated by the parties participating in the Costs thereof.

17.3    Notice of Proposed Construction.  Any Party may propose Such Construction by giving each of the other Parties written notice specifying the location, contemplated service, design, specifications, proposed Sub-Operator, and estimated Costs of Such Construction.

17.4    Response to Notice.  Within sixty (60) days after receipt of such notice each Party shall advise all other parties, in writing, whether or not it approves Such Construction and whether or not it desires to participate in Such Construction.  If any Party fails to respond to such notice within said sixty (60) day period, it shall be deemed to have failed to approve such construction and to have elected not to participate therein.

If the Parties approve Such Construction in the manner provided in Subsection 5.3E, then Such Construction shall be conducted by the designated Sub-Operator.

17.5    Participation.  In the event Such Construction receives the approval of the Parties as provided in Section 17.4, each Party shall have the right to participate therein in proportion to its BPI in the WIPA to be served.  Unless otherwise agreed by the Parties, the entire cost, risk, liability and expense of Such Construction by fewer than all of the Parties shall be borne by the Parties comprising the Participating Party (as hereinafter defined) in proportion to their respective interests in Such Construction as hereinafter provided.  The Party or Parties electing to participate in such Construction shall be referred to in this Article XVII as "Participating Party".

17.6    Relinquishment and Reversion of Interests.

A.    Such Construction By Less Than All Parties.  In order for the Participating Party to receive the benefits of this Section 17.6, Such Construction

shall be commenced with one (1) year after the expiration of the period provided in Section 17.4. Each Participating Party shall participate in Such Construction in the proportion that it's BPI of all Participating Parties in the relevant WIPA.

B.    <u>Non-Ownership and Relinquishment of Interest</u>. When any Party who is entitled to participate in Such Construction elects not to participate therein, such Party referred to in this Article XVII as "Non-Participating Party", it shall be deemed to have no interest in and shall not be entitled to the use of the platform, pipeline, or other facility constructed and, in the case of a platform, to have relinquished all of its operating rights and Working Interest in and Production from all wells drilled from that platform and completed in the WIPA for which that platform was constructed.

C.    <u>Acquisition of an Interest and Reversion of Relinquished Rights</u>. Within thirty (30) days after the pipeline or other facility is put into service or, in the case of a platform, within thirty (30) days after all well logs and data from the first well Drilled from that platform are mailed to Non-Participating Party, Sub-Operator shall furnish each Non-Participating Party a statement of the estimated Costs of Such Construction and Drilling. Within sixty (60) days after receipt of such statement, each Non-Participating Party may elect to pay to the Sub-Operator who conducted Such Construction an amount of money equal to the total of the following:

(1)    One hundred per cent 100% of that portion of the Costs incurred in operating the pipeline, other facility, or platform and well thereon that would have been charged to such Non-Participating Party had it participated in Such Construction;

(2)    One hundred thirty-five percent (135%) of that portion of the Costs incurred and committed in Such Construction and the Costs of Drilling a well or wells, if Drilled from the facility that would have been charged to such Non-Participating Party had it participated therein; and

(3)    Interest at the rate of one-half of one percent (1/2 of 1%) per month on such amounts computed from the month during which each portion of such Costs was paid.

If a Non-Participating Party has elected to make the payment hereinabove provided, and does so within thirty (30) days after such election, such Non-Participating Party shall immediately have that interest in that platform, pipeline or other facility as it would have had if it had participated in the construction thereof, and the operating rights and Working Interests which it relinquished by failing to participate in Such Construction shall at that time revert to such Party.

D.    Payment by Sub-Operator. All payments received by Sub-Operator from a Non-Participating Party pursuant to Subsection 17.6C shall be paid promptly to the Participating Parties in the proportions in which they shared the Costs of Such Construction and Drilling.

## ARTICLE XVIII

## RIGHT TO TAKE IN KIND AND FAILURE
## TO TAKE IN KIND - UNDERLIFTING

18.1   Taking in Kind. Each Party shall currently take in kind or separately dispose of its share of Production (and only its share, but its share shall include any Production said Party is then making up as the result of its underlift pursuant to this Article XVIII). Each such Party shall have the right to construct, maintain, and operate all necessary facilities for that purpose, provided that they are so constructed, maintained, and operated as not to interfere with Unit operations. Any extra expenditures incurred by reason of the delivery in kind of any portion of the Production shall be borne by the receiving party. If a royalty owner has the right to take in kind a share of Production and fails to do so, those parties taking Production shall take the Royalty Share of Production in the manner provided in Article X. On all purchases or sales each Party shall execute any division order or contract of sale pertaining to its interest.

18.2   Underlifting of Liquid Production.

A.    General. Notwithstanding the ownership of Production set forth in this Agreement, in the event any Party fails to take or otherwise dispose of its share of oil or other liquid hydrocarbons (liquid production), the other Parties shall be entitled to take their own shares of liquid production pursuant to this Section 18.2. These provisions shall be applicable to liquid production from gas wells when such liquid production is available; provided, however, a gas well shall not be produced primarily to obtain liquid production. Gas production will not be taken into account in the recovery or recoupment of liquid production.

The procedures set forth in this Article XVIII for underlifting and for the recovery or recoupment of underlifted liquid production shall apply separately to each WIPA and shall be computed on the basis of volume without regard to the value thereof.

B.    Underlifted Party. In the event any party fails to take or otherwise dispose of its proportionate share of "Available Production" (as defined in Subsection 18.2C hereof) during any calendar quarter, said Party shall be deemed to have "underlifted" and such Party shall be hereinafter referred to as an "Underlifted Party." Whenever any Party has not taken its share of liquid

production solely as a result of a Redetermination of BPI, as provided in Article XI hereof, that Party shall not be deemed to have "underlifted" and the provisions of this Article XVIII shall not affect the adjustment of Production under Article XI.

C.    Available Production.  Not less than forty-five (45) days prior to the beginning of each calendar quarter, Unit Operator shall advise in writing those Parties in the applicable WIPA of the total estimated quantity of liquid production therefrom which can be delivered to the Parties during the next calendar quarter. Such estimated quantity of liquid production for each such particular period of time is referred to herein as "Available Production". The amount of Available Production shall not exceed the maximum efficient rate of liquid production for that period of time as established for the particular WIPA by the Parties therein, in accordance with sound petroleum engineering practice.  When none of the Parties takes its full share of Available Production as originally determined by Unit Operator for any calendar quarter, the total Available Production for such quarter shall be reduced retroactively to such amount as would allow the party taking the highest percentage of its share to receive credit for having taken 100% of its share. Unit Operator, by notice to the Parties, shall revise the amount of Available Production in the event unforeseen physical occurrences alter the WIPA's capacity to produce.

D.    Nominations.  Within fifteen (15) days after receipt of notification of Available Production for a given period, each Party in that WIPA shall nominate in writing to Unit Operator the quantity of liquid production equivalent to all or any part of its share of Available Production which it desires to take during such period.  Any Underlifted Party desiring to make up a portion or all of the volume it is underlifted, shall also nominate the volume it wants to make up during the next succeeding calendar quarter.  A Party failing to nominate shall be deemed to have nominated zero quantity.

E.    Recovery or Recoupment of Underlifted Liquid Production.  Excess productive capacity (herein sometimes referred to as "Excess Capacity") is defined as the amount by which the Available Production exceeds the total amount of liquid production (excluding any being recovered or recouped as provided in this subsection) nominated by all Parties for each quarter.

