directly employed on the Joint Property, including the cost of moving their household goods and personal effects, shall be a direct charge unless such move is for the primary benefit of the Operator.

Transportation costs of Material necessary for the Joint Operations shall be charged to the Joint Account. In paragraphs 5A and 5B of the Accounting Procedure the following definitions are applicable:

Reliable supply store shall mean a recognized source or common stock point for the particular Material involved.

The COPAS Material Pricing Manual (Bulletin No.21) describes "Railway Receiving Point" as the railhead nearest the Joint Property for which freight rates are published to determine the freight to be charged by the Operator on Material delivered to the Joint Property, even though an actual railhead does not exist. The Computerized Equipment Pricing System (CEPS) developed by COPAS and offered through General Electric Information Services Company (GEISCO) to industry users, utilizes the Rail Rate Schedule published by LTV Energy Products Company, formerly Continental Emsco.

The $400 limit for the option to equalize or charge actual gross trucking cost will be adjusted to the amount most recently recommended by COPAS. (Refer to Bulletin No.21 for detailed procedures on applying this limit) This will eliminate the need for an amendment to the Accounting Procedure as costs fluctuate from time to time.

6. **Services**

Professional consulting services and contract services of technical personnel are charged direct under the provisions of this paragraph if under the same circumstances Technical Employees of the Operator would be charged direct. Charges under any other circumstances require prior agreement by the Parties.

7. **Equipment and Facilities Furnished by Operator**

The term equipment and facilities is used in the broad sense to include equipment which may be mobile or semimobile and also installations which may be semipermanent or permanent in nature. Examples of such facilities and the recommended basis of charge are as follows:

| Equipment/Facilities | Basis of Charge |
|---|---|
| **1. Mobile Equipment** | |
| Aircraft | Mile/Hour |
| Automobiles | Mile/Hour |
| Trucks | Mile/Hour |
| Tractors | Hour |
| Bulldozers | Hour |
| Mobile Cranes | Hour |
| Trailer-mounted Test Separators | Hour |
| Truck-mounted Paraffin Scraping Units | Hour |
| Trailer-mounted Cement Mixers | Hour |
| Boats | Day/Hour/Mile |
| House Trailers | Day |
| **2. Semimobile Equipment** | |
| Drill Rigs | Foot/Day |
| Workover Rigs | Hour |
| Pulling Units | Hour |
| Derricks | Day |
| Drilling Tender | Day |
| Barges | Day |
| **3. Semipermanent Installations** | |
| Skid-mounted Separators | Day/Volume |
| Skid-mounted Compressors | Day/Volume |
| **4. Permanent Installations** | |
| Compressor Stations | Volume |
| Saltwater Disposal Wells | Volume/Wells |
| Fresh water Wells and Supply Systems | Volume |
| Roads | Wells |
| Production/Drilling Platform | Volume/Wells |
| Canals | Wells |
| Docks | Wells |
| Oil Storage and Loading Facilities | Volume/Wells |
| Gathering Systems | Volume/Wells |
| ACT Systems | Volume/Wells |
| Laboratory Services (excluding research work) | Hour/Unit |
| Shore Base Facilities | Wells/Project/Other Equitable Basis |
| Communication Equipment | Time/Other Equitable Basis |
| Computer Production Control Equipment | Wells Connected/Functions Performed/ Other Equitable Basis |
| **5. Miscellaneous** | |
| Drill Pipe | Foot/Day |
| Casing Setting Tools | Day |
| Well Testing Equipment | Day |

Normally, the Joint Property rents the use of these facilities when in practice the Joint Property has need for only a small portion of the service available from the facility. As an example, one joint interest well located in proximity to a large number of wells wholly owned by the Operator will normally be furnished the services of a saltwater disposal system or compressor system on a cost of service or rental basis. The same practice is true in the case of automobiles, trucks, and drilling equipment where the equipment may be in use only for a short time on the Joint Property.

Where the cost of the service is expected to involve a greater than normal cost, the Operator is well advised to obtain a separate letter or some other type of agreement authorizing the charge. This is advisable because the Accounting Procedure is general in nature and limits the Operator to charge an amount not in excess of the rates normally prevailing in the field. In many instances there is no established rate and it is necessary to rely upon Operator's cost in establishing the rates.

Although the rates charged by the Operator should be in line with those normally prevailing in the field, the Operator is also charged with the duties and acts of a prudent individual experienced in oil field operations and technology; therefore, in cases of bona fide emergencies where time is of the essence, it is felt that the Operator is authorized to exceed the normal prevailing rates where time and circumstances dictate the use of facilities nearest at hand and do not afford the opportunity to shop for the lowest or prevailing cost.

When the Operator's wholly owned facilities are used on or serve the Joint Property and he elects to charge the Joint Account on the basis of costs of ownership and operation, he is entitled to recover his costs including interest on investment less depreciation prorated on the basis of time actually used on or serving the Joint Property. Such costs should include labor, maintenance, repair, depreciation of investment including overhead on construction, insurance, interest on investment less depreciation and applicable taxes. In addition, for platforms only, the cost may include an element of the estimated ultimate expense to dismantle the platform for abandonment. The cost of dismantlement used in this calculation may be the projected current estimate of the Operator or some other element of cost as agreed to by the Parties. The intent of this handling is to recognize the substantial cost ultimately to be borne by the Operator for platform abandonment which otherwise would not be shared by nonowning users of the platform during its useful life.

