IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

<table>
<tr><td>FOREST OIL CORPORATION,<br><br>      Plaintiff,<br><br>vs.<br><br>UNION OIL COMPANY OF AMERICA,<br>d/b/a UNOCAL ALASKA,<br><br>      Defendant.</td><td>Case No. 3:05-cv-0078-RRB<br><br><br>**ORDER DENYING DEFENDANT'S<br>MOTION FOR PARTIAL SUMMARY<br>JUDGMENT and GRANTING<br>PLAINTIFF'S CROSS-MOTION**</td></tr>
</table>

## I.    INTRODUCTION

Defendant Union Oil Company of California ("Unocal") moves for partial summary judgment on all claims by Plaintiff Forest Oil Corporation ("Forest") relating to the accounting for the disposal of naturally occurring radioactive material ("NORM").[1] Forest disagrees and argues that its cross-motion for summary judgment should be granted because Unocal admitted that it breached the contract in its NORM calculations.[2]  Alternatively, Forest

---

[1] Clerk's Docket No. 18.

[2] Clerk's Docket No. 35 at 25.

argues that Unocal's motion should be denied because questions of fact exist.[3]

Because the Court concludes that Unocal did not follow the express terms of the contract, Unocal's Motion for partial summary judgment is **DENIED.** Forest's cross-motion seeking an order that Unocal breached its duty to charge for NORM disposal in accord with the Operating Agreements is **GRANTED**.

## II.  FACTS

Forest and Unocal own working interests in several offshore oil and gas leases located in Alaska's Cook Inlet.[4]  These interests comprise the Trading Bay Properties.[5]  There are four agreements that govern the relationship between Forest and Unocal regarding the development and operation of the Trading Bay Properties.  These agreements are:

1.  The Trading Bay Unit Operating Agreement ("TBUOA").[6]

2.  The Trading Bay Field Operating Agreement ("TBFOA").[7]

---

[3] Id.

[4] Clerk's Docket No. 18 at 3.

[5] Id.  Unocal and Forest are the sole working interest owners of the oil assets underlying the Trading Bay Properties.  Id. at 4.

[6] Clerk's Docket No. 23 at Ex. A.

[7] Id. at Ex. B.

      3.    The Unit Agreement for the Development and Operation of the Trading Bay Unit, State of Alaska ("TB Unit Agreement").[8]

      4.    The Alignment Agreement Trading Bay Field/Trading Bay Unit.[9]

The TBUOA and the TBFOA are the relevant agreements for this issue (the "Operating Agreements"). Unocal is the Operator under the Operating Agreements.[10]

Naturally occurring radioactive material ("NORM") is "any waste that has a naturally occurring radioactive reading equal to or greater than 50 microRems per hour."[11] As a practical matter, material with emissions equal to or greater than 25 microRems per hour is treated as NORM by Unocal.[12] "Oilfield NORM is created when naturally occurring radioactive radium salts in the earth are dissolved by water; as the contaminated water is brought to the surface, the radioactive solids precipitate out and may collect on the well tubing walls and inside other production equipment."[13] NORM in the Trading Bay Properties primarily consists of oily

---

[8] Id. at Ex. C.

[9] Id. at Ex. A. for Tabler Declaration.

[10] Id. at Ex. A at 17 and Ex. B at 11.

[11] Clerk's Docket No. 18 at Hammond Declaration ¶ 2.

[12] Id.

[13] Id.

sludge and scales removed from equipment such as tanks and separator vessels.[14]

Alaska law has no requirements for treating or disposing of NORM. Unocal's standard is to treat Alaskan NORM pursuant to Texas and Louisiana regulations.[15] In Alaska, Unocal's practice is to dispose of NORM into an injection well.[16] One option used by Unocal is to ship the NORM Outside to be injected into a Texas well.[17] When NORM from the Trading Bay Properties is disposed of locally, Unocal uses the "Grind and Inject" process.[18] "First, the NORM is removed from the equipment that it contaminates and is placed into containers for transport" to Unocal's Bruce Platform in the Cook Inlet.[19] "At the Bruce Platform the NORM is ground and mixed with liquid and other flow improvers to make it easier to inject. The NORM is then injected down the well at the Bruce Platform into the surrounding geological formation at a depth downhole of 9,240 ft to 10,628 ft, or from 1.75 to 2 miles down."[20]

---

[14] Id.

[15] Id. at ¶ 3.

[16] Id.

