IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| FOREST OIL CORPORATION,<br><br>          Plaintiff,<br><br>     vs.<br><br>UNION OIL COMPANY OF CALIFORNIA d/b/a UNOCAL ALASKA,<br><br>          Defendant. | Case No. 3:05-cv-00078-RRB<br><br>**ORDER DENYING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT AT DOCKET NO. 23 and GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AT DOCKET NO. 39** |

**I.  INTRODUCTION.**

Defendant Union Oil Company of California ("Unocal") moves for partial summary judgment on its affirmative defense of accord and satisfaction.[1] Unocal argues that under the terms of Article 7 of the Unocal/Forest Oil Alignment Agreement the parties waived, dismissed and released any and all claims against each other that arose prior to the execution of the Alignment

---

[1] Clerk's Docket No. 23.

Agreement.[2]  Plaintiff Forest Oil Corporation ("Forest") disagrees, opposes the motion[3] and has cross-moved for summary judgment in its favor.[4]  Neither party has requested oral argument and the Court has determined that oral argument would not assist the court in resolving the motion.  Because the Court finds that, as a matter of law, Article 7 can not be construed to extend to encompass Forest's allegations in its complaint, Unocal's Motion for Partial Summary Judgment is **DENIED** and Forest's Motion for Partial Summary Judgment is **GRANTED**.

II.  **BACKGROUND/FACTS.**

Forest and Unocal own working interests in several offshore oil and gas leases located in Alaska's Cook Inlet.[5]  These interests comprise the Trading Bay Properties.[6]  There are four agreements that govern the relationship between Forest and Unocal regarding the development and operation of the Trading Bay Properties.  These agreements are:

---

[2]   Id.

[3]   Clerk's Docket No. 27.

[4]   Clerk's Docket No. 39.

[5]   Clerk's Docket No. 18 at 3.

[6]   Id.  Unocal and Forest are the sole working interest owners of the oil assets underlying the Trading Bay Properties.  Id. at 4.

ORDER DENYING DOCKET 23 and
    GRANTING DOCKET 39 - 2
3:05-CV-0078-RRB

    1.    The Trading Bay Unit Operating Agreement ("TBUOA").[7]

    2.    The Trading Bay Field Operating Agreement ("TBFOA").[8]

    3.    The Unit Agreement for the Development and Operation of the Trading Bay Unit, State of Alaska ("TB Unit Agreement").[9]

    4.    The Alignment Agreement Trading Bay Field/Trading Bay Unit ("Alignment Agreement").[10]

The TBUOA, TBFOA, and Alignment Agreement are, by their express terms, governed by Alaska law.[11] The factual background is undisputed and is taken from Unocal's motion.[12]

The Trading Bay Agreements were negotiated or entered into by and among Unocal and Forest (and/or their predecessors in interest) in the late 1960's and have been amended several times over the years. Up until the 1990s, there were multiple working interest owners in the Trading Bay Properties, and multiple parties to the Trading Bay Agreements. Additionally, the Trading Bay Properties were comprised of numerous working interest participating areas ("WIPAs") with ownership among the working

---

[7] Clerk's Docket No. 23 at Ex. A.

[8] Id. at Ex. B.

[9] Id. at Ex. C.

[10] Id. at Ex. A. for Tabler Declaration.

[11] Id. at Ex. A, p. 50 § 31.2; Ex. B., p. 28 § 23.2; Ex. A for Tabler Declaration, p. 8 § 9.6.

[12] Id.; Clerk's Docket No. 27.

interest owners in each WIPA being slightly different. By 1996, through mesne conveyances, the only working interest owners in the Trading Bay Properties were Unocal and Marathon Oil. In December 1996 Marathon conveyed its interest in the oil WIPAs only to Forcenergy. In 2000 Forcenergy conveyed its interests to Forest. At that point, Unocal and Forest became the sole working interest owners of the oil assets underlying the Trading Bay Properties.

