Brewster H. Jamieson, ASBA No. 8411122
Peter C. Partnow, ASBA No. 7206029
LANE POWELL LLC
301 West Northern Lights Boulevard, Suite 301
Anchorage, Alaska 99503-2648
Telephone: 907-277-9511
Facsimile:  907-276-2631
Email:      jamiesonb@lanepowell.com
Email:      partnowp@lanepowell.com

Attorneys for Defendant

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA AT ANCHORAGE

FOREST OIL CORPORATION and PACIFIC
ENERGY ALASKA OPERATING LLC,

                        Plaintiffs,

v.                                                      Case No. 3:05-cv-00078-RRB

UNION OIL COMPANY OF CALIFORNIA
d/b/a UNOCAL ALASKA,                                   **MOTION TO DISMISS
                                                       PLAINTIFF FOREST OIL CORPORATION**

                        Defendant.

COMES NOW defendant Unocal Company of California d/b/a Unocal Alaska ("Unocal"), by and through counsel, moves to dismiss Plaintiff Forest Oil Corporation.

## I.  INTRODUCTION

After Forest Oil Corporation ("Forest") commenced this lawsuit, it placed all its Alaska assets, including its interest in the Trading Bay Unit, into a separate legal entity (Forest Alaska Operating, LLC).  Subsequently, it sold 100 percent of its membership interest in that entity to Pacific Energy, which then re-named the entity Pacific Energy Operating Alaska, LLC (PEOA). Consequently, Forest is no longer a proper party plaintiff in this matter, and must be dismissed from this case.

LANE POWELL LLC
301 West Northern Lights Boulevard, Suite 301
Anchorage, Alaska 99503-2648
Telephone 907.277.9511 Facsimile 907.276.2631

## II. FACTS

This lawsuit concerns oil and gas properties located in Cook Inlet, Alaska, known as the Trading Bay Unit (TBU). In a series or orders issued earlier in this litigation, this court recognized and set forth the relationship between Forest and Unocal. *See* Docket No. 90 at 2-5. Prior to the transfers which are the subject of this motion, Forest owned a 46.8 interest in the TBU. Forest has subsequently entered into a series of transactions resulting in its complete divestiture of all interests in the TBU.

In order to accomplish the divestiture, Forest first created Forest Alaska Holding LLC and Forest Alaska Operating LLC as subsidiary companies.[1] On November 1, 2006, Forest then transferred and assigned all of its interests in the TBU to Forest Alaska Holding LLC, which immediately transferred the same interests to Forest Alaska Operating LLC.[2] To document the transfers, Forest, through its attorneys, prepared (i) a November 1, 2006, Master Conveyance between Forest and Forest Alaska Holding LLC,[3] and (ii) a November 1, 2006, Master Conveyance between Forest Alaska Holding LLC and Forest Alaska Operating LLC.[4] These agreements effectuated the transfer and assignment of Forest's interest in the Trading Bay Unit, including all associated contractual rights, to Forest Alaska Operating LLC.[5]

---

[1] Exhibit A Certificates of Formation and Amendment for Forest Alaska Holding LLC and Forest Alaska. Exhibit B, Operating Agreements for Forest Alaska Holding LLC and Forest Alaska Operating, LLC.

[2] *See* Exhibit C Assignments of Interest in Oil and Gas Lease, recorded with the State of Alaska, from Forest to Forest Alaska Holding LLC, and from Forest Alaska Holding LLC to Forest Alaska Operating LLC.

[3] Exhibit D.

[4] Exhibit E.

[5] Knowledge of this transfer led to Unocal's previous motion to join Forest Alaska Operating LLC as party plaintiff which motion was not opposed and was granted by this court. (Docket No. 103, "Motion to Join Forest Alaska Operating LLC as Party Plaintiff; Docket No. 106, Non-Opposition; and Docket No. 107, Order Granting Motion to Join Forest Alaska Operating LLC as Party Plaintiff"). Subsequently, Forest Alaska Holding LLC became Pacific Energy Alaska Operating LCC ("Pacific") and Pacific became a named party plaintiff. (Docket No. 110, "Pacific Energy Alaska Operating LLC's Motion to Change Caption and Party Plaintiff's Name; and Docket No. 111, Order Granting Plaintiff's Motion to Amend Pleading Captions").