Whenever there is Excess Capacity and when an Underlifted Party is able to utilize that Excess Capacity, such capacity will be allotted to that Party as herein provided.

In the event an Underlifted Party has nominated to utilize any Excess Capacity and during the two succeeding calendar quarters period Excess Capacity did not exist or was insufficient to permit that Underlifted Party to recover or

recoup the full amount of its underlifted liquid production, such party shall have the right to recover or recoup its underlifted production out of ten percent (10%) of Available Production in addition to any Excess Capacity, as above provided, to the extent required for recovery or recoupment by the Underlifted Party.

If more than one Party elects to recover or recoup at the same time, they shall share the available Excess Capacity and/or the ten percent (10%) of liquid production in proportion to their respective BPI's. When an Underlifted Party has recovered or recouped the full amount of its liquid production underlift, that Party's share of liquid production shall thereupon be its BPI share.

No Party shall be deemed an Underlifted Party due to a reduction in its share of Available Production pursuant to this Subsection 18.2.

F.    Rate of Liquid Production. Unit Operator shall timely advise all parties of the nominations received for each quarter and shall establish a rate of liquid production equal to the total of the volumes so nominated, not to exceed the maximum efficient rate of production and each Party shall accept the volume nominated by it.

G.    Allocation of Costs. Each Underlifted Party shall bear its BPI share of all Costs, except Lease Burdens and taxes measured by production, as provided in Article XXII hereof.

Further in any calendar quarter during which a Party is recovering or recouping its underlifted liquid production out of the ten percent (10%) of Available Production, a percentage of all "Operating" costs as defined in Exhibit "C", equivalent to the percentage of liquid production taken for recovery or recoupment of underlifted liquid production out of said ten percent (10%) of Available Production shall be borne by each such Party in proportion to the volume of liquid production so taken by that Party for recovery or recoupment. No adjustment in Costs, except taxes measured by production, shall be made for the use of Excess Capacity. Lease Burdens shall be borne as provided for in Article XXI hereof. (Amended 1/1/70)

18.3    Underlifting or Balancing of Gas Production.

A.    General. Notwithstanding the ownership of Production set forth in this Agreement, in the event any Party fails to take or otherwise dispose of its share of natural gas (gas production), the other parties shall be entitled to take their own and such party's shares of gas production pursuant to this Section 18.3. These provisions shall be applicable to gas well gas and to casing head gas when such gas production is available; provided, however, an oil well shall not be produced

primarily to obtain gas production. Liquid production will not be taken into account in the balancing of gas production.

The procedures set forth in this Article XVIII for underlifting or balancing of underlifted gas production shall apply separately to each WIPA and shall be computed on the basis of volume without regard to the value thereof.

The term "accounting period" as used in this Section 18.3 shall mean a calendar quarter or such other period as may be otherwise agreed by the parties.

B.    Repressuring, Recycling or Other Secondary Recovery Operations. In the event gas production is available in any WIPA, and such gas production may be utilized in repressuring, recycling, or other secondary recovery operations in that WIPA or any other WIPA, it is agreed that the Parties owning such gas production shall give first consideration to the use of such gas production for such operations upon such terms as may be acceptable to the parties; provided, however, in the event more than one WIPA, other than the WIPA from which the gas production is obtained, desires such production, the Hemlock WIPA, if involved, shall have preference.

C.    Underlifted Party. In the event any Party fails to take or otherwise dispose of its proportionate share of gas production during any accounting period, said Party shall be deemed to have "underlifted" and such party shall be hereinafter referred to as an "Underlifted Party" during that period. Whenever any Party has not taken its share of gas production solely as a result of a Redetermination of BPI, as provided in Article XI hereof, that Party shall not be deemed to have "underlifted" and the provisions of this Article XVIII shall not affect the adjustment of Production under Article XI.

D.    Overlifted Party. In the event any Party fails to take or otherwise dispose of its proportionate share of gas production during any accounting period, the other Parties shall have the right, but not the obligation, during such period to take or otherwise dispose of such Party's proportionate share of gas production. Each such party taking more than its share of gas production shall be deemed to have "overlifted" and shall be hereinafter referred to as an "Overlifted Party" during that period. Each Party desiring to take more than its share of gas production shall be entitled to take the gas production not being taken by the Underlifted Party in the proportion that its BPI bears to the BPI of the Overlifted Party.

E.    Gas Production Account. Unit Operator or any party selected by the Parties shall maintain and furnish a statement of a gas production account which

shall show the amount each Party has underlifted or overlifted relative to the cumulative gas production from the WIPA.

F.    Balancing.  If an Underlifted Party desires to take more than its share of gas production in order to balance its gas production account, that party shall so advise Unit Operator, who shall use its best efforts to reduce the portion of gas production being taken by all Overlifted Parties to the extent necessary to enable the Underlifted Party to take such amounts sufficient to balance its gas production account within one year from the date of its request.

In the event an Underlifted Party is unable to balance its gas production account within said one year, then that Underlifted Party shall be entitled to increase its take of gas production up to ten percent (10%) of the Overlifted Parties' share of current gas production until its gas production account is in balance.

If two or more of the Underlifted Parties desire to balance their gas production accounts at the same time, then each of such Underlifted Parties shall be entitled to take the proportion of such ten percent (10%) portion of the current gas production of the Overlifted Parties that their respective volumes of underlifted gas production bear to the total of such volume.

Without prior approval of the parties, no Sub-Operator shall produce any gas well in excess of the maximum efficient rate of gas production established for the wells in a WIPA by the Parties therein.

G.    Allocation of Costs.  Except as to Lease Burdens and taxes measured by production, no adjustment shall be made in Costs when a Party is underlifting or overlifting.  Lease Burdens shall be borne as provided in Article XXI hereof and taxes measured by production shall be borne by the parties in proportion to their respective gas production.

18.4    Indemnity.  In the event any Party or parties is underlifted and any such action causes the rate of production hereunder to be reduced, then said Party or Parties shall be solely responsible to the State of Alaska and any other royalty owner or overriding royalty owner for, and hold the other Parties harmless and indemnify them against any and all claims whatsoever which arise as a result of such failure to take.

## ARTICLE XIX

## UNIT EXPENSE

19.1    Basis of Charge to Parties.  All Costs incurred for the benefit of a WIPA initially shall be paid by Unit Operator or the Sub-Operator incurring same.  Each Party

shall reimburse Unit Operator or such Sub-Operator for its BPI share of such Costs except as otherwise provided in Articles XIII, XVII, and XVIII. All charges, credits and accounting shall be in accordance with Exhibit "C".