The current consensus is that an Operator should not charge the Joint Account a profit for the use of his equipment. The interest allowed on investment less accumulated depreciation is considered the cost of money and not a profit.

The greatest difficulty in determining reasonable depreciation is encountered in the case of permanent installations of the type of compressor stations and saltwater disposal systems. In order to accommodate the Joint Property along with his own and other Joint Properties, the Operator will frequently install a larger installation than he needs for his own use. If a high rate of depreciation is not charged in the early life of the installation, later the Operator may be left with greater capacity than needed for his remaining wells; and thus the burden of having served the Joint Property is shifted to the Operator's sole account. Neither a depreciation rate based on unit of production nor a rate based on passage of time is entirely adequate to prevent such an inequity. Also, the cost of the foundations of these permanent installations, which are not salvable, is frequently equal to or greater than the equipment itself; therefore, if the installation is expected to be used for a period of one-half its useful life; the foundation, not being movable, must be fully depreciated, while the compressor itself should only be depreciated down to its expected salvage value. The cost of intangibles, such as transportation, dirt work, etc., not salvable, should be fully depreciated.

In those instances when the maintenance and repair cost of the facility is absorbed by the Operator, the depreciation race should be considered in its appropriate relationship with these costs in establishing the overall rate. In the earlier life of the facility, maintenance and repair costs should be relatively insignificant; whereas, in the later life of the facility (when possible the facility may be

fully depreciated on Operator's books) the maintenance and repair costs would tend to increase substantially. It is, therefore, suggested that an equitable rate be determined, the elements of cost to include not only depreciation, but maintenance and repair costs. These elements of cost should continue in the rental charge throughout the life of the equipment, regardless of the fact that the facility might be fully depreciated on the Operator's books. This logic should be applied in general to categories: 1. Mobile Equipment, 2. Semi-mobile Equipment, 3. Semipermanent Installations, and 5. Miscellaneous equipment.

In those instances when the maintenance and repair costs of the facility are charged to the Joint Account, the depreciation rate should be considered separately from the maintenance and repair costs. After giving proper consideration to salvage value, estimated service life, and other conditions mentioned above, an equitable depreciation rate should be determined to recover the Operator's cost. After such cost (including interest on investment, overhead on construction and other costs originally absorbed by Operator) has been recovered, the depreciation element of rental should be discontinued. This logic should be generally applied to Category 4, Permanent Installations.

The period of time a facility is charged to the Joint Account compared to the time the facility is actually in use is sometimes a matter of controversy and it is not always an easy matter to arrive at an equitable solution. Generally, in the case of categories: 1. Mobile Equipment, 2. Semi-mobile Equipment, 3. Semipermanent Installations, and 5. Miscellaneous equipment, charges should be made for the time a facility is at the exclusive disposal and use of the Joint Account and is required to be available on a standby basis to adequately serve the Joint Account. We assume, of course, that the Operator is a prudent one and does not move a facility into the service of a Joint Property before its use is required nor permit the facility to remain on or in the service of the Joint Property when it is not necessary. In the case of Category 4. Permanent Installations, the period of time the facility is charged should be generally on the basis of actual time used. This would be appropriate for permanent compressor stations saltwater disposal wells, freshwater wells and supply systems, gathering systems and ACT systems. In other instances charges for facilities in this category (such as roads, canals, docks and oil storage and loading facilities) should be based on their availability for use if the service is of a continuing or permanent nature and by special agreement if the service is of a temporary nature.

The Joint Account should be charged with transportation of the facility to and from the Joint Property except when the facility is transferred to another service location, and charges should also include cost of setting up and dismantling the facility when such services are particularly required for the Joint Property.

For charging the use of Operator owned Computer Production Control Equipment refer to COPAS Bulletin No 12.

Where wholly owned facilities are rented to the Joint Property and the costs are anticipated to be equal to or less than the prevailing field price, the Operator can adequately pass these costs on under the provisions of the Accounting Procedure. In instances where the costs are expected to exceed the charge prevailing in the field or normal in industry in the area, the Operator should obtain prior agreement from the Nonoperators.

Whenever requested, Operator shall inform Nonoperators in advance of the rates it proposes to charge.

8. **Damages and Losses to Joint Property**

The generally accepted operating agreement provides that cost incurred for repairs or replacement of Joint Property because of damage or toss shall be borne by the Joint Account. Damages or losses to the Joint Property because of fire, lightning, windstorm, hurricane, hail, smoke, explosion, flood,

theft, accident, vandalism, malicious mischief or any other cause are recognized Joint Account costs except to the extent that the damages or losses resulted from gross negligence or willful misconduct on the part of the Operator.

As soon as practicable the Operator should notify Nonoperators in writing of the damage or loss giving the time, cause, extent and the estimated charge to the Joint Account. The Operator should also give immediate notice to the insurance carrier, if the Joint Property is covered by insurance, and protect the property from further damage. If the loss results from theft, vandalism or malicious mischief, the proper law enforcement agency should be notified.