[17] Id.

[18] Id.

[19] Id.

[20] Id.

In this instance, Unocal used the Grind and Inject process to dispose of the NORM at the Bruce Platform in Alaska.[21] Unocal charged the Joint Account $275 per barrel.[22]

Forest filed suit against Unocal for multiple claims, including Breach of Contract - Imprudent Operations. This claim includes the allegations that Unocal imprudently inflated the charges for NORM disposal and imprudently exposed Forest to potential liability.[23] Unocal now moves for partial summary judgment concerning the NORM allegations only, and not the entire Breach of Contract claim.

_____

[21] <u>Id.</u> at ¶ 6.

[22] <u>Id.</u>

[23] Complaint at ¶ 24. Paragraph 24 states:

As one example of such imprudent expenditures, Unocal charges the joint account $275 per barrel for disposal of natural occurring radioactive material ("NORM"). The $275 per barrel charge imposed by Unocal is derived from a bid Unocal received for the disposal of such waste at a disposal site in Texas. Approximately $175 of that bid amount reflects the cost of transporting NORM from Cook Inlet to Texas for disposal. Unocal, however, disposes of NORM from the properties not in Texas but at Unocal's own Bruce platform located off-shore in Cook Inlet, just a few miles from the properties. Thus, Unocal's charges for NORM disposal, which run into the millions of dollars, are artificially and grossly inflated by Unocal, and imprudently charged by Unocal against the joint account for the properties. Moreover, by disposing of the NORM itself, Unocal has exposed Forest to potential liability for disposal activities, which would not arise of a third-party were contracted for the disposal. No justification exists for this imprudent creation of potential liability.

## III. DISCUSSION

Pursuant to the Operating Agreements, Unocal charged the Joint Account for disposal of NORM generated from the Trading Bay Properties.[24]  The Operating Agreements between Forest and Unocal expressly incorporated and made part of each agreement identical documents titled "Accounting Procedure Offshore Joint Operations."[25] The Accounting Procedure Offshore Joint Operations were developed by the Council of Petroleum Accountants Societies, known as COPAS, and these accounting procedures are known as the COPAS Procedures.[26] The COPAS Procedures governed the accounting for the disposal of NORM.  Section 7 of the COPAS Procedures provides:

> 7.    Equipment and Facilities Furnished by Operator
>
> A.    Operator shall charge the Joint Account for use of Operator-owned equipment and facilities, including Shore Based and/or Offshore Facilities, at rates commensurate with costs of ownership and operation.  Such rates may include labor, maintenance, repairs, other operating expense, insurance, taxes, depreciation and interest on gross investment less accumulated depreciation not exceed twelve percent (12%) per annum.  In addition, for platform only, the rate may include an element of the estimated cost of platform dismantlement.  Such rates

---

[24] Clerk's Docket No. 18 at Hammond Declaration ¶ 5.

[25] Clerk's Docket No. 23 at Ex. A at 2 and 53-58 and Ex. B at 6 and 39-44.

[26] Clerk's Docket No. 18 at 8.

> shall not exceed average commercial rates currently prevailing in the immediate area of the Joint Property.
>
> B.   In lieu of charges in Paragraph 7A above, Operator may elect to use average commercial rates prevailing in the immediate area of the Joint Property less twenty percent (20%).  For automative equipment, Operator may elect to use rates published by the petroleum Motor Transport Association.

Here, Unocal did not calculate NORM disposal charges under either section, though it argues that it followed the procedures in Paragraph 7B.

Unocal charged the Joint Account $275 per barrel of NORM in 2002.[27]  Laura Hammond, the Waste Management Coordinator for Unocal, stated that the per barrel charge was not a mathematical evaluation.[28]  According to Hammond:

> The $275 per barrel charge in 2002 was not a mathematical average of the much more expensive NORM disposal rate ($400 per barrel) and the less expensive non-NORM disposal rate ($210 per barrel.  It must be noted that when the Unocal Alaska Project Manager for the 2002 Bruce Injection Project, Chris Meyers, set the charge at $275 in his e-mail dated December 6, 2002 . . . to our accounting staff he did not perform a rigorous mathematical evaluation of the commercial cost quotes for the NORM and the non-NORM minus 20% pursuant to Paragraph 7B of the COPAS Procedures.  A quote from that e-mail says "Don, After reviewing Laura's two

---

[27]  Id. at Hammond Declaration at ¶ 16.  Forest only complains about the rate charged in 2002.  Clerk's Docket No. 35 at 3.