The varying ownership in the WIPAs created accounting nightmares and required hundreds of thousands of accounting transactions each year. Allocation of costs to various WIPAs became a bone of contention between Unocal and Forest as each company sought to allocate costs to WIPAs in which each owed a smaller interest. To avoid the associated costs and confusion, and to resolve various claims that arose under the disparate ownership, Unocal and Forest commenced negotiations with the objective of rationalizing or equalizing their respective interests in all the Trading Bay oil WIPAs. These negotiations were successful.

By way of that certain Alignment Agreement dated January 1, 2002, Unocal and Forest aligned their respective working interests in the Trading Bay Properties, including all WIPAs (except for and excluding the Grayling Gas Sands WIPA). Since the alignment of interests (ortherwise known as "Common Equity"), Unocal maintains a 53.2% working interest and Forest maintains a

46.8% working interest in all oil WIPAs comprising the Trading Bay Properties.

> Article 7 of the Alignment Agreement provides:
>
> Forest and Unocal hereby waive, release and dismiss any Production, revenue, and Cost participation claims against each other, related to any current dispute, know or unknown, disclosed or undisclosed, whether greater or lesser in size than any party initially believed, arising from Trading Bay Field or Trading Bay operations, transactions or agreements pre-dating this Agreement.

Forest initiated this lawsuit alleging four causes of action arising out of Unocal's conduct as the field operator under the TBUOA and TBFOA.  Forest's first claim asserts a breach of contract seeking an unspecified amount of damages, alleging that Unocal, as the operator, acted imprudently by incurring unnecessary and excessive costs in operating the field.  Forest's second claim seeks a declaratory judgment that Unocal's operations have been imprudent.  The third claim, also brought as a breach of contract action, seeks to recover certain allegedly unauthorized expenses.  Forest's final claim seeks adjudication of exception claims noted in the routine audits made by Forest, or its predecessors in interest, under the terms of the TBUOA and/or TBFOA.

Unocal alleges in this motion that the claims made by Forest based upon events or acts that pre-date January 1, 2002, have been waived.  Forest, in its cross-motion, seeks a contrary

ORDER DENYING DOCKET 23 and
    GRANTING DOCKET 39 - 5
3:05-CV-0078-RRB

determination, *i.e.*, that it has not waived its claims to the extent they arise out of events or acts that pre-date January 1, 2002.

**III.   STANDARD OF REVIEW.**

Summary judgment is appropriate if, when viewing the evidence in the light most favorable to the non-moving party, there are no genuine issues of material fact, and the moving party is entitled to judgment in its favor as a matter of law.[13] "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, [when] he is ruling on a motion for summary judgment."[14] In response to a properly supported motion for summary judgment, the opposing party must set forth specific facts showing that there is a genuine issue for trial.[15] The issue of material fact required to be present to entitle a party to proceed to trial is not required to be resolved conclusively in favor of the party asserting its existence; all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require

---

[13] FED. R. CIV. P. 56(c); Lopez v. Smith, 203 F.3d 1122, 1131 (9th Cir. 2000) (en banc); Taylor v. List, 880 F.2d 1040, 1044 (9th Cir. 1989).

[14] Anderson v. Liberty Lobby, Inc. 477 U.S. 242, 255 (1986).

[15] FED. R. CIV. P. 56(e); Henderson v. City of Simi Valley, 305 F.3d 1052, 1055-56 (9th Cir. 2002).

a fact-finder to resolve the parties' differing versions of the truth at trial. There is no genuine issue of fact if, on the record taken as a whole, a rational trier of fact could not find in favor of the party opposing the motion.[16]

**IV. DISCUSSION.**

As noted above, the interpretation and effect of the Alignment Agreement is governed by Alaska law. When interpreting state law, this Court is bound by the decisions of the state's highest court. In the absence of a decision by the highest state court, this Court "must predict how the highest state court would decide the issue using intermediate appellate court decisions, decisions from other jurisdictions, statutes, treatises, and restatements as guidance."[17]

A release is interpreted in the same manner as any other contract.[18] With respect to contract interpretation, the Alaska Supreme Court recently stated:[19]

---

[16] _Matsushita Elec. Indus. Co. v. Zenith Radio Corp._, 475 U.S. 574, 586 (1986).