**LANE POWELL** LLC
301 West Northern Lights Boulevard, Suite 301
Anchorage, Alaska 99503-2648
Telephone 907.277.9511  Facsimile 907.276.2631

## IV.  <u>DISCUSSION</u>

### A.  <u>Forest  Conveyed all of its Interest in the Trading Bay Unit to Forest Alaska Operating LLC.</u>

In this lawsuit, Forest sought redress for alleged breaches of contractual rights arising under the Trading Bay Unit Operating Agreement and the Trading Bay Field Operating Agreement, in addition to the Accounting Procedures incorporated therein.[6]  According to Forest, its claims derived from the terms of those contracts.[7]  These contracts are the same contracts which were conveyed first by Forest to Forest Alaska Holding LLC, and then by Forest Alaska Holding LLC to Forest Alaska Operating LLC.  The language used in both Master Conveyance agreements is unambiguous:

> For good and valuable consideration, the receipt and sufficiency of which [Forest] hereby acknowledges, [Forest] has GRANTED, ASSIGNED, TRANSFERRED and CONVEYED, and does hereby GRANT, ASSIGN, TRANSFER and CONVEY to Assignee the following properties and interests (collectively, the "assets"), on the Effective Date, **<u>all</u>** of the right, title and interest owned by [Forest].

Exhibits D and E (emphasis added.)

---

[6] *See* Docket no. 1 "Complaint" paragraphs 5-11, and respective exhibits.  This court agreed with Forest's description of the relevant contracts, stating that "[t]here are four agreements that govern the relationship between Forest and Unocal regarding . . . the Trading Bay Properties."  Docket No. 19, (Order Denying Defendant's Motion for Summary Judgment).  Those agreements are: (1) The Trading Bay Unit Operating Agreement; (2) The Trading Bay Field Operating Agreement; (3) The Unit Agreement for the Development and Operation of the Trading Bay Unit, State of Alaska, and; (4) The Alignment Agreement Trading Bay Field/Trading Bay Unit.  *Id*

[7] *See* Docket no. 1 "Complaint."  Forest's first breach of contract claim alleges that "Unocal's imprudent operation of the Trading Bay properties is in breach of Section 8.3A of the Trading Bay Operating Agreement and Section 7.2.A of the Trading Bay Field Operating Agreement."  Forest's second breach of contract claim alleges that "Unocal's failure to notify Forest of all such unauthorized expenditures, and its failure to prepare and submit to Forest proper supplemental AFEs, are in breach of Unocal's obligations to Forest under both the Trading Bay Unit Operating Agreement and the Trading Bay Field Operating Agreement."  Forest's final breach of contract claims alleges that "Unocal's inappropriate and excessive charges to the joint account violate the accounting standards incorporated in the Trading Bay Operating Agreements and thereby constitute a breach of contract."

---

Specifically, under paragraph 1.5 of the Master Conveyances, Forest conveyed all of its "right title, and interest in and to . . . operating and all other contracts . . . and agreements . . . directly related to or used in connection with the Properties, including without limitation, those listed on Exhibit C . . . ." Exhibits D and E. The Trading Bay Unit Agreement, the Trading Bay Unit Operating Agreement and the Trading Bay Field Operating Agreement are each specifically listed in Exhibit C to the Master Conveyances. *Id.* At no point in the Master Conveyance documents did Forest reserve **any** rights, title or interest in the TBU or any of the contracts related to the TBU. Any claim by Forest suggesting it somehow reserved any causes of action against Unocal would not be supported by the plain language of the conveyances.