19.2    Budgets.  Each Sub-Operator will submit a proposed program and a proposed budget of estimated costs for the next calendar year to the Unit Operator by August 1 of each year. The Unit Operator will, as soon as practical after receipt of the proposed programs and budgets, distribute the proposed programs and budgets to the Parties and give notice of a preliminary meeting to review the proposed programs and budgets. This meeting will be held by August 15. Following this preliminary meeting and upon at least thirty (30) days' advance written notice which shall include the agenda for the meeting, Unit Operator shall call a meeting to be held not later than November 15, of each year. At such meeting, the representatives of the Parties shall compare the current year's program and budget to actual performance and shall endeavor to agree on the next year's program and budget after making such modifications as may be necessary; provided, however, that such agreement shall not constitute authority for the making of such expenditures, which shall be made only in accordance with the remaining provisions of this Agreement. A budget shall not constitute authority for the making of such expenditures, which shall be made only in accordance with the remaining provisions of this Agreement. A budget shall set forth the estimated annual Costs by semi-annual periods. Budgets shall be estimates only, and shall be adjusted or corrected by the relevant Parties whenever an adjustment or correction is proper. A copy of each budget and adjusted budget shall promptly be furnished to each party. Each program shall show that portion of such program and budget applicable to or allocated to each WIPA. **(Amended 1/1/90)**

19.3    Advance Billings.  Unit Operator and each Sub-Operator shall have the right to require the parties in each WIPA to advance their respective shares of estimated Costs by submitting to such Parties on or before the 15th day of any month, an itemized estimate thereof for the succeeding month, with a request for payment in advance. Within fifteen (15) days thereafter, each party shall pay to Unit Operator or Sub-Operators its share of such estimate. Adjustments between estimated and actual Costs shall be made by Unit Operator and Sub-Operators at the close of each calendar month, and the accounts of such Parties shall be adjusted accordingly.

19.4    Commingling of Funds.  No funds received by Unit Operator or any Sub-Operator under this Agreement need be segregated or maintained by it as a separate fund, but may be commingled with its own funds.

19.5    Lien of Unit Operator and Sub-Operator.  Each party grants to Unit Operator and the Sub-Operators a lien upon its oil and gas rights in each Tract, its share of production, and its interest in all Unit property, as security for payment of its share of Costs, together with interest thereon at the rate of six percent (6%) per annum. Unit

Operator and each Sub-Operator shall have the right to bring suit to enforce collection of such indebtedness with or without seeking foreclosure of the lien. In addition, upon default by any Party in the payment of its share of Costs, Unit Operator and each Sub-Operator shall have the right to collect from the purchaser the proceeds from the sale of such Party's share of Production until the amount owed by such Party, plus interest as aforesaid, has been paid. Each purchaser shall be entitled to rely upon Unit Operator's or Sub-Operators' written statement concerning the amount of any default.

## ARTICLE XX

## TITLES

20.1   Warranty and Indemnity. Each Party represents and warrants that it is the owner of the respective Working Interests set forth opposite its name in Exhibit "B" to the Unit Agreement, and hereby agrees to indemnify and hold harmless the other Parties from any loss due to failure, in whole or in part, of its title to any such interest, except failure of title arising out of Unit Operations; provided that such indemnity shall be limited to an amount equal to the net value that has been received from the sale or receipt of Unitized Substances attributed to the interest as to which title failed. Each failure of title will be deemed to be effective, insofar as this Agreement is concerned, as of the first day of the calendar month in which such failure is finally determined, and there shall be no retroactive allocation of Costs or retroactive allocation of Unitized Substances or the proceeds therefrom, as a result of title failure.

20.2   Failure Because of Unit Operations. The failure of title to any Working Interest in Tract by reason of Unit operations, including non-production from such Tract, shall not change the BPI of the Party whose title failed in relation to the BPI of the other Parties at the time of the title failure.

## ARTICLE XXI

## RENTALS AND LEASE BURDENS

21.1   Rentals. Each Party shall be obligated to pay, or cause to be paid, any and all rentals and other sums (other than Lease Burdens) payable upon or in respect of its Working Interests, subject, however, to the right of each Party to surrender any of its Working Interests in accordance with Article XXIV. Upon request, each Party shall furnish to Unit Operator satisfactory evidence of the making of such payments. However, no Party shall be liable to any other Party for unintentional failure to make any such payments provided it has acted in good faith.

21.2   Lease Burdens. Each party entitled to receive a share of Production shall make, or cause to be made, payments for that portion of the Lease Burdens constituting

the Royalty Share due the State of Alaska in respect of Production or the proceeds thereof allocated under the Unit Agreement to each Tract in each RIPA in which it owns a Working Interest, in accordance with Article X. Each Party shall be obligated to pay, or cause to be paid, all other Lease Burdens as to each Tract in which it owns a Working Interest, and shall be liable for any additional Costs occasioned thereby. Each Party entitled to receive the Production from a well completed as a producer but not included in a RIPA shall pay, or cause to be paid, all Lease Burdens payable in respect of such Production.

21.3    Payments to be Borne by Parties. All payments made pursuant to this Article XXI shall be borne by the Party responsible for such payments in accordance with this Agreement, except payments made by Unit Operator or a Sub-Operator acting in that capacity.

## ARTICLE XXII

## TAXES

22.1    Taxes Upon Unit Property and Operations. All taxes assessed or levied upon Unit property or operations under this Agreement, except income taxes, taxes measured by Production and taxes upon Lease Burdens which are payable by the owners thereof, shall be paid by Unit Operator or each Sub-Operator as and when due and payable.

All such taxes shall be charged to and borne by the Parties in proportion to their respective BPI's.

22.2    Other Taxes. Each Party shall pay or cause to be paid all taxes imposed upon or in respect of the production or handling of its share of Unitized Substances.

22.3    Transfer of Interests. In the event of a transfer by one Party to another under the provisions of this Agreement of any Working Interest, or of any interest in any well or in the materials and equipment in any well, or of any interest in platforms, pipelines or other facilities, or in the event of the reversion of any relinquished interest as in this Agreement provided, the taxes above mentioned assessed against the interest transferred or reverted for the taxable period in which such transfer or reversion occurs shall be apportioned between such Parties so that each shall bear the percentage of such taxes which is proportionate to that portion of the taxable period during which it owned such interest.

22.4    Notices and Returns. Each Party shall promptly furnish Unit Operator or the applicable Sub-Operator with copies of notices, assessments, levies or tax statements received by it pertaining to the taxes to be paid by Unit Operator or that Sub-Operator.

Unit Operator and each Sub-Operator shall make such returns, reports and statements as may be required by law in connection with any taxes above provided to be paid by it, shall furnish copies to the Parties upon request, and shall notify the Parties of any tax which it does not propose to pay before such tax becomes delinquent.

## ARTICLE XXIII

## INSURANCE

23.1   Required Insurance.  As to all operations hereunder, Unit Operator, or Sub-Operators where applicable, shall carry, for the benefit and protection of the parties hereto, Workmen's Compensation Insurance in accordance with all applicable laws, rules and regulations, or shall, at its option, self-insure under applicable statutes.  Unit Operator or Sub-Operators, where applicable, shall also procure and maintain such other insurance as shall be required by law.  The net premiums of such insurance shall be charged to the joint account.  The Unit Operator or Sub-Operators shall not carry physical damage insurance on jointly owned property for the benefit of the other parties hereto.  The liability, if any, of the parties hereto in damages for claims growing out of personal injury to or death of third persons or injury or destruction of property of third persons resulting from the operation and development of the Trading Bay Unit shall be borne by the parties hereto in proportion to their respective Unit participation interest at the time the act creating the damage claim occurred.  **(Amended 8/25/69, 8/30/72)**

23.2   Individual Insurance.  Any Party may procure and maintain at its own cost and expense such other insurance as it shall determine and any such insurance shall inure solely for the benefit of such Party procuring the same; provided, however, that each such insurance policy shall contain a waiver on the part of the insurance carrier of all rights, by subrogation or otherwise, against each Party not named as an insured in such policy or if such waiver is not secured the insured shall indemnify and hold harmless each Party not named as an insured in such policy against any claim of the insurance carrier arising against such Party by subrogation or otherwise.  **(Amended 8/30/72)**

23.3   Contractors' Insurance.  Unit Operator or Sub-Operators, where applicable, shall require any contractor employed by it, to obtain, maintain and pay for insurance with a reputable company or companies in amounts not less than that needed to protect the interests of the Unit Operator or Sub-Operators, where applicable, and Non-Operator predicated upon the exposure to risk of the work to be performed by the contractor.