If any equipment is destroyed or removed from the Joint Property, the Operator should furnish Nonoperators sufficient records and information to enable them to make proper entries to their investment records, and upon request, make available additional information to make claims against their insurers outside the Joint Account.

Any settlement received from an insurance carrier should be credited to the Parties participating in any Joint Property insurance coverage.

9.  **Legal Expense**

    Expenses, other than attorneys' services, incurred in handling, investigating and settling litigation or claims arising by reason of Joint Operations, or necessary to protect or recover the Joint Property, including court costs, costs of investigation or procuring evidence and amounts paid in settlement or satisfaction of any litigation or claim, are recognized as direct Joint Account costs. It should be recognized that these direct costs are subject to the limitation on provided in the operating agreement. These charges expressly relate only to such costs in connection with litigation and claims.

    No charge shall be made for services of Operator's legal staff or fees and expenses of outside counsel unless agreed to by the Parties. Otherwise, costs of such services are considered covered by the overhead. An exception is those costs in connection with the collection of unpaid amounts as provided in Section I, paragraph 3, of the Accounting Procedure.

    There are, however, other legal expenses which arise by reason of the Joint Operations, such as drilling contracts and other contracts of all kinds, title examination and curative activities, gas and oil sales and other disposition, division orders and many other activities relating to the Joint Property. All of these are considered to be covered by the overhead, whether rendered by staff or outside attorneys, unless agreed to by the Parties.

    If some unusual and special activity occurs requiring legal services for the benefit of the Parties to the operating agreement, it would be anticipated that the Parties would consent, as necessary, to a direct charge for such services.

    Through the use of the procedure's outlined in the above paragraphs, an Operator with little or no legal staff and an Operator who has such a staff but uses outside counsel for all or some of such functions will be treated equally with an Operator who has and uses such a staff.

10. **Taxes**

    If ad valorem taxes are based in whole or in part upon separate valuations of each Party's working interest, then charges to the Joint Account shall be made and paid by the Parties hereto in accordance with the tax value generated by each Parry's working interest. For example, if the Parties have different gas sales contracts and receive different prices for their gas and if the ad valorem tax is based upon separate valuations of each Party's working interest, then it is the intent of this provision

that the tax be shared in accordance with the tax value generated by each Party's working interest rather than the regular working interest percentages of the Joint Account

11. Insurance

The costs of net premiums for insurance required to be carried for the Joint Operations for the protection of the Parties are chargeable to the Joint Account. The types and amounts of insurance are to be agreed upon by the Parties and are usually included in the operating agreement. Net premiums are those premiums paid by the Operator less any refunds or rebates.

The following are types of insurance commonly required to be carried:

A. Worker's Compensation and Employer's Liability Insurance which is designed to cover a company's liability to its employees for on-the-job injuries. The obligation to be insured is required by law in some states; however, some permit self-insurance in which case a charge representing the cost of such insurance adjusted by Operator's experience factor should be charged not to exceed manual rates.

It should be noted that there is no Federal Administration or regulation of the insurance requirements offshore, other than the coverage required under the Longshoremen and Harbor Workers Act and the Seamen's Coverage under the Jones Act, etc. Consequently, there are no manual rates specifically applicable to offshore operations beyond the jurisdiction of the adjacent states. With respect to the computation of costs under an Operator's self-insurance program for offshore operations, the common practice is to add the cost of additional specific coverages required offshore to the current manual rates applicable to the adjacent state.

An equitable charge, based on direct labor of alt employees assigned to operations conducted for all business activities of the Operator within a state requiring a deposit fund, allocating an imputed interest allowance at prevailing rates per annum of the amount of the deposit fund required would be an acceptable method of determining this element of cost plus actual losses associated with the Joint Operation.

B. Comprehensive Automobile Liability Insurance which protects the Operator from damages resulting from the use of jointly owned vehicles. In addition to the liability coverage in the policy, there is usually an endorsement adding fire, theft and additional comprehensive coverage which provides protection for physical damage to, or loss of, the vehicles.

C. Comprehensive General Liability Insurance which provides protection to the Parties from claims by third parties. The primary coverage in this base policy maybe supplemented by additions to cover specific risks.

An Operator having an insurance program providing wide coverage to all types of business activities with varying degrees of risk of which even portions of all risks may be or may not be self-insured for the Joint Account may charge the Joint Account on an equitable basis the combined self-insured portion and premium cost not to exceed the manual rates established by the regulatory agency of the state or federal jurisdiction in which Joint Operations are conducted.

    D. Additional insurance may be required for offshore operations, such as:

        1. Longshoremen and Harbor Workers Compensation Insurance under the United States Longshoremen and Harbor Worker's Compensation Act, Marine and voluntary coverage or similar coverage which may be required for operations outside the continental limits of the United States.

        2. Vessels, Hull and Machinery Insurance to the extent of sound value.

        3. Waterborne Cargo Insurance to the extent of sound value.

    No charge for insurance premiums on automotive equipment owned exclusively by Operator should be made to the Joint Account except as otherwise provided in the operating agreement.