[28]  Clerk's Docket No. 18 at Hammond Declaration at ¶ 16.

files, I think we had a good case to charge a
flat $275 per bbl for disposing of the waste
this year on Bruce.   Looking through the
quotes it becomes apparent that some waste
could be a bit less (+/- $200) while other
waste could be more ($10,000 per 25 bbls norm
safeguard (sic)).   I feel we have a past
history that would allow us to charge the
$275." Mr. Meyers told me in May of 2005 "We
were not really focusing on how much to charge
them we were just trying to get the waste
disposed of and get a fair cost recovery."
The $275 per barrel rate which was actually
charged to the Joint Account for both NORM and
non-NORM likely resulted in a significant
undercharge for NORM disposal."[29]

Thus, Unocal did not follow the procedures specified in either

paragraph of the COPAS Procedures. Unocal did not calculate the

"average commercial rates prevailing in the immediate area of the

Joint Property," nor did it subtract twenty percent.[30] Unocal also

did not use rates published by the petroleum Motor Transport

Association.

    To determine whether this was a breach of contract, the

parties disagree on what standard of care should be applied.

Unocal argues that the correct standard is whether its actions were

grossly negligent or willful misconduct.[31]  Forest argues that the

---

[29] Id.

[30] See also Clerk's Docket No. 35 at Fischbach Aff. At ¶¶ 6-9.

[31] Clerk's Docket No. 18 at 10.

correct standard is whether Unocal's actions were imprudent.[32]  The

relevant contract language comes from the TBUOA.  Paragraph 8.3.A

provides:

> Unit Operator and each Sub-Contractor shall
> conduct all Unit operations in a good and
> workmanlike manner.  Unit Operator and Sub-
> Operators shall not be liable to the Parties
> for damages, unless such damages result from
> their gross negligence or willful misconduct.[33]

Paragraph 7.2.A provides:

> Operator shall conduct all operations in a
> good and workmanlike manner.  Operator shall
> not be liable to the Parties for damages,
> unless such damages result from Operator's
> gross negligence or willful misconduct.[34]

The parties disagree on the reach of these exculpatory clauses.

Unocal argues that they include both operational and accounting

activity, while Forest argues that these clauses only refer to

operational activity.

It does not appear that Alaska courts have considered the

reach of such exculpatory clauses.  However, both the Fifth Circuit

and the Tenth Circuit have considered the reach of clauses very

similar to the ones at issue here, and reached differing results.

The Fifth Circuit held that "an exculpatory clause in an operating

agreement may extend to administrative functions performed by the

---

[32] Clerk's Docket No. 35 at 12.

[33] Clerk's Docket No. 23 at Ex. A at 20.

[34] Id. at Ex. B at 13.

operator," including accounting duties.[35]  In contrast, the Tenth Circuit held that "the exculpatory clause has no application to claims that an operator has failed to abide by specific and express contractual duties assigned in the [operating agreement."[36]  The Tenth Circuit reasoned:

> While a higher standard for breach might apply to drilling, extraction, and other risky "operations" because most operators have the same incentive as non-operators to do well in physical operations, it is nonsensical to apply such a standard to administrative and accounting duties where the operator can profit by cheating, or simply overcharging, its working interest owners.[37]

This Court agrees with the holding and reasoning of the Tenth Circuit.  A broader reading of the clause would allow a party to act negligently (just not grossly) in following its express contractual administrative and accounting duties.  As a result, the court applies the prudent standard and holds that Forest breached the contract regarding its duties to charge for NORM disposal.

## IV.  CONCLUSION

For the foregoing reasons, Defendant's Motion is **DENIED** and Plaintiff's cross-Motion for an Order that Defendant breached

---

[35] <u>Stine v. Marathon Oil Co.</u>, 976 F.2d 254, 260-61 (5th Cir. 1993).

[36] <u>Shell Rocky Mountain Production, LLC v. Ultra Resources, Inc.</u>, 415 F.3d 1158, 1170 (10th Cir. 2005).

[37] <u>Id.</u> at 1171.

its duty to charge for NORM disposal in accord with the Operating

Agreements is **GRANTED**.  Whether Forest was damaged as a result of

this breach is not here addressed.

ENTERED this 7th day of April, 2006.

/s/ RALPH R. BEISTLINE
UNITED STATES DISTRICT JUDGE