[17] _S.D. Myers, Inc. v. City and County of San Francisco_, 253 F.3d 461, 473 (9th Cir. 2001); _Paulman v. Gateway Ventures Partners III L.P. (In re Filtercorp, Inc.)_, 163 F.3d 570, 578 (9th Cir. 1998).

[18] _Schmidt v. Lashley_, 627 P.2d 201, 204 n. 7 (Alaska 1981).

[19] _Norville v. Carr-Gottstein Foods Co._, 84 P.3d 996, 1004 (Alaska 2004) (internal quotation marks, footnotes, and citations (continued...)

> The objective of contract interpretation is to determine and enforce the reasonable expectations of the parties.
>
> In determining the intent of the parties the court looks to the written contract as well as extrinsic evidence regarding the parties' intent at the time the contract was made. The parties' expectations are assessed by examining the language used in the contract, case law interpreting similar language, and relevant extrinsic evidence, including the subsequent conduct of the parties
>
> Interpretation of a contract is ordinarily a question of law. But interpretation becomes a task for the trier of fact when the parties present extrinsic evidence to clarify a contract's meaning, when this evidence points towards conflicting interpretations of the contract, and when the contract itself is reasonably susceptible of either meaning.

On the other hand, where there is no dispute as to the extrinsic evidence, interpretation of contractual intent is a matter of law to be determined by the court.[20]

As the issue presented by the motions at bar involve the interpretation of the release clause contained in the Alignment Agreement, extrinsic or parol evidence may be received.[21] The Court

---

[19] (...continued) omitted).

[20] Herrick's Aero-Auto-Aqua Repair Service v. State, Dept. of Transp. and Pub. Facilities, 754 P.2d 1111, 1116 (Alaska 1988).

[21] Alaska Diversified Contractors, Inc. v. Lower Kuskokwim Sch. Dist., 778 P.2d 581, 534 (Alaska 1989) ("Extrinsic evidence may always be received on the question of meaning.").

may look to "the language and conduct of the parties, the objects sought to be accomplished and the surrounding circumstances at the time the contract was negotiated."[22] The conduct of the parties subsequent to the agreement is also relevant to the determination of intent.[23] However, it has also been stated:[24]

> Differences of opinion among the parties as to their subjective intent, expressed during the litigation, do not establish an issue of fact regarding the parties' reasonable expectations at the time they entered into the contract, since such self-serving statements are not considered to be probative. Rather, the court must look to express manifestations of each party's understanding of the contract in attempting to give effect to the intent behind the agreement.

The Court must now apply these principles to the question before it. The parties have produced little evidence as to specific conduct after January 1, 2002, that would tend to explain or interpret the scope of the release.[25] The primary evidence as

---

[22] Pepsi-Cola Bottling Co. v. New Hampshire Ins. Co., 407 P.2d 1009, 1013 (Alaska 1965).

[23] North Pacific Processors, Inc. v. City and Borough of Yakutat, Alaska, 113 P.3d 575, 585 (Alaska 2005).

[24] Peterson v. Wirum, 625 P.2d 866, 870 (Alaska 1981) (footnotes and internal citations omitted).

[25] The evidence submitted consists of the unrefuted testimony of Mitchell Fischback in opposition to Unocal's motion that subsequent to January 1, 2002, Unocal either did not raise or withdrew any objections to audits of 1999, 2000, and 2001 by Forest. Clerk's Docket No. 27, Fischback Decl. While this is of
(continued...)

to the intent of the scope of the release must be derived from the language of the Agreement, the objective sought, and the surrounding circumstances.

Paragraph 3 of the preamble to the Alignment Agreement states the general intent and purpose of the agreement.

> 3. Forest and Unocal desire to align their respective Working Interests relative to all Production and Costs in the Trading Bay Field and all Production and Costs relative to all interests (excluding the Grayling Gas Sands) in the Trading Bay Unit, as provided in this Agreement, so as to create an area of common lease interests.