Having explicitly and without reservation conveyed to Forest Alaska Operating LLC all contracts forming the basis of the alleged breach of contract claims, Forest now lacks any legal interest in, or standing to maintain, this action. An assignment of a contract carries with it any causes of actions associated with that contract. *See Knott v. McDonalds Corporation*, 147 F.3d 1065, 1067-68 (9th Cir. 1998). Forest, while originally possessing the causes of action asserted in this case, effectively assigned those causes of action to PEOA. Having done so, it, may no longer maintain this action, because the right to demand performance was extinguished with the assignee PEOA acquiring all such rights. *See generally*, *McCown v. Spencer*, 87 Cal. Rptr. 213 (1970); Restatement of Contracts § 150, p. 180.[8]

---

[8] An entity which totally assigns its interest lacks standing to sue on that interest. *See, e.g. MHI Shipbuilding, LLC v. National Fire Ins. Co. of Hartford,* 286 B.R. 16 (D. Mass. 2002); *Borkowski v. Fraternal Order of Police, Philadelphia Lodge No. 5*, 155 F.R.D. 105 (E.D. Pa. 1994). When an assignor retains no rights to the assigned property, the assignor lacks standing to enforce any agreements regarding that property. *See, e.g., Crestwood Golf Club, Inc. v. Potter*, 493 S.E.2d 826 (S.C. 1997). Because an assignment vests in the assignee the right to enforce the contract, an assignor retains no rights to enforce the contract after it has been assigned. *See e.g., Lauren Kyle Holdings, Inc. v. Heath-Peterson Const. Corp.*, 864 So. 2d 55 (Fla. Dist. Ct. App. 5th Dist. 2003). Accordingly, if the owner of a cause of action assigns all its interests, parting with both legal and equitable title, the assignor cannot bring suit thereon except in a representative capacity and upon proper authority, for the new owner of the claim, since the assignor no longer owns any part of the claim, and lacks that justifiable interest which is necessary to maintain any action. *See, e.g., Duke v. Brookshire Grocery Co.*, 568 S.W.2d 470 (Tex. Civ. App. Texarkana 1978). An assignor cannot maintain an action on a chose in action after making an absolute assignment of it to another. *See, e.g., Byczek v. Boelter Cos., Inc.*, 230 F. Supp. 2d 843 (N.D. Ill. 2002).

**LANE POWELL** LLC
301 West Northern Lights Boulevard, Suite 301
Anchorage, Alaska 99503-2648
Telephone 907.277.9511 Facsimile 907.276.2631

For example, in *Knott v. McDonalds Corp.*, *supra*, a franchisee (the Knotts) sued a franchisor (McDonalds Corporation) for breach of franchise agreement after the Knotts assigned their interests in franchises. The Ninth Circuit held the Knotts' assignment of "all [their] right, title and interest" in franchises to purchasers precluded their recovery for breach of the franchise agreement. *Id.* at 1068. The Knotts did not contest that rights attached to a contract, including the right to sue for breach of contract, were assignable. However, the Knotts argued that they never intended to assign the right to sue for breach of contract. In interpreting the assignment, in which the Knotts expressly assigned "all [their] right, title and interest" in the franchises, the court determined the assignment was not ambiguous. The court held that "[i]n short, 'all' means all." *Id.* at 1067.

That is the case here. Forest conveyed "all" of its interest in the TBU to Forest Alaska Holding LLC, which, in turn, conveyed "all" of its interest in the Trading Bay Unit to Forest Alaska Operating LLC. Those conveyances expressly included all contracts giving rise to the claims involved in the instant law suit. The language of the Master Conveyances is unambiguous, and leaves no doubt that Forest conveyed all of its interests in the relevant contracts and any claims arising out of those contracts.[9] Forest, which is no longer a party as to those contracts, is no longer a party in interest, and therefore has no standing to maintain this action.

### B.     The Trading Bay Unit Agreement Dictates That All Assignments of Interest Must Be Complete.

The plain language and clear intent of the Master Conveyances is consistent with the requirements of the TBU Unit Agreement. Paragraph 19 of the Unit Agreement, also referred to as a Maintenance of Uniform Interest Provision (MUI), explicitly prohibits any partial assignments, providing as follows:

> The covenants herein shall be construed to be covenants running with the land with respect to the interest of the parties hereto and their successors in interest until this agreement terminates, and *any grant, transfer or conveyance of*

---

[9] *See Norville v. Car-Gottstein Foods Co.*, 84 P.3d 996 (Alaska 2004) (holding that words should be interpreted as taking their ordinary, contemporary, common meaning); *See also Williams v. Crawford*, 982 P.2d 250 (Alaska 1999) (holding that a court should refrain from departing from the plain language of the contract).