Unit Operator or Sub-Operators, where applicable, shall require any contractor, employed by it, to submit to it property executed certificates of insurance as issued by approved insurers before work contemplated in any contract is begun.  **(Amended 8/30/72)**

23.4   <u>Notice of Losses and Claims</u>.  Unit Operator or Sub-Operators shall notify the other Parties as soon as practicable after the occurrence of any accident involving either damage to property or injuries to or death of persons.  **(Amended 8/30/72)**

ARTICLE XXIV

RELEASE FROM OBLIGATIONS AND SURRENDER

24.1   <u>Surrender or Release Within a WIPA</u>.  A Working Interest in a WIPA shall not be surrendered except with the consent of all parties in such WIPA.  However, a Party who owns a Working Interest in a WIPA and who is not at the time committed to participate in the Drilling, Deepening or Plugging Back of a Well in such WIPA may be relieved of further obligations with respect to such WIPA as then constituted by executing and delivering to Unit Operator an assignment conveying to all other Parties in such WIPA, proportionately to such other Parties' respective BPI's as among themselves, all Working Interests owned by such Party in the WIPA, together with the entire interest of such Party in any and all wells, materials, equipment and other property in or pertaining to such WIPA.

24.2   <u>Procedure on Surrender Outside a WIPA</u>.  Whenever a Party desires to, surrender a Working Interest in any tract which is not in a WIPA, such Party shall give to all other Parties written notice thereof describing such Working Interest.  The Parties receiving such notice, or any of them, shall have the right at their option to take from the Party desiring to surrender an assignment of such Working Interest by giving to the Party desiring to surrender written notice of election so to do within thirty (30) days after receipt of the notice of the desire to surrender.  If such election is made as above provided, the Party or Parties taking the assignment (which shall be taken by them in proportion to the Surface Acreage of their Working Interests among themselves in the Unit Area) shall pay to the assigning Party its share of the salvage value of any wells owned by the Parties and then located on the land covered by such Working Interest, which payment shall be made on receipt of the assignment.  If no Party elects to take such assignment within such thirty (30) day period, then the Party or Parties owning such Working Interest may surrender the same if surrender thereof can be made in accordance with the Unit Agreement.

24.3   <u>Accrued Obligations</u>.  A Party making an assignment or surrender in accordance with Section 24.1 or 24.2 shall not be relieved of its liability for any obligation accrued hereunder at the time the assignment or surrender is made, or of obligation to bear its share of the Costs incurred in any Drilling, Deepening or Plugging Back operation in which such Party has elected to participate prior to the making of such assignment or surrender, except to the extent that the Party or Parties receiving such assignment shall assume, with the approval of the Parties, any and all obligations of the assigning Party hereunder and under the Unit Agreement.

# ARTICLE XXV

## FORCE MAJEURE

25.1    Force Majeure. The obligations of Unit Operator and each Sub-Operator hereunder shall be suspended to the extent that, and only so long as, performance thereof is prevented, in whole or in part, by acts of God, fire, action of the elements, weather or natural phenomena, including, but not limited to, ice within the Unit Area rendering continued operations hazardous to life or property, strikes or other differences with workmen, unavoidable accidents, acts of civil or military authorities, acts of the public enemy, restrictions or restraints imposed by law or by regulation or order of governmental authority, whether Federal, state, or local, inability to obtain necessary rights of access, uncontrollable delays in transportation, inability to obtain necessary materials in open market, or any other cause reasonably beyond control of Unit Operator and Sub-Operators whether or not similar to any cause above enumerated. No Party shall be required against its will to adjust or settle any labor dispute. Whenever performance of obligations is prevented by any such cause, Unit Operator and each Sub-Operator shall give notice thereof to the other Parties as promptly as reasonably possible.

# ARTICLE XXVI

## NOTICES

26.1    Giving and Receipt. Except as otherwise specified herein, any notice, consent, or statement herein provided or permitted shall be deemed to have been properly served when sent by mail (air mail if out of state), facsimile transmission, or telegram to the address of the representative of each Party as furnished to Unit Operator in accordance with Article V and received by the Party. A notice given under any provision hereof shall be deemed given only when received by the party to whom such notice is directed, except that any notice given by United States certified or registered mail, or facsimile transmission, or by telegram, properly addressed to the Party to whom given with all postage and charges prepaid, shall be deemed given to and received by the Party to whom directed seventy-two (72) hours after such notice is deposited in the United States mails or upon confirmation of receipt of facsimile transmission, or forty-eight (48) hours after such notice if filed with an operating telegraph company for immediate transmission by telegraph, exclusive of Saturdays, Sundays and legal holidays in each case, and also except that a notice to Unit Operator or any Sub-Operator shall not be deemed given until actually received by it. (Amended 1/1/90)

26.2    Proper Addresses. Each Party's proper address shall be deemed to be the address of that Party's representative furnished to the Unit Operator in accordance with Article V.

## ARTICLE XXVII

## LIABILITY, CLAIMS AND SUITS

27.1  Individual Liability.  The duties, obligations, and liabilities of the Parties shall be several and not joint or collective; and nothing herein contained shall ever be construed as creating a partnership of any kind, joint venture, association, trust, or other legal entity among the Parties.

27.2  Settlements.  Unit Operator and Sub-Operators may settle any single damage claim or suit involving Unit operations but not involving an expenditure in excess of Two Thousand Five Hundred Dollars ($2,500.00) provided the payment is in complete settlement of such claim or suit.  If the amount required for settlement exceeds the above specified amount, the Parties shall assume and take over the further handling of the claim or suit unless such authority is expressly delegated to Unit Operator or a Sub-Operator. All costs and expense of handling, settling, or otherwise discharging such claim or suit shall be an item of Costs.  If a claim is made against any Party or if any Party is sued on account of any matter arising from Unit operations and over which such Party individually has no control because of the rights given the Parties, Unit Operator and Sub-Operators by this Agreement and the Unit Agreement, the Party shall immediately notify the Parties and the claim or suit shall be treated as any other claim or suit involving Unit operations.

## ARTICLE XXVIII

## INTERNAL REVENUE PROVISIONS

28.1  Internal Revenue Provisions.  Each of the Parties hereby elects to be excluded from the application of Subchapter K of Chapter t of Subtitle A of the Internal Revenue Code of 1954, or such portion or portions thereof as may be permitted or authorized by the Secretary of the Treasury of the United States or his delegate insofar as such Subchapter or any portion or portions thereof may be applicable to the Parties.  If any present or future income tax laws of the State of Alaska contain provisions similar to those contained in the Subchapter of the Internal Revenue Code of 1954 above referred to under which a similar election is permitted, each of the Parties hereby elects to be excluded from the application of such laws.  Accordingly, each Party hereby authorizes and directs Unit Operator to execute such an election or elections on its behalf and file the same with the proper administrative office or agency. If requested by Unit Operator, each Party agrees to execute and join in such instruments as are necessary to make such elections effective.

## ARTICLE XXIX

## EFFECTIVE DATE AND TERM

29.1  <u>Effective Date</u>.  This Agreement shall be effective as of the effective date of the Unit Agreement.