## 12. Communications

Additional costs are incurred to provide communication facilities unique to offshore operations. Offshore remoteness and exposure to hazardous conditions dictate the need for specialized communication facilities such as radio, microwave, satellite, etc., for normal operations as well as for safety considerations. For information on Computer Production Control Systems refer to COPAS Bulletin No.12, Computer Production Control Accounting Guidelines.

Joint Account charges are limited to equipment and associated expenses on the Joint Property and between the Joint Property and the nearest Shore Base Facility. Systems serving only the Joint Property would normally be jointly owned with all costs borne by the Joint Account. Systems serving multiple offshore fields with various ,ownerships would normally be Operator-owned with charges made to properties served on an equitable basis such as established rates, direct usage, allocation, etc.

## 13. Ecological and Environmental

It is intended that the Joint Account be charged for operations conducted on the Joint Property as a result of statutory regulations imposed by regulatory authorities in connection with ecological and environmental requirements when the Operator funds such operations on behalf of all Parties. Stipulations attached to certain OCS leases sometimes require the Operator to conduct certain operations relative to ecological, environmental and pollution considerations.
Examples of current regulatory requirements are:

(a) Conduct of geophysical/archaeological surveys to determine potential existence of any cultural resources (site, structure or object of historical or archaeological significance) which could be affected by the offshore operation.

(b) Bottom mapping of the sea floor prior to any drilling activity or placement of any permanent drilling/production platforms or pipelines.

(c) Geophysical or other data on sea floor features to prove to the satisfaction of the regulatory authorities that operations will not interfere with other significant uses of the Outer Continental Shelf including commercial fishing.

Pollution containment and removal equipment must also be available. The Operator is required to immediately deploy appropriate equipment to the site of an oil spill and start containment and clean-up operations. The equipment is not ordinarily Operator-owned, but is generally made available to the Operator through his membership in an association such as Clean Gulf Associates or Clean

Atlantic Associates. Operator-incurred costs of such association charges are allocated to Joint Properties on various bases such as barrels of liquid production, drilling operations, acreage leased, etc. In addition, the Joint Account incurs direct usage charges for such equipment utilized for an oil spill clean-up on the Joint Property.

14. **Abandonment and Reclamation**

All well abandonment costs incurred in meeting regulatory agency requirements in the plugging and abandonment of wells are proper charges to the Joint Property. In addition, costs incurred to abandon surface facilities, including platforms and other offshore structures, and/or place the surface in the same condition it was in prior to the equipment or facility being installed, and required by terms of a lease or by regulatory agency, are proper charges to the Joint Property.

15. **Other Expenditures**

This provision is included to cover expenditures of a direct nature which may be required due to changes in governmental regulations or operating practices.

# III. OVERHEAD

**GENERAL**

Overhead is a provision whereby those costs incurred above the lease operating level which generally include administrative costs, supervision, office services and warehousing costs are combined into a single overhead allowance for a given type of operation. This overhead charge shall be in lieu of costs and expense of all offices and salaries or wages plus applicable burden and expenses of all personnel except those directly chargeable under Section II, Paragraph 2A.

Administrative costs for overhead purposes are defined as those general costs attributed to executive and administrative functions incurred by the Operator at the home, divisional, area, regional, or similar administrative office above the operating level serving, indirectly, the development and producing operations. - In the case of the large or "major" companies, the administrative function can be located in more than one office, while in the case of the smaller or "independent" companies the function is usually located at the home office. Administrative costs applicable to development and producing)n operations include the overhead of the related facility operations, such as gas systems and plants, salt water disposal systems, additional recovery systems, etc., if such other facility operations are administered b~ a common staff with the development and producing operations. Administrative overhead costs of downstream operations, such as refinery, sales, oil and gas transportation, oil purchases and sales, manufacturing and other operations not directly associated with producing operations should not be included in administrative costs. In determining the apportionment of administrative costs of any particular account, equitable weight should be given to all functions.

Supervision and office services performed at the area, regional or district level which are incurred while drilling and producing and are of such a general nature that all wells, leases and facilities in the area benefit proportionately, are recognized as being included in the overhead rate.

These expenses consist of the salaries and expenses of the production superintendent and other employees serving properties in the same operating area whose time is not charged directly to the properties.

Costs of field operated and maintained buildings permanently staffed by field employees responsible for directly operating leases and units, and whose salaries and wages are charged directly to the leases and units served by the building and associated facilities are direct charges to the Joint Properties served by the field employees.

Warehouse operation and maintenance expenses represent Operator's cost of storing and handling that Material for which it is not practical nor feasible to purchase directly from outside sources at the required time of need.

The warehouse operation and maintenance expenses include costs such as: salaries and related payroll burden of warehousemen or clerks receiving and disbursing stock items, depreciation on material storage facilities, loading, unloading and transportation in to stocking point, maintenance and care of stock and storage facilities and any other cost incurred directly for the purpose of warehousing Material.

For further amplification, refer to COPAS Bulletin No.16 on Overhead.

    i.    This section provides that other costs not provided for as Direct Charges under Section II shall be recovered under the overhead provisions on the basis of either a fixed rate or percentage rate.

ii. This paragraph provides for the election of charging Technical Employees, salaries or wages plus applicable burdens and Personal Expenses, for work performed on the Joint Property either direct or by including these costs in the overhead rate. Costs of professional consultant services and contract services of technical personnel are closely related and should be treated the same as Technical Employees.