The facts preceding and surrounding the Alignment Agreement as recited by Unocal in its motion and concurred in by Forest clearly establish that the impetus for the negotiations and the ultimate agreement between the parties was the varied ownership of the working interests that were creating accounting problems and disputes between the parties regarding the proper allocation of costs and production revenue attributable to the various WIPAs. Article 4 entitled "Working Interest Alignment; Production and Revenue Participation," the heart of the Alignment Agreement, provides:

---

[25] (...continued) some probative value concerning the scope of the release, the Court does not accord it any significant weight.

> Commencing on the Efective Date, Unocal's and Forest's Working Interests in the TBF, TBU, and TBPF shall be held in accordance with each party's Relative Interests such that all Production and Costs from the TBF and TBU (excluding Grayling Gas Sands and Grayling Gas Sands WIPA) shall be allocated 53.20% for Unocal and 46.80% for Forest. Any other revenue derived from TBF, TBU and TBPF assets shall be similarly apportioned.

Article V, entitled "Cost Participation," provides:

> 5.1 General. Commencing on the Effective Date, the costs of all operations related to the TBF, TBU, and TBPF shall be allocated between the Parties in the percentage of each Party's Relative Interests. This shall apply to all such Costs due on or after the Effective Date, regardless of when they were incurred.
>
> 5.2 Abandonment. Commencing on the Effective Date, the Costs of all Abandonment operations in the TBF, TBU, or TBPF due on or after the Effective Date, regardless of when they were incurred, shall be allocated between the Parties in the percentage of each Party's Relative Interests.
>
> 5.3 Environmental Remediation. Commencing on the Effective Date, the Costs of all Environmental Remediation for the TBF, TBU, and TBPF due on or after the Effective Date, regardless of when they were incurred, shall be allocated between the Parties in the percentage of each Party's Relative Interests.

In his declaration submitted in support of Unocal's motion, Kevin A. Tabler stated: "Article 7, Claims, of the Alignment Agreement effected a mutual release of all claims between Forest and Unocal prior to the execution of the Alignment

Agreement. It was our intent to 'wipe the slate clean' and start fresh as of January 1, 2002. This was an important term to Unocal, and it was negotiated at arms length and in good faith."

Article 7 itself refers to the release of "Production, revenue, and Cost *participation claims*," (emphasis added) a very narrow category that is entirely consistent with the Alignment Agreement taken as a whole, *i.e.*, it addresses the allocation between the parties, nothing more. The sole evidence proffered by Unocal that might possibly support its position is the self-serving testimony of Mr. Tabler, which has no probative value. There is nothing in the Alignment Agreement itself or the circumstances preceding or surrounding its execution that logically tends to support the expansive interpretation advanced by Unocal. The Court finds that, as a matter of law, Article 7 of the Alignment Agreement Trading Bay Field/Trading Bay Unit released only those claims arising out of or associated with the allocation of the costs incurred in connection with and revenue derived from the Trading Bay Properties. It did not operate to release all other claims that the parties might have in connection with the TBUOA or TBFOA. In particular, it does not extend to claims based upon the propriety of expenditures made by Unocal as operator under the TBUOA and/or TBFOA, the subject of this lawsuit. However, lest there be any misunderstanding as to the scope of the Court's

ruling, to the extent that Forest's claims are predicated upon the *allocation of the expenses between the parties* during the years preceding 2002, those claims have been waived and any and all claims related to allocation are precluded.

**V. CONCLUSION/ORDER.**

For the foregoing reasons,

1. Defendant's Motion for Partial Summary Judgment at Clerk's Docket No. 23 is **DENIED**; and

2. Plaintiff's Motion for Partial Summary Judgment at Clerk's Docket No. 39 is **GRANTED**.

ENTERED this 7th day of July, 2006.

/s/ RALPH R. BEISTLINE
UNITED STATES DISTRICT JUDGE