**LANE POWELL** LLC
301 West Northern Lights Boulevard, Suite 301
Anchorage, Alaska 99503-2648
Telephone 907.277.9511 Facsimile 907.276.2631

> *interest in land or leases subject hereto shall be and hereby is conditioned upon the assumption of all privileges and obligations hereunder by the grantee, transferee or other successor in interest.*

Exhibit F, paragraph 19. (Emphasis added)

Any partial transfer of Forest's interests is specifically prohibited by the controlling Unit Agreement. Forest is prohibited from disposing of its TBU interests piecemeal—any transfer of its interests must be all or nothing. The Master Conveyances certainly did not assign "nothing"—rather, by unambiguous terms, these agreements conveyed "all obligations relating to the asset." This transfer is consistent with the requirement of Paragraph 19 of the Unit Agreement.

As this Court has previously noted, "[i]n determining the intent of the parties the court looks to the written contract as well as extrinsic evidence regarding the parties' intent at the time the contract was made. The parties' expectations are assessed by examining the language used in the contract, case law interpreting similar language, and relevant extrinsic evidence, including the subsequent conduct of the parties."[10] The Trading Bay Unit Agreement qualifies as circumstances surrounding the Forest conveyances. This Court also noted:[11]

> Differences of opinion among the parties as to their subjective intent, expressed during the litigation, do not establish an issue of fact regarding the parties' reasonable expectations at the time they entered into the contract, since such self serving statements are not considered probative.

Ultimately, this court should look to ascertain the reasonable expectations of the parties. *Harris v. Ahtna, Inc.*, 107 P.3d 271 (Alaska 2005). The appropriate standard to apply in determining intention of parties who have entered commercial contract is that of the reasonable expectation of the parties, or in other words, the sense in which the party using the words should reasonably have apprehended that they would be understood by the other party and the meaning which the recipient of the

---

[10] Docket 90, Order Denying Defendant's Motion for Partial Summary Judgment at Docket No. 23 and Granting Plaintiff's Motion and Partial Summary Judgment a Docket No. 39 (quoting *Norville v. Carr-Gottstein Foods Co.*, 84 P.3d 996, 1004 (Alaska 2004) (internal quotation marks, footnotes, ad citations omitted).

[11] Docket 90, Order Denying Defendant's Motion for Partial Summary Judgment at Docket No. 23 and Granting Plaintiff's Motion and Partial Summary Judgment a Docket No. 39 (quoting *Peterson v. Wirum*, 625 P.2d 866, 870 (Alaska 1981) (footnotes and internal citations omitted).

**LANE POWELL** LLC
301 West Northern Lights Boulevard, Suite 301
Anchorage, Alaska 99503-2648
Telephone 907.277.9511  Facsimile 907.276.2631

communication might reasonably have given to it.  *Arctic Contractors, Inc. v. State*, 564 P.2d 30 (Alaska 1977).  When Forest initiated its conveyance, the court must assume it did so consistent with the requirements of the MUI provision of the Trading Bay Unit agreement.  A partial conveyance would have violated those requirements.

The MUI provision of paragraph 19 is not unique to the TBU Agreement.  The Bureau of Land Management (BLM) has developed a model unit agreement which has been used in connection with Federal lands for decades.[12]  43 C.F.R 3186.1.  Paragraph 19 of the BLM model unit agreement contains the same wording as paragraph 19 of the Trading Bay Unit agreement.  The TBU Unit Agreement, consistent with the BLM model, requires that any transfer or conveyance by a party transfer or convey that party's entire interest and an assumption of all of those interests by the transferee or assignee.[13]  Furthermore, although it does not contain the exact language, the American Association of Petroleum Landmen (AAPL) Model Form Operating Agreement contains a similar MUI provision.  The AAPL MUI provision provides that "[f]or the purposes of maintaining uniformity of ownership . . . no party shall sell, encumber, transfer or make other disposition of its interest . . . unless such disposition covers . . . the entire interest of the party . . ."[14]

---

[12] Title 43 of the Code of Federal Regulations, Part 3180, governs oil and gas unit agreements.  The purpose of the BLM's regulations is to:

> Prescribe the procedures to be followed and the requirements to be met by the owners of any right, title or interest in Federal oil and gas leases and their representatives who wish to unite with others, in collectively adopting and operating under a unit plan for the development of any oil or gas pool, field or like area, or any part thereof.