29.2  <u>Term</u>.  This Agreement shall continue in effect so long as the Unit Agreement remains in effect and thereafter until:  (a) all wells have been plugged and abandoned or otherwise disposed of, (b) all Unit property acquired for the joint account has been disposed of in accordance with the instructions of the Parties, and (c) there has been a final accounting.

## ARTICLE XXX

## NON-DISCRIMINATION

30.1  <u>Non-discrimination</u>.  In connection with the performance of work under this Agreement, Unit Operator and Sub-Operators agree to comply with all of the provisions of Section 202(1) to (7), inclusive, of Executive order 11246, as amended (30 FR 12319), which are hereby incorporated by reference in this Agreement.

Unit Operator and Sub-Operators agree to insert the foregoing provision in all subcontracts hereunder, except subcontracts for standard commercial supplies or raw materials.

## ARTICLE XXXI

## OTHER PROVISIONS

31.1  <u>Audits</u>.  An audit shall be made of Unit Operator and Sub-Operator's records and books of account pertaining to operations under this Agreement whenever the making of such audit is requested by any two or more Parties in the affected WIPA, except that neither Unit Operator nor a Sub-Operator shall be audited more often than once each year, except upon the resignation or removal of such Unit Operator or Sub-Operator.  Such audit shall be made by auditors in the employ of the Parties desiring to participate therein, and the allowance to be made to each Party furnishing an auditor shall be determined by the approval of such Parties, and paid by such Parties in proportion to their respective participations among themselves in Costs incurred during the period covered by the audit.

31.2  <u>Laws and Regulations</u>.  This Agreement shall be subject to all applicable laws and regulations, and shall be interpreted in accordance with the laws of the State of Alaska.

31.3    _Additional Burdens_.  In the event that any Party has created or should subsequently create against its interest as shown in Exhibit "B" to the Unit Agreement, any additional royalty, overriding royalty, production payment, or other burden or charge, the Party which has created or subsequently creates any such additional burden or charge shall hold the other Parties to this Agreement harmless from such additional burdens and charges, and shall satisfy and discharge such burdens and charges out of its own funds.  As security for the performance of the obligations created by this paragraph, the Parties entitled to be held harmless shall have a lien to secure the performance of the obligations created by this Section 31.3.  Such lien shall exist upon the interests shown in said Exhibit "B" to be owned by the Party charged with performing such obligation.

31.4    _Successors and Assigns_.  The provisions of this Agreement shall be covenants running with the lands, leases, and interests covered hereby, and shall be binding upon and inure to the benefit of the legal representatives, successors and assigns of the Parties hereto.

## ARTICLE XXXII

## EXECUTION

32.1    _Counterparts_.  This Agreement may be executed in counterparts and all such counterparts taken together shall be deemed to constitute one and the same instrument.

32.2    _Ratification_.  This Agreement may be executed by the execution and delivery of a good and sufficient instrument of ratification, adopting and entering into this Agreement.  Such ratification shall have the same effect as if the party executing it had executed this Agreement or a counterpart hereof.

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed as of the date first herein written.

UNIT OPERATOR, SUB-OPERATOR and PARTY

UNION OIL COMPANY OF CALIFORNIA

By_____

By_____

SUB-OPERATOR and PARTY

MARATHON OIL COMPANY

By_____

By_____

SUB-OPERATOR and PARTY

ATLANTIC RICHFIELD COMPANY

By_____

By_____

PARTIES

PAN AMERICAN PETROLEUM CORPORATION

By_____

By_____

PHILLIPS PETROLEUM COMPANY

By_____

By_____

*Tracy's copy*
*from Jim A.    1/06/2000*

Council of Petroleum
Accountants Societies

# EXHIBIT "C-1994"

Attached to and made a part of ...... UNIT OPERATING AGREEMENT
TRADING BAY UNIT
COOK INLET, ALASKA

# ACCOUNTING PROCEDURE
## OFFSHORE JOINT OPERATIONS
### I. GENERAL PROVISIONS

**1. Definitions**

"Joint Property" shall mean the real and personal property subject to the Agreement to which this Accounting Procedure is attached.

"Joint Operations" shall mean all operations necessary or proper for the development, operation, protection and maintenance of the Joint Property.

"Joint Account" shall mean the account showing the charges paid and credits received in the conduct of the Joint Operations and which are to be shared by the Parties.

"Operator" shall mean the party designated to conduct the Joint Operations.

"Non-Operators" shall mean the Parties of this Agreement other than the Operator.

"Parties" shall mean Operator and Non-Operators.

"First Level Supervisors" shall mean those employees whose primary function in Joint Operations is the direct supervision of other employees and/or contract labor directly employed on the Joint Property in a field operating capacity.

"Technical Employees" shall mean those employees either permanently or temporarily assigned in Alaska who have special and specific engineering, geological or other professional skills, and whose primary function in Joint Operations is the handling of specific operating conditions and problems for the benefit of the Joint Property. See attached Statement of Clarification and Intent.

"Personal Expenses" shall mean travel and other reasonable reimbursable expenses of Operator's employees.

"Material" shall mean personal property, equipment or supplies acquired or held for use on the Joint Property.

"Controllable Material" shall mean Material which at the time is so classified in the Material Classification Manual as most recently recommended by the Council of Petroleum Accountants Societies.

"Shore Base Facilities" shall mean onshore support facilities that during drilling, development, maintenance and producing operations provide such services to the Joint Property as receiving and transshipment point for supplies, materials and equipment; debarkation point for drilling and production personnel and services; communication, scheduling and dispatching center; other associated functions benefiting the Joint Property.

"Offshore Facilities" shall mean platforms and support systems such as oil and gas handling facilities, living quarters, offices, shops, cranes, electrical supply equipment and systems, fuel and water storage and piping, heliport, marine docking installations, communication facilities, navigation aids, and other similar facilities necessary in the conduct of offshore operations.

**2. Statements and Billings**

Operator shall bill Non-Operators on or before the last day of each month for their proportionate share of the Joint Account for the preceding month. Such bills will be accompanied by statements which identify the authority for expenditure, lease or facility, and all charges and credits, summarized by appropriate classifications of investment and expense except that items of Controllable Material and unusual charges and credits shall be separately identified and fully described in detail.

**3. Advances and Payments by Non-Operators**

A. Unless otherwise provided for in the Agreement, the Operator may require the Non-Operators to advance their share of estimated cash outlay for the succeeding month's operation within fifteen (15) days after receipt of the billing or by the first day of the month for which the advance is required, whichever is later. Operator shall adjust each monthly billing to reflect advances received from the Non-Operators.

B. Each Non-Operator shall pay its proportion of all bills within fifteen (15) days after receipt. If payment is not made within such time, the unpaid balance shall bear interest monthly at the prime rate in effect at Chase Manhattan Bank, New York _____ on the first day of the month in which delinquency occurs plus 1% or the maximum contract rate permitted by the applicable usury laws of the jurisdiction in which the Joint Property is located, whichever is the lesser, plus attorney's fees, court costs, and other costs in connection with the collection of unpaid amounts.

**4. Adjustments**

Payment of any such bills shall not prejudice the right of any Non-Operator to protest or question the correctness thereof; provided, however, all bills and statements rendered to Non-Operators by Operator during any calendar year shall conclusively be presumed to be true and correct after twenty-four (24) months following the end of any such calendar year, unless within the said twenty-four (24) month period a Non-Operator takes written exception thereto and makes claim on Operator for adjustment. No adjustment favorable to Operator shall be made unless it is made within the same prescribed period. The provisions of this paragraph shall not prevent adjustments resulting from a physical inventory of Controllable Material as provided for in Section V.