Time records should be kept to support charges and chargeable time would include travel time to and from the Joint Property. It would not include preliminary preparation time and followup effort performed after the onsite visit.

iii. This paragraph provides for the election of charging Technical Employees, salaries or wages plus applicable burdens and Personal Expenses, for work performed in the operation of the Joint Property, either direct or by including these costs in the overhead rate. Costs of professional consultant services and contract services of technical personnel are closely related and should be treated the same as Technical Employees. Again, time records should he maintained to support these direct charges.

1. **Overhead - Drilling and Producing Operations**

    A. Overhead - Fixed Rate Basis

    (1) Drilling well Rates

    (a) The drilling well rate is expressed as a "per well per month" rate, but the application is based on drilling days during a month. For example, if a rig arrives on location January 31, the Joint Account would be charged 1/31st of the monthly rate, while a rig arriving on February 28 in a non-leap year would generate a charge of 1/28th of the monthly rate. Another way to prorate the rate is to divide the number of days in a month into the drilling well rate, then multiply the daily rate by the number of drilling days.

    The date for terminating the overhead charges has always been hard to express, as it was -felt the well attracted drilling overhead as long as the well was sustaining some type of drilling or completion work. The only evidence that such an operation is continuing is the use of some type of unit used in drilling operations, or a unit used in completion work remaining in use on the well. These provisions are not intended to cover equipment used in production testing, cleanup operations, testing for state and federal regulations, etc. Conversely, if work is suspended, for whatever reason, for a period of up to fourteen days, and then drilling or completion work is continued, overhead may be charged for the suspended time. If, however, the suspension is for a period of fifteen days or more, even though drilling or completion work is continued following such suspension, overhead is not chargeable for the suspended period.

    (b) Workover or recompletion operations attract overhead similar to drilling wells, as many of the same concerns are present. Technology has produced tools that are able to perform such operations without requiring the use of large drilling rigs or other high cost units, and therefore, it has become more complicated to determine when these operations should qualify for drilling well overhead rates. Rather than require an accountant to know what type of equipment is capable of drilling, or use some other technical method, if the operation requires five or more consecutive workdays using a rig or other unit, the operation qualifies for the drilling well rate. The same rules govern suspension of work as were applied to the drilling well in (a) above.

(2) Producing Well Rates

Producing gas wells, injection wells for recovery operations, water supply wells utilized for water flooding operations, salt water disposal wells, and gas wells shut in for overproduction or failure of purchaser to take production shall be included in the producing well schedule and be considered the same as producing oil wells.

Wells permanently shut down, but on which plugging operations are deferred, shall be dropped from the well schedule at the time the well shut down is effective. The producing overhead rate shall be charged for the entire month during which plugging operations are completed.

Any well that produces or injects a volume during any portion of a month shall be considered as a producing well for the entire month, regardless of whether there has been a fractional part of the month's drilling overhead rate charged. The same administrative efforts are involved for a producing well in accounting to the various regulatory bodies and bookkeeping for this accounting, whether a well produced one day during the month or the complete month. This recommended method of charging producing overhead is based on the functional requirements in accounting for production as opposed for those in accounting for drilling operations. It is felt that the functions involved in the two types of operations tend to separate the administrative level into two separate overhead classifications.

Wells being plugged back or drilled deeper, either in the same or in a new formation, and wells being converted to a source or input well, should be included in the drilling well overhead schedule. Wells which are undergoing any type of workover that requires five or more consecutive workdays, shall be considered as drilling wells.

Wells undergoing normal maintenance, such as pulling or rerunning rods, replacing or respacing tubing, repairing or replacing gas lift valve installations, and the repair or replacement of production pumps, shall be included in the producing well overhead schedule, unless such work requires five or more consecutive workdays. In such event, the particular well will be considered the same as a drilling well for overhead application.

B. Overhead - Percentage Basis

The base used for applying the agreed percentage provisions is the total chargeable costs currently billed less certain specific exclusions; which for the development of the Joint Property is legal expense and credits for equipment salvaged, and for operating the Joint Property is rentals and royalties, legal expense and credits for equipment salvaged Additionally, items to be excluded are the value of purchased secondary recovery injected substances, and any and all taxes levied, assessed and paid upon the mineral interest for the Joint Property. Although the accounting procedure uses the term "secondary"; the intent was to include all phases of enhanced recovery.

Application of Overhead - Percentage Basis

The determination of the overhead charges using the percentage basis is relatively simple in that Development means all costs and expenses incurred in the preliminary preparation of the location, to drill, redrill, or deepen, and also any remedial operations on any well or wells which require five (5) or more consecutive work days. Also, costs associated with the abandonment of a well at the time of drilling, i.e. costs to salvage Material, clean up location, restore location to its original condition, are included in the base. Costs connected with the construction, installation or expansion of fixed assets, are also included.

All other expenditures other than those recognized as development, major construction or catastrophe expenditures are considered operating costs and are subject to the operating overhead percentage application.

2. **Overhead - Major Construction**

The provisions of this paragraph permit the Parties to establish a minimum amount before any construction or dismantlement for abandonment project qualifies as major construction to which the appropriate rate would be applied as further defined in the paragraph. Overhead on any project costing less than the minimum amount would be included in the fixed rate basis if that basis for overhead was elected, or in the case of the percentage basis the development rate would apply.