[13] This intent is mirrored in the transfer documents.  Paragraph 3.3 of Forest's conveyance established that "Assignee expressly assumes all of [Forest's] obligations relating to the Assets, without limitation."  Those assumptions included, inter alia, the "leases, operating agreements, unit agreements, right-of-way agreements and all other contracts."

[14] *See generally*, AAPL website, http://landman.org/default.asp.  *See also*, Cross, *The Ties that Bind: Preemptive Rights and Restraints on Alienation that Commonly Burden Oil and Gas Properties*, Tex. Wesleyan L. Rev. 193, 212-13 (1999) (discussing the MUI provision of the AAPL model unit agreement).

LANE POWELL LLC
301 West Northern Lights Boulevard, Suite 301
Anchorage, Alaska 99503-2648
Telephone 907.277.9511  Facsimile 907.276.2631

The rationale behind MUI provisions is evident.[15]  Any partial conveyance of interests in a unit such as the TBU works to undermine its very operation.  Allowing a stranger to the relationship, which Forest now is, a voice in interpreting the on-going rights and obligations of the joint interest owners of the TBU would give it the ability to influence ongoing operations in which it has no interest.  Simply put, if Forest is allowed to remain a party to this lawsuit despite no longer possessing an interest in the TBU, it will be given the power to shape future TBU policy and operation.  The +/- 250 as-yet unresolved audit exceptions[16], which are now the principal focus of this suit, will require the court to make determinations on recurring issues impacting not only past economic disputes, but the on-going relationship and interests of Unocal and PEOA.  Such determinations should be made between Unocal and PEOA—Forest no longer does or should have any say in these matters.

Many of the 250 remaining audit exceptions occurred not in isolation, but arose year after year in each of Forest's audits, and involve policy issues that will impact future operations.  As but one example,  each year from 1999 through 2004 Forest took exception to various "Time Writing Charges" as they relate to employees such as "Drilling Foremen, Drilling Engineers, and Wireline Coordinators."[17]  One of these, Exception 36 of 2004[18], in the amount of $147,837.32, claimed:

---

[15] *See, e.g.*, Cross, *The Ties that Bind: Preemptive Rights and Restraints on Alienation that Commonly Burden Oil and Gas Properties*, Tex. Wesleyan L. Rev. 193 (1999).  Cross notes that:

> The "big picture" purpose is to protect the investment of the original risk takers by assuring that all parties with rights under the operating agreement will be similarly situated and motivated.  Obviously, some co-owners will always be better capitalized than others, but at least, if the MUI is enforced, each party will have in common the same (proportionate to its interest) amount of sunk costs in the producing and proved non-producing reserves and upside potential in the probable and possible preserves.  Most breaches of the MUI are results of separating the ownership of established production from the ownership of future drilling opportunities.

*Id.* at 213.

[16] Exhibit G.

[17] Exhibit H.

[18] Forest's exception 36 of 2004 is the same exception made in each year from 1999 through 2004 (Exception 15 of 1999, exception 43 of 2000, exception 10 of 2001, exception 44 of 2001, and exception 16 of 2003).