**5. Audits**

A. A Non-Operator, upon notice in writing to Operator and all other Non-Operators, ...

An audit report will be released to the Operator no later than 90 days following the audit closing conference. The Operator shall then have 90 days to respond to the audit report. If any claims are disallowed, Non-Operators will have 60 days to rebut the reply to the audit claim. If no agreement is reached at that time, the disputed claims will be placed on the agenda of the next Accounting Subcommittee meeting for handling. If the Accounting Subcommittee has no other reasons to schedule a meeting in the foreseeable future, the Operator and Non-Operators accounting representatives will attempt to resolve the disputed claims by a telephone poll. If agreement still cannot be reached, the Accounting Subcommittee will the refer the matter to the Unit Owners Committee for resolution and settlement.

**Approval by Non-Operators**

Where an approval or other agreement of the Parties or Non-Operators is expressly required under other sections of this Accounting Procedure and if the agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, Operator shall notify all Non-Operators of the Operator's proposal, and the agreement or approval of a majority in interest of the Non-Operators shall be controlling on all Non-Operators.

COPYRIGHT© 1987 by the Council of Petroleum Accountants Societies.

— 1 —

**Exhibit A**
**Page 53 of 58**

## II. DIRECT CHARGES

Operator shall charge the Joint Account with the following items:

1. **Rentals and Royalties**

   Lease rentals and royalties paid by Operator for the Joint Operations.

2. **Labor**

   A. (1) Salaries and wages of Operator's field employees directly employed on the Joint Property in the conduct of Joint Operations.

   (2) Salaries and wages of Operator's employees directly employed on Shore Base Facilities or other Offshore Facilities
      See attached Statement of Clarification and Intent.                    under Paragraph 7 of this Section II.

   (3) Salaries of First Level Supervisors in the field.

   (4) Salaries and wages of Technical Employees either permanently or temporarily assigned and directly employed in the Operation of the Joint Property if such charges are excluded from the Overhead rates.    See attached Statement of Clarification and Intent.
      (5) Salaries and wages of Technical Employees either temporarily or permanently assigned to and directly employed in the operation of the Joint Property if such charges are excluded from the overhead rates.

   B. Operator's cost of holiday, vacation, sickness and disability benefits and other customary allowances paid to employees whose salaries and wages are chargeable to the Joint Account under Paragraph 2A of this Section II. Such costs under this Paragraph 2B may be charged on a "when and as paid basis" or by "percentage assessment" on the amount of salaries and wages chargeable to the Joint Account under Paragraph 2A of this Section II. If percentage assessment is used, the rate shall be based on the Operator's cost experience.

   C. Expenditures or contributions made pursuant to assessments imposed by governmental authority which are applicable to Operator's costs chargeable to the Joint Account under Paragraphs 2A and 2B of this Section II.

   D. Personal Expenses of those employees whose salaries and wages are chargeable to the Joint Account under Paragraph 2, of this Section II.

3. **Employee Benefits**

   Operator's current costs of established plans applicable to _____ recomputed _____ chargeable to the Joint
   Notwithstanding the foregoing, benefit recovery shall be increased by 0.5% of salaries and wages of employees. This increase is before adjustment for vacation/sick pay and will not be affected by the burden limitations set forth in this Paragraph II.3
   recommended by the Council of Petroleum Accountants Societies.             Such cost not to exceed the percent most recently

4. **Material**

   Material purchased or furnished by Operator for use on the Joint Property as provided under Section IV. Only such Material shall be purchased for or transferred to the Joint Property as may be required for immediate use and is reasonably practical and consistent with efficient and economical operations. The accumulation of surplus stocks shall be avoided.

5. **Transportation**

   Transportation of employees and Material necessary for the Joint Operations but subject to the following limitations:

   A. If Material is moved to the Joint Property from the Operator's warehouse or other properties, no charge shall be made to the Joint Account for a distance greater than the distance from the nearest reliable supply store where like material is normally available or railway receiving point nearest the Joint Property unless agreed to by the Parties.

   B. If surplus Material is moved to Operator's warehouse or other storage point, no charge shall be made to the Joint Account for a distance greater than the distance to the nearest reliable supply store where like material is normally available, or railway receiving point nearest the Joint Property unless agreed to by the Parties. No charge shall be made to the Joint Account for moving Material to other properties belonging to Operator, unless agreed to by the Parties.

   C. In the application of subparagraphs A and B above, the option to equalize or charge actual trucking cost is available when the actual charge is $400 or less excluding accessorial charges. The $400 will be adjusted to the amount most recently recommended by the Council of Petroleum Accountants Societies.

6. **Services**

   The cost of contract services, equipment and utilities provided by outside sources, except services excluded by Paragraph 9 of Section II and Paragraphs i and ii of Section III. The cost of professional consultant services and contract services of technical personnel directly engaged on the Joint Property if such charges are excluded from the overhead rates. The cost of professional consultant services or contract services of technical personnel directly engaged in the operation of the Joint Property shall be charged to the Joint Account if such charges are excluded from the overhead rates.

7. **Equipment and Facilities Furnished by Operator**

   A. Operator shall charge the Joint Account for use of Operator-owned equipment and facilities, including Shore Base and/or Offshore Facilities, at rates commensurate with costs of ownership and operation. Such rates may include labor, maintenance, repairs, other operating expense, insurance, taxes, depreciation and interest on gross investment less accumulated depreciation not to exceed _____ Twelve _____ percent ( 12 %) per annum. In addition, for platform only, the rate may include an element of the estimated cost of platform dismantlement. Such rates shall not exceed average commercial rates currently prevailing in the immediate area of the Joint Property.

   B. In lieu of charges in Paragraph 7A above, Operator may elect to use average commercial rates prevailing in the immediate area of the Joint Property less twenty percent (20%). For automotive equipment, Operator may elect to use rates published by the Petroleum Motor Transport Association.

8. **Damages and Losses to Joint Property**

   All costs or expenses necessary for the repair or replacement of Joint Property made necessary because of damages or losses incurred by fire, flood, storm, theft, accident, or other causes, except those resulting from Operator's gross negligence or willful misconduct. Operator shall furnish Non-Operator written notice of damages or losses incurred as soon as practical after a report thereof has been received by Operator.

9. **Legal Expense**

   Expense of handling, investigating and settling litigation or claims, discharging of liens, payments of judgements and amounts paid for settlement of claims incurred in or resulting from operations under the Agreement or necessary to protect or recover the Joint Property, except that no charge for services of Operator's legal staff or fees or expense of outside attorneys shall be made unless previously agreed to by the Parties. All other legal expense is considered to be covered by the overhead provisions of Section III unless otherwise agreed to by the Parties, except as provided in Section I, Paragraph 3.

10. **Taxes**

   All taxes of every kind and nature assessed or levied upon or in connection with the Joint Property, the operation thereof, or the production therefrom, and which taxes have been paid by the Operator for the benefit of the Parties. If the ad valorem taxes are based in whole or in part upon separate valuations of each party's working interest, then notwithstanding anything to the contrary herein, charges to the Joint Account shall be made and paid by the Parties hereto in accordance with the tax value generated by each party's working interest.