In negotiating major construction overhead rates, special consideration should be given as to whether construction projects including engineering, design and specifications, etc., will be absorbed by the Operator or charged direct to the Joint Account. Provisions have been incorporated to establish rates to compensate Operator if all engineering, design and drafting costs are absorbed by the Operator and rates to compensate Operator if the engineering, design and drafting tests are charged directly to the Joint Account whether such work is performed by Operator or by a third party contractor. It is anticipated that both sections will be completed and the Operator will select the appropriate option for each project. Provision is made for advance notification to Nonoperators of the option selected for each project. Such notification should accompany the AFE when submitted to the Nonoperator for approval.

Overhead rates are applied to total gross cost of a single project. Total gross cost means all costs exclusive of overhead charged to the project, reduced by the credits for refunds or returns. Additions, modifications, enlargements, dismantling for abandonment, etc., required at some date subsequent to the physical completion of the project would constitute a separate project.

3. **Overhead - Catastrophe**

A major catastrophe commands the direct intervention and supervision of administrative management more than any other offshore event. Usually, an administrative team is formed by the Operator to deal with the media, general public, the regulatory authorities, the Nonoperators and anyone alleging damages to his property or personal injury, and in addition to formulate courses of action to deal with the emergency. Both development and producing operations may be suspended due to a catastrophe. This provision has as its purpose a basis of reimbursing Operator for its overhead costs incurred in such an event. If as a result of the event, relief wells are drilled or existing wells are reworked, the provisions of this paragraph would apply to that operation in lieu of fixed well rate bases in paragraph 1.A. or the percentage bases in paragraph 1.B. Furthermore, this provision replaces overhead for major construction; paragraph 2, even though major construction may be required to restore the premises to the equivalent condition that existed prior to the event causing the expenditure. Catastrophe overhead should not be construed to be in lieu of either fixed rates or percentage overhead in the event normal operations are continued under the operating agreement, i.e., such rates shall continue to apply to such normal operations conducted simultaneous with catastrophe restoration operations.

In the event of a single occurrence, such as a hurricane, that affects more than one jointly-owned property operated under a single contract, it is intended that the overhead rates herein shall apply to the gross costs incurred due to the single occurrence. Gross cost should not be reduced by the value of salvage recoveries or insurance proceeds. The overhead rates should be applied to the gross costs incurred necessary to restore the property to the equivalent condition that existed prior to the event causing the expenditure or if not restored, to the gross costs incurred up to the point of abandonment or other disposition. Under the operating agreement, the Operator usually is granted broad authority

during a catastrophe to incur such expenditures as are necessary to protect life and property; therefore, it is possible the gross costs will include costs not normally contemplated in the Accounting Procedure; for example, clean-up costs off the Joint Property due to an oil spill that occurred on the Joint Property. The Operator should separately identify for audit purposes the gross cost of the catastrophe, due to special accounting required and, if applicable, for insurance purposes.

4. **Amendment Of Rates**

It is common practice in the industry during the agreement negotiations to agree upon an allowance for Operator in lieu of actual overhead cost incurred for the benefit of the Joint Account. Such allowance may be reviewed periodically to determine if it is equitable and commensurate with Operator's overhead costs, considering changes in the services furnished, the fluctuation of wages and other cost variances from the date of the agreement or last change, not coveted by the April 1 adjustment.

# IV. PRICING OF JOINT ACCOUNT MATERIAL PURCHASES, TRANSFERS AND DISPOSITIONS

A uniform method of pricing new and used Material is necessary in order to provide a basis by which the Parties can operate with a minimum of differences regarding the pricing of Material.

Material supplied by the Non-operator should comply with the Operator's specifications and be delivered in good condition and on a timely basis. The Non-operator shall bear all expenses relative to supplying Material.

1.  **Purchases**

    Material purchased specifically for a Joint Property should be charged to that property from the vendor's invoice at the price paid after deduction of all discounts actually taken. This would include the transportation from vendors stocking point, any modification such as coating and wrapping for use on the property.

2.  **Transfers And Dispositions**

    The Accounting Procedure addresses Material transferred to or from the Joint Account and provides instruction for the pricing of such Material. This procedure provides a consistent auditable basis for charging or crediting the Joint Account. For more information, refer to COPAS Bulletin 21, "Material Pricing Manual".

    The Operator has the option to use Continental Emsco (LTV) published freight rates from Lorain and Youngstown, Ohio to railway receiving points within the United States for tubular transfer movements or other published freight rates. The LTV freight rates are used in the GEISCO/COPAS Computerized Equipment Pricing System (CEPS).

    The Accounting Procedure provides for the disposition of surplus Material by the following methods:

    1. Purchase by Operator or Non-operator(s)
    2. Division in Kind
    3. Sales to Outsiders

    Proper credits to the Joint Account resulting from the disposition of surplus Material by one of the above methods should be reflected in the monthly statement covering the period in which the transaction occurred. Controllable/non-controllable Material should not be disposed of without a material transfer or similar document being prepared initiating credit to the Joint Account.