LANE POWELL LLC
301 West Northern Lights Boulevard, Suite 301
Anchorage, Alaska 99503-2648
Telephone 907.277.9511  Facsimile 907.276.2631

> [t]he method of not reporting all workdays available in the calendar month causes the employees' full monthly salary to be allocated at an inflated daily rate. This inflated daily salary rate causes the "Charge" category for each allocated project to include employees' unreported time applicable to vacations, holidays, sick leave, excused absences, etc. However, these unreported days-off are already included in the payroll "Benefits" category, and constitutes a duplicate charge to the Joint Account.[19]

Unocal denied exception 36, noting, inter alia:

> Drilling foremen, construction foremen, and engineers sitting on platform projects are given a day off for each 24 hour day spend on the job. The auditor's approach would yield extremely distorted results not even closely reflecting actual cost for those employees. As an extreme example for illustration purposes only, a drilling foreman who sat on a well for the full month under Forest's methodology would be entitled to pay during the following month but could only be charged to the joint account for on working month's wages (while costing Unocal two month's wages). . . . [20]

If Forest's, rather than Unocal's, reimbursement methodology is adopted, it could result in a series of unintended consequences to the current TBU owners (but not to Forest): Unocal would either have to reduce compensation to these critical employees (thereby diminishing the ability to attract and retain the most experienced and qualified to the TBU), or bear a disproportionate amount of their salaries (thereby either forcing Unocal to bear those costs, or creating an incentive to diminish Unocal's willingness to propose and engage in drilling operations). This Court's resolution of these time writing exceptions, no matter what it might be, will govern the on-going relationship between the correct joint interest owners.

Only the parties with interests in the contracts at issue should be permitted to raise and pursue the resolution of such issues, which necessarily impact decisions of whether to continue, expand or contract unit operations. The MUI clause of paragraph 19 recognizes and protects the TBU owners by ensuring that they each have uniform, rather than fractured, interests in the TBU.

---

[19] Exhibit H.

[20] Exhibit I.

**LANE POWELL LLC**
301 West Northern Lights Boulevard, Suite 301
Anchorage, Alaska 99503-2648
Telephone 907.277.9511 Facsimile 907.276.2631

LANE POWELL LLC
301 West Northern Lights Boulevard, Suite 301
Anchorage, Alaska 99503-2648
Telephone 907.277.9511  Facsimile 907.276.2631

### C.    A Partial Transfer is a Violation of the Terms of the Trading Bay Unit Operating Agreement

As stated above, Forest conveyed the entirety of its TBU interests, including the contractual claims asserted in this suit, to Forest Alaska Operating, LLC.  Nevertheless, and despite the plain language in the transfer documents, it is expected that Forest will argue it did not intend to convey the entirety of its interests in the TBU.[21]  Should this contention be accepted, the court would be faced with the dilemma of either declaring null and void an illegal partial conveyance, or, alternatively, ordering Forest to specifically perform its obligations under paragraph 19 to effect a complete conveyance.

In *ExxonMobil Corporation v. Valence Operating Company,* 174 S.W.3d 303 (Tex.App. 1st District 2005), Valence, the minority interest holder in an oil and gas lease, brought a breach of contract action against the majority interest holder, Exxon.  Valence alleged that Exxon's decision to farm out a portion of its interest in one of the units violated the MUI in the joint operating agreement.  Valence contended the MUI provision prevented any party from transferring interests covered by the joint operating agreement unless the conveying party transferred its entire interest in the unit.  The MUI provision of the controlling joint operating agreement provided, in part, that "[n]otwithstanding any other provisions to the contrary, no party shall sell, encumber, transfer or make other disposition of its interest . . . unless such disposition covers . . . the entire interest of the party in all leases and equipment and production."  *Id.* at 311.  The farmout agreement between Exxon and third parties constituted an agreement to transfer, because Exxon agreed to assign all of its "present right, title" in the unit in question.  *Id.* at 313.  The court found that "the [MUI] provision evinces the intent of the parties not to partition the undivided interests in the leases."  *Id.* at 314.  As a result, the court held that "the plain language of the [MUI] provision in the JOA required that Exxon[] not partition its interest . . . but that it convey its entire interest . . . [and] Exxon[] breached the [MUI] provision."  *Id.*

---

[21] Such an assertion by Forest would not create an ambiguity in the transfer documents.  "The mere fact that two parties disagree as to the interpretation of a contract term does not create an ambiguity. An ambiguity exists only where the disputed terms are reasonably subject to differing interpretation after viewing the contract as a whole and the extrinsic evidence surrounding the disputed terms." *Wessells v. State Dept. of Highways*, 562 P.2d 1042, 1046 (Alaska 1977).