— 2 —

COPAS

**Insurance**

Net premiums paid for insurance required to be carried for the Joint Operations for the protection of the Parties. In the event Joint Operations are conducted at offshore locations in which Operator may act as self-insurer for Workers' Compensation and Employers' Liability, Operator may include the risk under its self-insurance program in providing coverage under State and Federal laws, and charge the Joint Account at Operator's cost not to exceed manual rates.

**Communications**

Costs of acquiring, leasing, installing, operating, repairing and maintaining communication systems including radio and microwave facilities between the Joint Property and the Operator's nearest Shore Base Facility. In the event communication facilities systems serving the Joint Property are Operator-owned, charges to the Joint Account shall be made as provided in Paragraph 7 of this Section II.

**Ecological and Environmental**

Costs incurred on the Joint Property as a result of statutory regulations for archaeological and geophysical surveys relative to identification and protection of cultural resources and/or other environmental or ecological surveys as may be required by the Bureau of Land Management or other regulatory authority. Also, costs to provide or have available pollution containment and removal equipment plus costs of actual control and cleanup and resulting responsibilities ___

Engineering Committee Established by the Parties

A charge for the services provided by the Engineering Committee will be made to the Joint Account. The charge will be determined in accordance with the Fifth Amendment to the Unit Operating Agreement.                                                   ity.

~~_____ property, including costs required by governmental or other regulatory authority.~~

**Other Expenditures**

Any other expenditure not covered or dealt with in the foregoing provisions of this Section II, or in Section III and which is of direct benefit to the Joint Property and is incurred by the Operator in the necessary and proper conduct of the Joint Operations.

## III. OVERHEAD

compensation for administrative, supervision, office services and warehousing costs, Operator shall charge the Joint Account in accordance with this Section III.

ess otherwise agreed to by the Parties, such charge shall be in lieu of costs and expenses of all offices and salaries or wages and applicable burdens and expenses of all personnel, except those directly chargeable under Section II. The cost and expense of services from outside sources in connection with matters of taxation, traffic, accounting or matters before or involving governmental agencies shall be considered as included in the overhead rates provided for in this Section III unless such cost and expense is agreed to by the Parties as a direct charge to the Joint Account.

i.   Except as otherwise provided in Paragraph 2 of this Section III, the salaries, wages and Personal Expenses of Technical Employees and/or the cost of professional consultant services and contract services of technical personnel directly employed on the Joint Property:     in the operation of

   (   ) shall be covered by the overhead rates.

   (  X  ) shall not be covered by the overhead rates.

ii.  Except as otherwise provided in Paragraph 2 of this Section III, the salaries, wages and Personal Expenses of Technical Employees and/or costs of professional consultant services and contract services of technical personnel either temporarily or permanently assigned to and directly employed in the operation of the Joint Property:

   (   ) shall be covered by the overhead rates.

   (  X  ) shall not be covered by the overhead rates.

**Overhead – Drilling and Producing Operations**

As compensation for overhead incurred in connection with drilling and producing operations, Operator shall charge on either:

   (   ) Fixed Rate Basis, Paragraph 1A, or

   (  X  ) Percentage Basis, Paragraph 1B

1. **Overhead – Fixed Rate Basis**

(1) Operator shall charge the Joint Account at the following rates per well per month:

   Drilling Well Rate $ _____

   Producing Well Rate $ _____  (Prorated for less than a full month)

(2) Application of Overhead – Fixed Rate Basis for Drilling Well Rate shall be as follows:

   (a) Charges for drilling wells shall begin on the date when drilling or completion equipment arrives on location and terminate on the date the drilling or completion equipment moves off location or rig is released, whichever occurs first, except that no charge shall be made during suspension of drilling operations for fifteen (15) or more consecutive calendar days.

   (b) Charges for wells undergoing any type of workover or recompletion for a period of five (5) consecutive work days or more shall be made at the drilling well rate. Such charges shall be applied for the period from date workover operations, with rig or other units used in workover, commence through date of rig or other unit release, except that no charge shall be made during suspension of operations for fifteen (15) or more consecutive calendar days.

(3) Application of Overhead – Fixed Rate Basis for Producing Well Rate shall be as follows:

   (a) An active well either produced or injected into for any portion of the month shall be considered as a one-well charge for the entire month.

   (b) Each active completion in a multi-completed well in which production is not commingled down hole shall be considered as a one-well charge providing each completion is considered a separate well by the governing regulatory authority.

   (c) An inactive gas well shut in because of overproduction or failure of purchaser to take the production shall be considered as a one-well charge providing the gas well is directly connected to a permanent sales outlet.

   (d) A one-well charge shall be made for the month in which plugging and abandonment operations are completed on any well. This one-well charge shall be made whether or not the well has produced except when drilling well rate applies.

   (e) All other inactive wells (including but not limited to inactive wells covered by unit allowable, lease allowable, transferred allowable, etc.) shall not qualify for an overhead charge.

) The well rates shall be adjusted as of the first day of April each year following the effective date of the agreement to which this Accounting Procedure is attached. The adjustment shall be computed by multiplying the rate currently in use by the percentage increase or decrease in the average weekly earnings of Crude Petroleum and Gas Production Workers for the last calendar year compared to the calendar year preceding as shown by the Index of average weekly earnings of Crude Petroleum and Gas Fields Production Workers as published by the United States Department of Labor, Bureau of Labor Statistics, or the equivalent Canadian index as published by Statistics Canada, as applicable. The adjusted rates shall be the rates currently in use, plus or minus the computed adjustment.

— 3 —

**Exhibit A**
**Page 55 of 58**

COPAS

B. Overhead – Percentage Basis

(1) Operator shall charge the Joint Account at the following rates:

(a) Development

THREE Percent ( 3 %) of cost of Development of the Joint Property exclusive of costs provided under Paragraph 9 of Section II and all salvage credits.

(b) Operating

SIX Percent ( 6 %) of the cost of Operating the Joint Property exclusive of costs provided under Paragraphs 1 and 9 of Section II, all salvage credits, the value of injected substances purchased for secondary recovery and all taxes and assessments which are levied, assessed and paid upon the mineral interest in and to the Joint Property.

(2) Application of Overhead – Percentage Basis shall be as follows:

For the purpose of determining charges on a percentage basis under Paragraph 1B of this Section III, development or permanent abandonment shall include all costs in connection with drilling, redrilling, or deepening of any or all wells, and shall also include any remedial operations requiring a period of five (5) consecutive work days or more on any or all wells; also, preliminary expenditures necessary in preparation for drilling and expenditures incurred in abandoning when the well is not completed as a producer, and original cost of construction or installation of fixed assets, the expansion of fixed assets and any other project clearly discernible as a fixed asset, except Major Construction as defined in Paragraph 2 of this Section III. All other costs shall be considered as Operating except that catastrophe costs shall be assessed overhead as provided in Section III, Paragraph 3.

2. Overhead – Major Construction

To compensate Operator for overhead costs incurred in the construction and installation of fixed assets, the expansion of fixed assets, and any other project clearly discernible as a fixed asset required for the development and operation of the Joint Property, or in the dismantling for abandonment of platforms and related production facilities, Operator shall either negotiate a rate prior to the beginning of construction, or shall charge the Joint Account for Overhead based on the following rates for any Major Construction project in excess of $ _____ .