    The accounting procedure provides that junk shall be disposed of by material transfer or sale. The Operator has the right to take such Material into its 100 percent account at prevailing junk prices in that area or retain for the Joint Account until a reasonable quantity is accumulated for sale to an outsider. The usual practice in the industry is purchase by the Operator, thus giving immediate credit to the Joint Account.

Material Purchased by Operator or Non-operator(s)

The Operator has the prerogative, subject to contract limitations, to purchase for its own account surplus Condition A or B Material without approval of Non-operators. This would include controllable and non-controllable equipment. Other dispositions of Condition A or B Controllable Material would require approval of the Parties. Any disposal of Condition C Controllable Material, i.e., purchase by Operator or Non-operator, division in kind, or sale to outsiders, would have to be agreed to by the Parties. Condition D and B Material can be disposed of under procedures normally used by the Operator without prior approval of Non-operators. Any purchase of Material by Operator, without approval of the Parties, shall be on the basis of condition value.

Occasionally, the Operator may desire to acquire a piece of equipment from the Joint Account that is in B condition, thereby requiring credit to the Joint Account at condition percent of new value. However, due to the age or obsolescence of the equipment, the Operator may not feel that condition percent of new or comparable value is equitable. Nevertheless, if Operator acquires the Material, the Operator must grant credit in accordance with the provisions of the Accounting Procedure unless prior approval of Non-operator(s) for a stipulated value has been obtained.

Division in Kind

Operator and Non-operator(s) nay elect to divide, in proportion to each Party's interest, surplus Material from the Joint Property. Due to the time, expense and inconvenience involved, a division of Material among the Parties will be infrequent. Division in kind could occur during periods of Material shortage or from joint projects where large quantities of Material often become surplus. At such time as a division occurs, Operator should bill the Parties acquiring the Material as if it were a sale to an outsider and, upon receipt of payment, credit the Joint Account with the proceeds therefrom. In the event the Material or equipment involved is of such nature that division in kind would be impractical or impossible, the Parties desiring the Material must arrive at a mutual agreement as to its disposition; or if unable to do so, Operator shall sell the Material as provided below,

Sales to Outsiders

Disposition of Material by this method is accomplished on the basis of competitive bidding in writing from outsiders. This will normally occur after it has been determined that neither Operator nor Non-operators have need for the Material and approval has been obtained by Operator to dispose of the Material at the best price possible.

In the absence of explanatory detail in the operating agreement, covering the disposition of Material, it is recommended that after approval has been obtained by the Operator to dispose of the Material, the Non-operator(s) as well as outsiders be allowed the opportunity to submit bids. If the Operator deems the high bid is satisfactory, the sale will be made to the high bidder.

3.  **Premium Prices**

Purchases for Specific Properties

A.  New Material

Operator should charge price paid after deduction of all discounts received. Non-operator, however, should be notified when the price paid is in excess of the higher of the mill base price, manufacturer price, or current out of stock price from established reliable supply stores.

33

**EXHIBIT E-2**
**PAGE 35 OF 40**

B. Used Material

Used Material should also be charged at the price paid by Operator. Non-operator should be notified when actual cost incurred in providing the Material and in making it suitable for use is in excess of the higher of the new mill base price, manufacturer price, or current out of stock price from established, reliable supply stores.

Transfers and Warehouse Issues

A. New Material

During a premium pricing period, Operator may incur costs which exceed the amount chargeable during a "normal" pricing period. If the Operator elects to charge such costs, Non-operator should be notified.

B. Used Material

Transfers of Material between properties and issues from warehouse stock are normally priced at the appropriate condition value of current new prices. However, during a premium pricing period, Operator may incur costs either through reconditioning or actual price paid that exceed condition value of current new prices. Non-operator should be notified when the amount to be charged is greater than that allowed during a "normal" pricing period.

C. Chargeable Costs

Actual costs may include costs of (I) Material, (2) making it suitable for use, and (3) transportation from the point of acquisition to the Joint Property including loading and unloading. Not included are storage or carrying costs.

Non-operator's Right to Furnish in Kind

A. The opening paragraph of Section IV recognizes the Operator is the Party primarily responsible for providing all Material to be used on the Joint Property, whether it is new or used, but it also recognizes that Non-operators may supply such Material at the Operator's option. An example of such a situation would be when tabular goods are in short supply, an Operator has limited quantities and may desire to request Non-operators to furnish their share in kind.

B. When it becomes necessary for an Operator to go outside the normal supply channels to pay premium prices, to incur transportation and/or repair costs, and the Operator desires to pass some or all of these costs to the Joint Account, the Operator is required to provide Non-operators a written notice of such costs. The Non-operators can elect to furnish all or part of their shares of such Material by notifying the Operator within ten days after Operator's notice is received. Such Material furnished in kind must be of a quality and condition acceptable to the Operator.

Additional information may be found in COPAS Interpretation No.10.

4. **Warranty Of Material Furnished By Operator**

The Operator does not warrant Material purchased for or transferred to the Joint Account.
However, it is the Operator's responsibility to pursue warranty with the applicable vendor and pass credits to the Joint Account when the Operator receives credit.