Similarly, in *Samson Resources Co. v. Amerada Hess Corp.*, 41 P.3d 1055 (Okla. 2001), the court determined that, in order to comply with the MUI provision of the controlling operating agreement in the context of a package sale offer, the buyer was required to buy the *entire interest* in all the leases. *Id*. at 1056. Amerada and Samson were parties to three joint operating agreements. *Id*. Each operating agreement contained both a preferential right to purchase and a MUI provision. *Id*. at 1056-57. Amerada entered into a contract to sell its interest in numerous leases to a third party. *Id*. at 1057. In accordance with the joint operating agreements' preferential rights provisions, Amerada informed Samson of the pending sale of Amerada's interest in various wells. *Id*. In response, Samson elected to purchase part of Amerada's interest in two of the operating agreements, and Amerada's entire interest in the other joint operating agreement. *Id*. Amerada responded that it did not consider Samson's elections to be valid, and proceeded to sell its property interests to the third party. *Id*. Samson sued both Amerada and the third-party, seeking specific performance of the preferential rights provision. *Id*. The trial court granted Samson's motion for summary judgment. *Id*. at 1058.

On appeal, Amerada argued that Samson's offer to purchase only a portion of the interests under the two joint operating agreements violated the MUI provisions and that the joint operating agreement required Samson to either accept or reject the entirety of the interests. *Id*. The court agreed with Amerada, finding that the MUI provision "was a term and condition of the sale contract," and "[i]n order to accept the offer, Samson was required to accept that condition and purchase Amerada's entire interest under each applicable JOA." *Id*. at 1059.

In the case at bar, the court need not even reach this issue because Forest's argument that it should be permitted to effect a partial conveyance in contravention of the MUI provision of paragraph 19 violates well-established rules of contract interpretation: "where a contract is fairly open to two constructions, by one of which it would be lawful and the other unlawful, the former must be adopted." *Rockstad v. Erikson*, 113 P.3d 1215, 1222 (Alaska 2005). Here, the only reasonable interpretation of the Master Conveyances is that they accomplished what they appear to do on their face—a complete transfer of *all* TBU rights, including specifically the contractual audit rights giving rise to this suit. A contrary reading of the Master Conveyances would lead Forest straight into a breach of contract claim; on it face, such a reading would be improper.

301 West Northern Lights Boulevard, Suite 301
Anchorage, Alaska 99503-2648
Telephone 907.277.9511 Facsimile 907.276.2631

**LANE POWELL** LLC

## V.  <u>CONCLUSION</u>

Forest no longer has standing to maintain this action having conveyed all of its interest in the TBU.  This is clear from the language of the conveyances themselves as well as from the controlling language paragraph 19 of the TBU Agreement. Under the unambiguous provisions terms of the TBU Unit Agreement, Forest is not permitted transfer its interest in the TBU to a third party while retaining a voice in the operation of the unit.  This is not a mere formalistic nicety, but serves the purpose of permitting only the current interest owners to participate in the resolution of the important issues which dictate their on going relationships.

Forest no longer has any interest in the TBV, and must therefore be dismissed as a party to this action.

DATED this 25th day of April, 2008.

LANE POWELL LLC
Attorneys for Defendant


By  s/ Brewster H. Jamieson
    Brewster H. Jamieson, ASBA No. 8411122
    301 West Northern Lights Boulevard, Suite 301
    Anchorage, Alaska  99503-2648
    Tel:    907-277-9511
    Fax:   907-276-2631
    Email:  jamiesonb@lanepowell.com

I certify that on April 25, 2008, a copy of the
foregoing was served by ECF on:

Jeffrey M. Feldman, feldman@frozenlaw.com
Michael Jungreis, mj@hartig.com

  s/ Brewster H. Jamieson

017351.0040/162299.3

**LANE POWELL LLC**
301 West Northern Lights Boulevard, Suite 301
Anchorage, Alaska  99503-2648
Telephone 907.277.9511  Facsimile  907.276.2631