A. If the Operator absorbs the engineering, design and drafting costs related to the project:

(1) _____ % of total costs if such costs are more than $ _____ but less than $100,000; plus
(2) _____ % of total costs in excess of $100,000 but less than $1,000,000; plus
(3) _____ % of total costs in excess of $1,000,000.

If the Operator charges engineering, design and drafting costs related to the project directly to the Joint Account:

(1) 3 % of total costs if such costs are more than $ _____ but less than $500,000; plus
(2) 2 % of total costs in excess of $500,000 but less than $1,000,000; plus
(3) 1 % of total costs in excess of $1,000,000.

Total cost shall mean the gross cost of any one project. For the purpose of this paragraph, the component parts of a single project shall not be treated separately and the cost of drilling and workover wells and artificial lift equipment shall be excluded.

On each project, Operator shall advise Non-Operator(s) in advance which of the above options shall apply. In the event of any conflict between the provisions of this paragraph and those provisions under Section II, Paragraph 2 or Paragraph 6, the provisions of this paragraph shall govern.

Overhead – Catastrophe

To compensate Operator for overhead costs incurred in the event of expenditures resulting from a single occurrence due to oil spill, blowout, explosion, fire, storm, hurricane, or other catastrophe as agreed to by the Parties, which are necessary to restore the Joint Property to the equivalent condition that existed prior to the event causing the expenditures, Operator shall either negotiate a rate prior to charging the Joint Account or shall charge the Joint Account for overhead based on the following rates:

(1) _____ % of total costs through $500,000; plus
(2) 2 % of total costs in excess of $500,000 but less than $1,000,000; plus
(3) 1 % of total costs in excess of $1,000,000.

Expenditures subject to the overheads above will not be reduced by insurance recoveries, and no other overhead provisions of this Section III shall apply.

4. Unit Operator's Fee

The Unit Operator shall receive a fee each month to cover the additional duties performed in that capacity and not as Sub-Operator. Said fee shall be $4,200 each month during the period January 1, 1981 through March 31, 1982. Thereafter, said fee shall be adjusted annually on the first day of April, to reflect annual changes in the Council of Petroleum Accountants Societies Wage Index. For the sake of clarification, the following formula shall be employed for determining the new adjusted monthly charge.

$$\text{Adjusted Monthly Rate} = \frac{\$4,200 \times \text{Index Figure}}{\$351.50 \text{ (1981 Index Figure)}}$$

"Index Figure" as used herein, shall be the current index as shown in the Council of Petroleum Accountants Societies Wage Index (1962 = 100) and which is published and made effective annually on the first day of April.

5. Amendment of Rates

The Overhead rates provided for in this Section III may be amended from time to time only by mutual agreement between the Parties hereto if, in practice, the rates are found to be insufficient or excessive.

6. Statement of Clarification and Intent

See statement attached hereto and made a part of this Accounting Procedure.

...aterial furnished to the Joint Property and Material transferred from the Joint Property or disposed of by the Operator, unless otherwise agreed to by the Parties, shall be priced on the following basis exclusive of cash discounts.

I. New Material (Condition A)

(1) Tubular Goods Other than Line Pipe

(a) Tubular goods, sized 2¼ inches OD and larger, except line pipe, shall be priced at Eastern mill published carload base prices effective as of date of movement plus transportation cost using the 80,000 pound carload weight basis to the railway receiving point nearest the Joint Property for which published rail rates for tubular goods exist. If the 80,000 pound rail rate is not offered, the 70,000 pound or 90,000 pound rail rate may be used. Freight charges for tubing will be calculated from Lorain, Ohio and casing from Youngstown, Ohio.

(b) For grades which are special to one mill only, prices shall be computed at the mill base of that mill plus transportation cost from that mill to the railway receiving point nearest the Joint Property as provided above in Paragraph 2.A.(1)(a). For transportation cost from points other than Eastern mills, the 30,000 pound Oil Field Haulers Association interstate truck rate shall be used.

– 4 –

## STATEMENT OF CLARIFICATION AND INTENT

To clarify the provisions of Section II, Paragraph 2, and Section III of the Accounting Procedure attached, the following has been agreed upon by the parties with respect to the chargeability of certain expenditures which may be incurred thereunder:

All salaries, wages and payroll burden of technical employees, either permanently or temporarily assigned in Alaska, performing services for the benefit of the joint account shall be charged direct.

a. Such employees shall consist of Operator's Exploration, Producing, and Environmental Departments' technical employees, including geologists, geophysicists, engineers, technologists, engineering assistants, technicians, draftsmen, engineering clerks and field communications technicians performing technical services within the technical organization. Charges to the joint account for any technical employees in job categories other than those stated above would require prior written approval of Non-Operators.

b. The time of said employees shall be charged direct only when such time involves at least one day or more per month devoted to the joint operation.

c. All charges for technical employees will be based on actual salary and burden. Documentation for audit purposes shall be the same as for Paragraph 1(a).

2. Gross charges to the Joint Account for technical labor outside Alaska, over $50,000 per project must be specifically approved prior to charging the Joint Account. Prior approval must be in writing in either an AFE or letter agreement. Salaries, wages and payroll burden of technical employees (as defined in 1.a. above) working outside of Alaska and performing services for the benefit of the joint operations shall be charged direct if:

- the services can be performed as cost-effectively outside of Alaska as inside of Alaska;
- the services cannot be performed by the Operator's normal Alaskan district, division, or regional office technical employees.;
- the gross cost is less than $50,000 per project;

All technical labor shall be charged at salary and burden. Time sheets documenting charged employees must be provided for audit purposes.

3. Services performed by an entity related to the operator shall be charged at the entity's actual salary, wages, labor, payroll burden and up to 15% for the entity's overhead. The operator shall add percentage-based overhead to this sum as provided in the Accounting Procedure attached. Actual charges, including overhead, from the entity shall not exceed commercial rates for similar services in the immediate area.

4. All salaries, wages and payroll burden of fire and safety employees, material expediter(s), warehousemen and dispatchers either permanently or temporarily assigned in Alaska, performing services for the direct benefit of the joint account shall be charged direct.

5. Shore Base Facilities and offices in the Kenai-Nikiski Area will allocate a portion of their office expenses, when they directly benefit the joint account. The allocated expenses will be charged direct and include, but not be limited to, secretarial/clerical labor, rent (or depreciation in lieu thereof), utilities, materials and supplies, operating and maintenance costs and other related expenses. Employees supporting accounts payable and purchasing agents located in the Kenai-Nikiski area office will not be charged to the Joint Account.

6. The salaries, wages, payroll burden and related costs of area, district, division and regional office employees, except those charged direct under paragraphs 1 through 5 above, shall be considered as

**Exhibit A**
Page 57 of 58

covered by Operator's overhead rates.  These non-chargeable costs shall include Area or Field Superintendent, stenographic, clerical, purchasing, landman, industrial relations, accounting, EDP, departmental management, top technical managers and  other services personnel and all district, division and regional office costs including, but not limited to, rent (or depreciation in lieu thereof), interest on investment, utilities, janitorial, materials and supplies, operating and maintenance costs and other related costs applicable to the Exploration, Producing, and Environmental Departments.

7.   Overhead - Major Construction is hereby further defined to include any single non-Development project AFE, whether capital or expense, with actual gross costs which exceed  $100,000.

8.   Legal fees over $25,000 must be approved by the parties prior to charging to the Joint Account.

9.   The overhead rates as defined in the 8th Amendment will apply to all costs billed to the Joint Account after December 1, 1994, regardless of the date of service or purchase.