34

# V. INVENTORIES

This section contains a requirement for the Operator to maintain detailed records of Controllable Material. Controllable Material is defined in Section 1 of the Accounting Procedure as Material which at the time is so classified in the Material Classification Manual as most recently recommended by the Council of Petroleum Accountants Societies. Currently the most recent recommendation is the Bulletin No.6.

1. **Periodic Inventories, Notice And Representation**

    This paragraph specifies that inventories are to be taken at "reasonable intervals", The industry has never been able to reach agreement on what constitutes a "reasonable interval" with some Operators taking an initial inventory only, while others attempt to comply with the term "periodic" by inventorying Joint Properties at 3 to 10 year intervals. Additionally, written notice of an inventory is required at least thirty (30) days prior to the taking of the inventory and as all Parties are bound by the results of periodic inventories, the Operator should ensure that notification is received by all Non-operators. This can be accomplished by sending the notice by Certified Mail - Return Receipt Requested.

2. **Reconciliation And Adjustment Of Inventories**

    This provision allows the Operator up to six (6) months following the inventory to reconcile the inventory and make all necessary adjustments to the Joint Account for all overages and shortages. The Operator is accountable for shortages only when due to a lack of reasonable diligence. In other words, the Operator charges the Joint Account for any overages, but except for lack of reasonable diligence, the Operator makes no monetary adjustment on shortages with the Joint Account.

3. **Special Inventories**

    Special inventories may be taken when a sale of property occurs, when an interest in a property is sold, at a change of Operator, or at any time an inventory may be needed because of special circumstances.

4. **Expense Of Conducting Inventories**

    The Parties desiring the special inventory will be governed by such inventory and responsible for its costs, When an inventory is taken due to a change of Operator, the Joint Account will bear the cost.



**copas**
Council of Petroleum Accountants Societies

Turning Energy Into Synergy

# 1986 ACCOUNTING PROCEDURE OFFSHORE JOINT OPERATIONS

MODEL FORM MODIFICATION                MFM 1986-1

Publication/Revision Date --- April 23, 2004

Council Approved

*Copyright © 2004 by the Council of Petroleum Accountants Societies, Inc. (COPAS)*



# Introduction

The objective of this document is to modify certain provisions of the 1986 Model Form Accounting Procedure that have become obsolete. The modified provisions will be incorporated in all future COPAS 1986 Accounting Procedures published by COPAS. This modification does not supersede or override the provisions of any existing agreements.

# Background

A. Overhead

The 1986 Model Form Accounting Procedure provides that Combined Fixed Rate drilling and producing Overhead will be adjusted each year by the Bureau of Labor Statistics (BLS) Index of Average Weekly Earnings of Crude Petroleum and Gas Production Workers and/or the Index of Average Weekly Earnings of Crude Petroleum and Gas Field Production Workers. The BLS is converting all of its industry-based statistics from the Standard Industry Classification (SIC) system to the North American Industry Classification System (NAICS). The NAICS was developed in cooperation with the United States' North American Free Trade Agreement partners, to standardize codes across Canada, U.S., and Mexico, allowing a direct comparison of economic data across North America. As a result of the conversion, the BLS is not publishing the Overhead adjustment index by its former name after March 2003.

B. Line Pipe

At the time the 1986 Accounting Procedure was developed, the mills added a 20% out-of-stock percentage factor to the published Eastern Mill base price for line pipe under 30,000 pounds and smaller than 24" OD with ¼" wall thickness. Current line pipe market conditions do not warrant the application of this 20% out-of-stock surcharge.

# CURRENT PROVISIONS

Section III.1.A.(4)
  The well rates shall be adjusted as of the first day of April each year following the effective date of the agreement to which this Accounting Procedure is attached. The adjustment shall be computed by multiplying the rate currently in use by the percentage increase or decrease in the Average Weekly Earnings of Crude Petroleum and Gas Production Workers for the last calendar year compared to the calendar year preceding, as shown by the Index of Average Weekly Earnings of Crude Petroleum and Gas Field Production Workers as published by the United States Department of Labor, Bureau of Labor Statistics, or the equivalent Canadian index as published by Statistics Canada, as applicable. The adjusted rates shall be the rates currently in use, plus or minus the computed adjustment.

1

Section IV.2.A.(2)(b)
    Line pipe movements (except size 24" OD and larger with walls ¾" and over) less than 30,000 pounds shall be priced at Eastern Mill published carload base prices effective as of date of shipment, plus 20%, plus transportation costs based on freight rates as set forth under provisions of tubular goods pricing in Paragraph A.(1)(a) as provided above. Freight charges shall be calculated from Lorain, Ohio.

## MODIFIED PROVISIONS

Section III.1.A.(4)
    The well rates shall be adjusted as of the first day of April each year following the effective date of the agreement to which this Accounting Procedure is attached <u>by the percent increase or decrease published by COPAS</u>.

Section IV.2.A.(2)(b)
    Line pipe movements (except size 24" OD and larger with walls ¾" and over) less than 30,000 pounds shall be priced at Eastern Mill published carload base prices effective as of date of shipment, <u>plus the percent most recently recommended by COPAS</u>, plus transportation costs based on freight rates as set forth under provisions of tubular goods pricing in Paragraph A.(1)(a) as provided above. Freight charges shall be calculated from Lorain, Ohio.