# UNIT AGREEMENT WITH AMENDMENT
# FOR DEVELOPMENT AND OPERATION OF THE
# TRADING BAY UNIT AREA
# STATE OF ASLAKA

UNIT AGREEMENT

FOR THE DEVELOPMENT AND OPERATION OF THE

TRADING BAY UNIT AREA

STATE OF ALASKA


THIS AGREEMENT, entered into as of the 6th day of February, 1967, by and between the parties subscribing, ratifying, or consenting hereto, and herein referred to as the "parties hereto".

WITNESSETH:

WHEREAS, the parties hereto are the owners of working, royalty or other oil and gas interests in the unit area subject to this agreement; and,

WHEREAS, the Commissioner of the Department of Natural Resources, State of Alaska, hereinafter referred to as the "Commissioner", is authorized by Alaska Statute 38.05 and appropriate State Regulations to consent to or approve this agreement on behalf of the State of Alaska, insofar as it covers and includes lands and mineral interests of the State of Alaska; and

WHEREAS, the parties hereto hold sufficient interest in the Trading Bay Unit Area covering the land hereinafter described to give reasonably effective control of operations therein; and

WHEREAS, it is the purpose of the parties hereto to conserve natural resources, prevent waste, and secure other benefits obtainable through development and operation of the area subject to this agreement under the terms, conditions and limitations herein set forth; and,

WHEREAS, State Lands, as that term is used in this agree-

ment, means those lands title to which is vested or that become
vested in the State of Alaska and lands which have been tenta-
tively approved after state selection and are not covered by an
existing Federal oil and gas lease at such time as any right or
authority is exercised;

NOW, THEREFORE, in consideration of the premises and the
promises herein contained, the parties hereto commit to this agree-
ment their respective interests in the below-defined unit area, and
agree severally among themselves as follows:

1. ENABLING ACT AND REGULATIONS. The Alaska Land Act
(A.S. 38.05.005-370) and all valid and pertinent oil and gas stat-
utes and regulations including the oil and gas operating statutes
and regulations in effect as of the effective date hereof or here-
after issued thereunder governing drilling and producing operations,
not inconsistent with the terms hereof or the laws of the State of
Alaska are hereby accepted and made a part of this agreement.

2. UNIT AREA. The area specified on the map attached here-
to marked Exhibit "A" is hereby designated and recognized as constitut-
ing the unit area, containing 39,599 acres, more or less. Exhibit "A"
shows, in addition to the boundary of the unit area, the boundaries
and identity of tracts and leases in said area to the extent known to
the Unit Operator.

Exhibit "B" attached hereto is a schedule showing, to the
extent known to the Unit Operator, the acreage, percentage, and kind
of ownership of oil and gas interests in all land in the unit area.
However, nothing herein or in said schedule or map shall be construed
as a representation by any party hereto as to the ownership of any
interest other than such interest or interests as are shown in said

-2-

Exhibit F
Page 3 of 41

map or schedule as owned by such party.

Exhibits "A" and "B" shall be revised by the Unit Operator whenever changes in the unit area render such revision necessary, or when requested by the Director, Division of Lands of the Department of Natural Resources, hereinafter referred to as the "Director", and four (4) copies thereof shall be filed with the Director.

The above-described unit area shall, when practicable, be expanded to include therein any additional tract or tracts regarded as reasonably necessary or advisable for the purposes of this agreement, or shall be contracted to exclude lands not within any participating area whenever such expansion or contraction is necessary or advisable to conform with the purposes of this agreement.  Such expansion or contraction shall be effected in the following manner:

(a)  Unit Operator, on its own motion, or on demand of the Director, shall prepare a notice of proposed expansion or contraction describing the contemplated changes in the boundaries of the unit area, the reasons therefor and the proposed effective date thereof, preferably the first day of a month subsequent to the date of notice.

(b)  Said notice shall be delivered to the Director and copies thereof mailed to the last known address of each working interest owner, lessee, and lessor whose interests are affected, advising that 30 days will be allowed for submission to the Unit Operator of any objections.

-3-

(c)  Upon expiration of the 30-day period provided in the preceding item (b) hereof, Unit Operator shall file with the Director, evidence of mailing of the notice of expansion or contraction, and a copy of any objections thereto which have been filed with the Unit Operator, together with an application in sufficient number, for approval of such expansion or contraction and with appropriate joinders.

(d)  After due consideration of all pertinent information, the expansion or contraction shall, upon approval by the Director become effective as of the date prescribed in the notice thereof.

(e)  All legal subdivisions of unitized lands (i.e., 40 acres by Government survey or its nearest lot or tract equivalent in instances of irregular surveys, however, unusually large lots or tracts shall be considered in multiples of 40 acres, or the nearest aliquot equivalent thereof, for the purpose of elimination under this subsection), no parts of which are entitled to be in a participating area within five years after the first day of the month following the effective date of the first initial participating area established under this unit agreement, shall be eliminated automatically from this agreement, effective as of the first day thereafter, and such lands shall no longer be a part of the unit area and shall no longer be subject to this agreement except as provided in Paragraph 18 (g), unless at the expiration of said five-year period diligent drilling operations are in progress on unitized lands not entitled to participation, in which event all such lands shall remain subject hereto for so long as such drilling operations are continued diligently, with not more than ninety (90) days time elapsing between the

-4-

completion of one such well and the commencement of the next such
well, except that the time allowed between such wells shall not
expire earlier than 30 days after the expiration of any period of
time during which drilling operations are prevented by a matter
beyond the reasonable control of Unit Operator, as set forth in
the section hereof entitled "Unavoidable Delay"; provided that all
legal subdivisions of lands not in a participating area and not en-
titled to become participating under the applicable provisions of
this agreement within 10 years after the first day of the month fol-
lowing the effective date of said first initial participating area
shall be eliminated as above specified.  Determination of creditable
"unavoidable delay" time shall be made by Unit Operator and subject
to approval of the Director.  The Unit Operator shall, within 90
days after the effective date of any elimination hereunder, describe
the area so eliminated to the satisfaction of the Director and prompt-
ly notify all parties in interest.

        If conditions warrant extension of the ten-year period
specified in this subsection 2(e), a single extension of not to ex-
ceed two years may be accomplished by consent of the owners of ninety
percent of the current unitized working interest and sixty percent of
the current unitized basic royalty interests (exclusive of the basic
royalty interests of the State) on a total nonparticipating-acreage
basis, respectively, with approval of the Commissioner provided such
extension application is submitted to the Director not later than
60 days prior to the expiration of said ten-year period.

        Any expansion of the unit area pursuant to this section
which embraces lands theretofore eliminated pursuant to this sub-

-5-

section 2(e) shall not be considered automatic commitment or re-
commitment of such lands.

3. UNITIZED LAND AND UNITIZED SUBSTANCES. All land com-
mitted to this agreement shall constitute land referred to herein as
"unitized land" or "land subject to this agreement". All oil and
gas in any and all formations of the unitized land are unitized under
the terms of this agreement and herein are called "unitized substances".

4. UNIT OPERATOR. UNION OIL COMPANY OF CALIFORNIA, with
offices at Anchorage, Alaska, is hereby designated as Unit Operator
and by signature hereto as Unit Operator and as working interest own-
er commits to this agreement all interests in unitized substances
vested in it and agrees and consents to accept the duties and obli-
gations of Unit Operator for discovery, development and production
of unitized substances as herein provided.

Whenever reference is made herein to the Unit Operator,
such reference means the Unit Operator acting in that capacity and
not as an owner of interest in unitized substances, and the term
"working interest owner" when used herein shall include or refer to
Unit Operator as the owner of a working interest when such an inter-
est is owned by it.

5. RESIGNATION OR REMOVAL OF UNIT OPERATOR. Unit Operator
shall have the right to resign at any time prior to the establishment
of a participating area or areas hereunder, but such resignation shall
not become effective so as to release Unit Operator from the duties
and obligations of Unit Operator and terminate Unit Operator's rights
as such for a period of six months after notice of intention to resign
has been served by Unit Operator on all working interest owners and
the Director, and until all wells then drilled hereunder are placed

-6-

in a satisfactory condition for suspension or abandonment, whichever is required by the Director as to State and privately owned lands, unless a new Unit Operator shall have been selected and approved and shall have taken over and assumed the duties and obligations of Unit Operator prior to the expiration of said period.

Unit Operator shall have the right to resign in like manner and subject to like limitations, as above provided, at any time a participating area established hereunder is in existence but, in all instances of resignation or removal, until a successor Unit Operator is selected and approved as hereinafter provided, the working interest owners shall be jointly responsible for performance of the duties of Unit Operator, and shall not later than 30 days before such resignation or removal becomes effective appoint a common agent to represent them in any action to be taken hereunder.

The resignation of Unit Operator shall not release Unit Operator from any liability for any default by it hereunder occurring prior to the effective date of its resignation.

The Unit Operator may, upon default or failure in the performance of its duties or obligations hereunder be subject to removal by the same percentage vote of the owners of working interests determined in like manner as herein provided for the selection of a new Unit Operator. Such removal shall be effective upon notice thereof to the Director.

The resignation or removal of Unit Operator under this agreement shall not terminate its right, title, or interest as the owner of a working interest or other interest in unitized substances, but upon the resignation or removal of Unit Operator becoming

-7-

effective such Unit Operator shall deliver possession of all
equipment, materials, and appurtenances used in conducting the
unit operations and owned by the working interest owners to the
new duly qualified successor Unit Operator or to the owners there-
of if no such new Unit Operator is elected, to be used for the
purpose of conducting unit operations hereunder. Nothing here-
in shall be construed as authorizing removal of any material,
equipment and appurtenances needed for the preservation of any
wells.

      6.  SUCCESSOR UNIT OPERATOR.  Whenever the Unit Oper-
ator shall tender his or its resignation as Unit Operator, or shall
be removed as hereinabove provided, or a change of Unit Operator is
negotiated by working interest owners, the owners of the working in-
terests in the participating area or areas according to their respec-
tive acreage interests in such participating area or areas, or until
a participating area shall have been established, the owners of the
working interests according to their respective acreage interests in
all unitized land, shall by majority vote select a successor Unit
Operator; provided that, if a majority but less than 75 percent of
the working interests qualified to vote are owned by one party to
this agreement, a concurring vote of one or more additional work-
ing interest owners shall be required to select a new operator.
Such selection shall not become effective until:

      (a)  a Unit Operator so selected shall accept in writing
the duties and responsibilities of Unit Operator, and

      (b)  the selection shall have been filed with and approved
by the Director. If no successor Unit Operator is selected and qual-
ified as herein provided, the Commissioner at his election may

declare this Unit Agreement terminated.

    7.  ACCOUNTING PROVISIONS AND UNIT OPERATING AGREEMENT.
If the Unit Operator is not the sole owner of working interests,
costs and expenses incurred by Unit Operator in conducting unit
operations hereunder shall be paid and apportioned among and borne
by the owners of working interests, all in accordance with the
agreement or agreements entered into by and between the Unit Oper-
ator and the owners of working interests, whether one or more,
separately or collectively.  Any agreement or agreements entered
into between the working interest owners and the Unit Operator
as provided in this section, whether one or more, are herein re-
ferred to as the "Unit Operating Agreement".  Such unit operating
agreement shall also provide the manner in which the working inter-
est owners shall be entitled to receive their respective propor-
tionate and allocated share of the benefits accruing hereto in
conformity with their underlying operating agreements, leases or
other independent contracts, and such other rights and obliga-
tions as between Unit Operator and the working interest owners
as may be agreed upon by Unit Operator and the working interest
owners; however, no such unit operating agreement shall be deemed
either to modify any of the terms and conditions of this unit agree-
ment or to relieve the Unit Operator of any right or obligation es-
tablished under this unit agreement, and in case of any inconsis-
tency or conflict between the unit agreement and the unit opera-
ting agreement, this unit agreement shall prevail.  Three (3) true

-9-

Exhibit _E_
Page _10_ of _41_

copies of any unit operating agreement executed pursuant to this
Section shall be filed with the Director within six (6) months
after the effective date of this Unit Agreement or such later
date as may be agreed to by the parties hereto and the Commis-
sioner. In the event copies of the Unit Operating Agreement are
not filed as hereinabove provided, this agreement shall termin-
ate.

    8.  RIGHTS AND OBLIGATIONS OF UNIT OPERATOR.  Except
as otherwise specifically provided herein, the exclusive right,
privilege, and duty of exercising any and all rights of the par-
ties hereto which are necessary or convenient for prospecting for,
producing, storing, allocating, and distributing the unitized sub-
stances are hereby delegated to and shall be exercised by the Unit
Operator as herein provided.  Acceptable evidence of title to said
rights shall be deposited with said Unit Operator and, together with
this agreement, shall constitute and define the rights, privileges
and obligations of Unit Operator.  Nothing herein, however, shall
be construed to transfer title to any land or to any lease or oper-
ating agreement, it being understood that under this agreement the
Unit Operator, in its capacity as Unit Operator, shall exercise
the rights of possession and use vested in the parties hereto on-
ly for the purposes herein specified.

    9.  DISCOVERY.  Inasmuch as wells capable of producing
unitized substances in paying quantities (to-wit:  quantities
sufficient to repay the cost of drilling and producing operations,
with a reasonable profit) from the Tertiary system have already

-10-

Exhibit F
Page 11 of 41

been drilled and tested within the unit area, no initial test
well shall be required under the terms of this agreement and
it shall be considered that production is had in paying quan-
tities under this agreement on the effective date hereof.

10.  PLAN OF FURTHER DEVELOPMENT AND OPERATION.
Within six months after the effective date of this unit agree-
ment, the Unit Operator shall submit for the approval of the
Director an acceptable plan of development and operation for
the unitized land which, when approved by the Director, shall
constitute the further drilling and operating obligations of
the Unit Operator under this agreement for the period specified
therein.  Thereafter, from time to time before the expiration of
any existing plan, the Unit Operator shall submit for the approv-
al of the Director a plan for an additional specified period for
the development and operation of the unitized land.

Any plan submitted pursuant to this section shall pro-
vide for the exploration of the unitized area and for the dili-
gent drilling necessary for determination of the area or areas
thereof capable of producing unitized substances in paying quan-
tities in each and every productive formation and shall be as
complete and adequate as the Director may determine to be nec-
essary for timely development and proper conservation of the
oil and gas resources of the unitized area, and shall:

(a)  specify the number and location of any wells to
be drilled and the proposed order and time for such drilling;
and,

(b)  to the extent practicable, specify the operating

-11-

practices regarded as necessary and advisable for the proper con-
servation of natural resources.

Separate plans may be submitted for separate produc-
tive zones, subject to the approval of the Director.

Said plan or plans shall be modified or supplemented
when necessary to meet changed conditions, or to protect the in-
terests of all parties to this agreement.  Reasonable diligence
shall be exercised in complying with the obligations of the approved
plan of development.  The Director is authorized to grant a reas-
onable extension of the six-month period herein prescribed for
submission of an initial plan of development where such action is
justified because of unusual conditions or circumstances.  After
completion hereunder of a well capable of producing unitized sub-
stances in paying quantities, no further wells, except such as
may be necessary to afford protection against operations not un-
der this agreement or such as may be specifically approved by the
Director shall be drilled except in accordance with a plan of
development approved as herein provided.

11.  PARTICIPATION AFTER DISCOVERY.  Within sixty (60)
days after the effective date of this unit agreement, the Unit
Operator shall submit for approval by the Director a schedule
based on subdivisions of the public land survey or aliquot parts
thereof of all unitized land then regarded as reasonably proved
to be productive of unitized substances in paying quantities;
all lands in said schedule on approval of the Director are to
constitute a participating area, effective as of the effective

-12-

date of the unit agreement.  The acreages of both State and
non-State lands shall be based upon approved protraction
diagrams or appropriate computations from the courses and
distances shown on the last approved protraction diagram or
public land survey as of the effective date of the initial
participating area or computed with reference to the last
approved protraction survey or grids.  Said schedule also shall
set forth the percentage of unitized substances to be allocated
as herein provided to each unitized tract in the participating
area so established and shall govern the allocation of produc-
tion from and after the date the participating area becomes
effective.  A separate participating area shall be established
in like manner for each separate pool or deposit of unitized sub-
stances or for any group thereof produced as a single pool or zone,
effective as of the date of completion of a well capable of pro-
ducing unitized substances in paying quantities therefrom, and
any two or more participating areas so established may be com-
bined into one with the consent of the owners of all working in-
terests in the lands within the participating areas so to be com-
bined, on approval of the Director.  The participating area or
areas so established shall be revised from time to time, subject
to like approval, whenever such action appears proper as a result
of further drilling operations or otherwise, to include additional
land then regarded as reasonably proved to be productive in pay-
ing quantities, or to exclude land then regarded as reasonably
proved not to be productive in paying quantities and the percentage

-13-

of allocation shall also be revised accordingly. The effec-
tive date of any revision shall be the first of the month in
which is obtained the knowledge or information on which such
revision is predicated, provided, however, that a more approp-
riate effective date may be used if justified by the Unit Oper-
ator and approved by the Director. No land shall be excluded
from a participating area on account of depletion of the uni-
tized substances.

It is the intent of this section that a participating
area shall represent the area known or reasonably estimated to
be productive in paying quantities; but, regardless of any re-
vision of the participating area, nothing herein contained shall
be construed as requiring any retroactive adjustment for pro-
duction obtained prior to the effective date of the revision of
the participating area.

In the absence of agreement at any time between the
Unit Operator and the Director as to the proper definition or
redefinition of a participating area, or until a participating
area has, or areas have, been established as provided herein,
the portion of all payments affected thereby may be impounded
in a manner mutually acceptable to the owners of working inter-
ests, except royalties due the State of Alaska, which shall be
determined by the Director for State lands and the amount there-
of deposited, as directed by the Director, to be held as unearned
money until a participating area is finally approved and then

-14-

applied as earned or returned in accordance with a determination
of the sum due as State royalty on the basis of such approved
participating area.

Upon the request of the operator or working interest
owners, the Director shall hold as confidential any engineer-
ing, geophysical, geological data including but not limited to
drilling logs, daily drilling reports or any other data of like
or similar nature which may be requested or required by the Direc-
tor for any purpose of this agreement.  This shall not apply to
those items required to be submitted and to be held confidential
for only a limited period of time under the oil and gas conserva-
tion regulations.

Whenever it is determined, subject to the approval of
the Director, that a well drilled under this agreement is not
capable of production in paying quantities and inclusion of the
land on which it is situated in a participating area is unwarran-
ted, production from such well shall, for the purposes of settle-
ment among all parties other than working interest owners, be
allocated to the land on which the well is located so long as
such land is not within a participating area established for
the pool or deposit from which such production is obtained.
Settlement for working interest benefits from such a well shall
be made as provided in the unit operating agreement.

12.  ALLOCATION OF PRODUCTION.  All unitized substances

-15-

produced from each participating area established under this
agreement, except any part thereof used in conformity with good
operating practices within the unitized area for drilling, oper-
ating, camp and other production or development purposes, for
repressuring or recycling in accordance with a plan of develop-
ment approved by the Director, or unavoidably lost, shall be
deemed to be produced equally on an acreage basis from the sev-
eral tracts of unitized land of the participating area established
for such production and, for the purpose of determining any bene-
fits accruing under this agreement, each such tract of unitized
land shall have allocated to it such percentage of said produc-
tion as the number of acres of such tract included in said parti-
cipating area bears to the total acres of unitized land in said
participating area, except that allocation of production hereunder
for purposes other than for settlement of the royalty, overriding
royalty, or payment out of production obligations of the respec-
tive working interest owners, shall be on the basis prescribed
in the unit operating agreement whether in conformity with the
basis of allocation herein set forth or otherwise. It is hereby
agreed that production of unitized substances from a participat-
ing area shall be allocated as provided herein regardless of
whether any wells are drilled on any particular part or tract of
said participating area. If any gas produced from one participat-
ing area is used for repressuring or recycling purposes in another

-16-

participating area, the first gas withdrawn from such last-mentioned participating area for sale during the life of this agreement shall be considered to be the gas so transferred until an amount equal to that transferred shall be so produced for sale and such gas shall be allocated to the participating area from which initially produced as constituted at the time of such final production.

13.   DEVELOPMENT OR OPERATION OF NON-PARTICIPATING LAND OR FORMATIONS.  Any party or parties hereto owning or controlling the working interests in any unitized land having thereon a regular well location may, with the approval of the Director, and subject to the non-conflicting provisions of the unit operating agreement, at such party's or parties' sole risk, costs, and expense, drill a well at such location on such land to test any formation for which a participating area has not been established or to test any formation for which a participating area has been established if such location is not within said participating area, unless within 90 days of receipt of notice from said party of his intention to drill the well the Unit Operator elects and commences to drill such a well in like manner as other wells are drilled by the Unit Operator under this agreement.

If any well drilled as aforesaid by a working interest owner results in production such that the land upon which it is situated may properly be included in a participating area, such

-17-

participating area shall be established or enlarged as provided
in this agreement and the well shall thereafter be operated by
the Unit Operator in accordance with the terms of this agreement
and the unit operating agreement.

If any well drilled as aforesaid by a working inter-
est owner obtains production in quantities insufficient to jus-
tify the inclusion in a participating area of the land upon which
such well is situated, such well may be operated and produced by
the party drilling the same subject to the conservation require-
ments of this agreement.  The royalties in amount or value of
production from any such well shall be paid as specified in the
underlying lease and agreements affected.

14.  ROYALTY SETTLEMENT.  The State of Alaska and all
royalty owners who, under existing contract, are entitled to take
in kind a share of the substances now unitized hereunder produced
from any tract, shall hereafter be entitled to the right to take
in kind their share of the unitized substances allocated to such
tract, and Unit Operator, or in case of the operation of a well
by a working interest owner as herein in special cases provided
for, such working interest owner, shall make deliveries of such
royalty share taken in kind in conformity with the applicable
contracts, laws and regulations.  Settlement for royalty inter-
est not taken in kind shall be made by working interest owners

-18-

responsible therefor under existing contracts, laws and regulations on or before the last day of each month for unitized substances produced during the preceding calendar month; provided, however, that nothing herein contained shall operate to relieve the lessees of any land from their respective lease obligations for the payment of any royalties due under their leases.  No deduction for dehydration and cleaning charges shall be charged to the State's royalty except where royalty is taken in kind, unless the State subsequently agrees to such deductions as reasonable and proper.

If gas obtained from lands not subject to this agreement is introduced into any participating area hereunder, for use in repressuring, stimulation of production, or increasing ultimate recovery, which shall be in conformity with a plan first approved by the Director, a like amount of gas, after settlement as herein provided for any gas transferred from any other participating area and with due allowance for loss or depletion from any cause, may be withdrawn from the formation into which the gas was introduced, royalty free as to dry gas, but not as to the products extracted therefrom; provided that such withdrawal shall be at such time as may be provided in the plan of operations or as may otherwise be consented to by Director as conforming to good petroleum engineering practice; and provided further that such right of withdrawal shall terminate on the termination of this unit agreement.

-19-

Royalty due on account of the State of Alaska shall be computed and paid as to all unitized substances on the basis of the amounts allocated to such lands, and in accordance with appropriate statutes and regulations.

15. RENTAL SETTLEMENT. Rental or minimum royalties due on leases committed hereto shall be paid by working interest owners responsible therefor under existing contracts, laws, and regulations, provided that nothing herein contained shall operate to relieve the lessees of any land from their respective lease obligations for the payment of any rental or minimum royalty in lieu thereof due under their leases.

Rentals or minimum royalty on State of Alaska lands subject to this agreement shall be paid at the rate specified in the respective leases and in accordance with appropriate statutes and regulations.

With respect to any lease on non-State land containing provisions which would terminate such lease unless drilling operations were within the time therein specified commenced upon the land covered thereby or rentals paid for the privilege of deferring such drilling operations, the rentals required thereby shall, notwithstanding any other provision of this agreement, be deemed to accrue and become payable during the term thereof as extended by this agreement and thereafter until the required drilling operations are commenced upon the land covered thereby or some portion of such land is included within a participating area.

-20-

16.  CONSERVATION.  Operations hereunder and production of unitized substances shall be conducted to provide for the most economical and efficient recovery of said substances without waste, as defined by or pursuant to State law or regulation.

17.  DRAINAGE.  The Unit Operator shall take appropriate and adequate measures to prevent drainage of unitized substances from unitized land by wells on land not subject to this agreement, or, with prior consent of the Director, pursuant to applicable regulations, pay a fair and reasonable compensatory royalty as determined by and approved by the Director for State lands leases.

18.  LEASES AND CONTRACTS CONFORMED AND EXTENDED.  The terms, conditions and provisions of all leases, subleases and other contracts relating to exploration, drilling, development or operation for oil and gas on lands committed to this agreement are hereby expressly modified and amended to the extent necessary to make the same conform to the provisions hereof, but otherwise to remain in full force and effect; and the parties hereto hereby consent that the Director as to State leases shall and, by his approval hereof or by the approval hereof by his duly authorized representative, does hereby establish, alter, change or revoke the drilling, producing, rental, minimum royalty and royalty requirements of State leases committed hereto and the regulations in respect thereto and conform said requirements to the provisions of this agreement and, without limiting the generality of the foregoing, all leases, subleases, and contracts are particularly modified in accordance with the following:

(a)  The development and operation of lands subject to

-21-

this agreement under the terms hereof shall be deemed full per-
formance of all obligations for development and operation with
respect to each and every part or separately owned tract sub-
ject to this agreement, regardless of whether there is any
development of any particular part or tract of the unit area,
notwithstanding anything to the contrary in any lease, oper-
ating agreement or other contract by and between the parties
hereto, or their respective predecessors in interest, or any
of them.

(b)  Drilling and producing operations performed
hereunder upon any tract of unitized lands will be accepted
and deemed to be performed upon and for the benefit of each
and every tract of unitized land, and no lease shall be deemed
to expire by reason of failure to drill or produce wells sit-
uated on the land therein embraced.

(c)  Suspension of drilling or producing operations
on all unitized lands pursuant to direction or consent of the
Commissioner or his duly authorized representative, shall be
deemed to constitute such suspension pursuant to such direc-
tion or consent as to each and every tract of unitized land.

(d)  Each lease, sublease or contract relating to
the exploration, drilling, development or operation for oil
or gas of lands, other than those of the State of Alaska, com-
mitted to this agreement, which, by its terms might expire
prior to the termination of this agreement, is hereby extended

-22-

beyond any such term so provided therein so that it shall be
continued in full force and effect for and during the term of
this agreement.

(e)  Any lease embracing lands of the State of Alaska
which are made subject to this agreement, shall continue in force
beyond the term provided therein as to the lands committed so
long as such lease remains subject hereto, provided that pro-
duction is had in paying quantities under this unit agreement
prior to the expiration date of the term of such lease or, in
the event actual drilling operations are commenced on unitized
land, in accordance with the provisions of this agreement, prior
to the end of the primary term of such lease and are being dili-
gently prosecuted at that time, such lease shall be extended for
two years and so long thereafter as oil or gas is produced in pay-
ing quantities.

(f)  Any lease embracing land of the State of Alaska
having only a portion of its lands  committed hereto, shall be
segregated as to the portion committed and the portion not
committed, and the provisions of such lease shall apply separ-
ately to such segregated portions commencing as of the effec-
tive date hereof; provided, however, notwithstanding any of
the provisions of this agreement to the contrary, any lease em-
bracing lands of the State of Alaska having only a portion of
its lands committed hereto shall continue in full force and
effect beyond the term provided therein as to all lands em-
braced in such lease if oil or gas is discovered and is capable
of being produced in paying quantities from some part of the
land embraced in such lease at the time of approval of the

-23-

unit agreement by the State of Alaska or if at the time of approval of the unit agreement by the State the lessee or the Unit Operator is then engaged in bona fide drilling or reworking operations on some part of the lands embraced in such lease, the same as to all lands embraced therein shall remain in full force and effect so long as such operations are being diligently prosecuted, and if they result in the production of oil or gas in paying quantities, said lease shall continue in full force and effect as to all of the lands embraced therein so long thereafter as oil or gas in paying quantities is being produced from any portion of said lease; provided, however, that any such lease as to the non-unitized portion shall continue in force and effect for the term thereof, but for not less than two years from the date of such segregation and so long thereafter as oil or gas is produced in paying quantities.

Any State lease having production in paying quantities, as defined in this agreement, on said lease prior to commitment to this agreement shall not be segregated. The non-unitized portion shall not participate in the unit area but shall be extended by virtue of the production on the unitized portion and so long as it produces in paying quantities. Nothing herein shall operate to excuse further development on the portion lying outside the unit area where the circumstances would require a reasonably prudent lessee to further develop.

(g)  Where some portion of a lease is included within

-24-

the final participating area as provided in Paragraph 2(e) of
this agreement, the following shall apply as to the area of
the lease not so included:  That area of lease lands not so
included in the final participating area shall be eliminated
as in Paragraph 2(e) of this agreement and shall terminate
after the expiration of 90 days unless annual rentals at the
rate specified in the original lease shall have been paid with-
in the said 90 days.  The entire lease shall continue in force
and effect so long thereafter as production is allocated to a
portion of said lease and so long as annual rentals are paid
on the portion not within the participating area.  The first
rental payment is due and payable on the first day after the
expiration of the above mentioned 90 day period with allowance
for proration of rentals.  Thereafter, annual rentals are due
and payable on the anniversary date of the lease.

   19.  COVENANTS RUN WITH LAND.  The covenants herein
shall be construed to be covenants running with the land with
respect to the interest of the parties hereto and their suc-
cessors in interest until this agreement terminates, and any
grant, transfer or conveyance of interest in land or leases
subject hereto shall be and hereby is conditioned upon the
assumption of all privileges and obligations hereunder by the
grantee, transferee or other successor in interest.  No assign-
ment or transfer of any working interest, royalty or other

-25-

Exhibit E
Page 24 of 41

interest subject hereto shall be binding upon Unit Operator until the first day of the calendar month after Unit Operator is furnished with the original, photostatic or certified copy of the instrument of transfer.

20.  EFFECTIVE DATE AND TERM.  This agreement shall become effective upon approval by the Commissioner or his duly authorized representative as of the date of approval by the Commissioner and shall terminate five (5) years from said effective date unless:

(a)  such date of expiration is extended by the Commissioner, or

(b)  it is reasonably determined prior to the expiration of the fixed term or any extension thereof that the unitized land is incapable of production of unitized substances in paying quantities in the formations tested hereunder and after notice of intention to terminate the agreement on such ground is given by the Unit Operator to all parties in interest at their last known addresses, the agreement is terminated with the approval of the Commissioner, or

(c)  a valuable discovery of unitized substances has been made or accepted on unitized land during said initial term or any extension thereof, in which event the agreement shall remain in effect for such term and so long thereafter as unitized substances can be produced in quantities sufficient to pay for

-26-

the cost of producing same from wells on unitized land with-
in any participating area established hereunder and, should
production cease, so long thereafter as diligent operations
are in progress for the restoration of production or discov-
ery of new production and so long thereafter as the unitized
substances so discovered can be produced as aforesaid, or

      (d)  it is terminated as provided in this agreement.

    This agreement may be terminated at any time by not
less than 75 percentum, on an acreage basis, of the owners of
working interests signatory hereto, with the approval of the
Commissioner; notice of any such approval to be given by the
Unit Operator to all parties hereto.

    21.  RATE OF PROSPECTING, DEVELOPMENT AND PRODUCTION.
The Director is hereby vested with authority to alter or modify
from time to time in his discretion the quantity and rate of
production under this agreement when such quantity and rate is
not fixed pursuant to State law or does not conform to any state-
wide voluntary conservation or allocation program which is es-
tablished, recognized and generally adhered to by the majority
of operators in such State, such authority being hereby limited
to alteration or modification in the public interest, the pur-
pose thereof and the public interest to be served thereby to be
stated in the order of alteration or modification.  Without
regard to the foregoing, the Director is also hereby vested with

-27-

authority to alter or modify from time to time at his dis-
cretion the rate of prospecting and development and the quan-
tity and rate of production under this agreement when such
alteration or modification is in the interest of attaining
the conservation objectives stated in this agreement and is
not in violation of any applicable State law.

Powers in this section vested in the Director shall
only be exercised after notice to Unit Operator and opportunity
for hearing to be held not less than fifteen (15) days from
notice.

22.  APPEARANCES.  Unit Operator shall, after notice
to other parties affected, have the right to appear for and on
behalf of any and all interests affected hereby before the Com-
missioner of the Department of Natural Resources of the State
of Alaska and to appeal from orders issued under the regulations
of said Department, or to apply for relief from any of said reg-
ulations or in any proceedings relative to operations before the
Commissioner or any other legally constituted authority; provided,
however, that any other interested party shall also have the right
at his own expense to be heard in any such proceeding.

23.  NOTICES.  All notices, demands or statements re-
quired hereunder to be given or rendered to the parties hereto
shall be deemed fully given if given in writing and personally

-28-

Exhibit E
Page 29 of 41

delivered to the party or sent by postpaid registered mail or
certified mail, addressed to such party or parties at their
respective addresses set forth in connection with the signatures
hereto or the ratification or consent hereof or to such other
address as any such party may have furnished in writing to the
party sending the notice, demand or statement.

    24.  NO WAIVER OF CERTAIN RIGHTS.  Nothing in this
agreement contained shall be construed as a waiver by any party
hereto of the right to assert any legal or constitutional right
or defense as to the validity or invalidity of any law of the
State or of the United States, or regulations issued thereunder
in any way affecting such party, or as a waiver by any such party
of any right beyond his or its authority to waive.

    25.  UNAVOIDABLE DELAY.  All obligations under this
agreement requiring the Unit Operator to commence or continue
drilling or to operate on or produce unitized substances from
any of the lands covered by this agreement shall be suspended
while, but only so long as, the Unit Operator despite the exer-
cise of due care and diligence is prevented from complying with
such obligations, in whole or in part, by strikes, acts of God,
action of the elements, weather or natural phenomena including
but not limited to ice within the unit area rendering continued
operations hazardous to life or property, Federal, State or
Municipal law or agencies, unavoidable accidents, uncontrol-
lable delays in transportation, inability to obtain necessary
materials in open market, or other matters beyond the reason-
able control of the Unit Operator whether similar to matters
herein enumerated or not.

-29-

Exhibit E
Page 30 of 41

26. NONDISCRIMINATION. In connection with the per-
formance of work under this agreement, the operator agrees to
comply with all of the provisions of Section 202 (1) to (7)
inclusive, of Executive Order 11246 (30 F.R. 12319), which are
hereby incorporated by reference into this agreement.

27. LOSS OF TITLE. In the event title to any tract
of unitized land shall fail and the true owner cannot be induced
to join in this unit agreement, such tract shall be automatically
regarded as not committed hereto and there shall be such readjust-
ment of future costs and benefits as may be required on account
of the loss of such title. In the event of a dispute as to title
as to any royalty, working interest or other interests subject
thereto, payment or delivery on account thereof may be withheld
without liability for interest until the dispute is finally set-
tled; provided that, as to State land or leases, no payments of
funds due the State of Alaska should be withheld, but such funds
of the State of Alaska shall be deposited as directed by the
Commissioner, to be held as unearned money pending final settle-
ment of the title dispute, and then applied as earned or returned
in accordance with such final settlement.

Unit Operator as such is relieved from any responsi-
bility for any defect or failure of any title hereunder.

28. NON-JOINDER AND SUBSEQUENT JOINDER. If the owner
of any substantial interest in a tract within the unit area fails
or refuses to subscribe or consent to this agreement, the owner
of the working interest in that tract may withdraw said tract

-30-

Exhibit F
Page 31 of 41

from this agreement by written notice to the Director and
the Unit Operator prior to the approval of this agreement
by the Commissioner. Any oil or gas interests in lands with-
in the unit area not committed hereto prior to submission of
this agreement for final approval may thereafter be committed
hereto by the owner or owners thereof subscribing or consent-
ing to this agreement and, if the interest is a working inter-
est, by the owner of such interest also subscribing to the
unit operating agreement. After operations are commenced
hereunder, the right of subsequent joinder, as provided in
this section, by a working interest owner is subject to such
requirements or approvals, if any, pertaining to such joinder,
as may be provided for in the unit operating agreement. After
final approval hereof, joinder by a non-working interest owner
must be consented to in writing by the working interest owner
committed hereto and responsible for the payment of any bene-
fits that may accrue hereunder in behalf of such non-working
interest. Joinder by any owner of a non-working interest, at
any time, must be accompanied by appropriate joinder by the
owner of the corresponding working interest in order for the
interest to be regarded as committed hereto. Joinder to the
unit agreement by a working interest owner, at any time, must
be accompanied by appropriate joinder to the unit operating
agreement, if more than one committed working interest owner
is involved, in order for the interest to be regarded as

-31-

committed to this unit agreement. Except as may otherwise here-
in be provided, subsequent joinders to this agreement shall be
effective as of the first day of the month following filing with
the Director of duly executed counterparts of all or any papers
necessary to establish effective commitment of any tract to this
agreement unless objection to such joinder is duly made within
sixty (60) days by the Director.

29. COUNTERPARTS. This agreement may be executed
in any number of counterparts, no one of which needs to be
executed by all parties, or may be ratified or consented to by
separate instrument in writing specifically referred hereto and
shall be binding upon all those parties who have executed such
a counterpart, ratification or consent hereto with the same force
and effect as if all such parties had signed the same document
and regardless of whether or not it is executed by all other
parties owning or claiming an interest in the lands within the
above-described unit area.

Address:                          UNION OIL COMPANY OF CALIFORNIA
2805 Denali Street
Anchorage, Alaska                 By _____
                                     Its Attorney in Fact

                                        "UNIT OPERATOR"

STATE OF CALIFORNIA        )
County of _____      ( ss.

On this 2[?]7h day of _February_, 1967, before me,
the undersigned, a Notary Public in and for said State, personally
appeared JOHN R. FRASER _____, known to me to be the person
whose name is subscribed to the within Instrument, as the Attorney
in Fact of UNION OIL COMPANY OF CALIFORNIA and acknowledged to me
that he subscribed the name of UNION OIL COMPANY OF CALIFORNIA
thereto as principal and his own name as Attorney in Fact.

WITNESS my hand and official seal.

                          _____
                          Notary Public in and for said State

My Commission Expires September 18, 1970

                    AUDREY A. BURKE
                    NOTARY PUBLIC - CALIFORNIA
                    PRINCIPAL OFFICE IN
                    LOS ANGELES COUNTY

                    -32-

Exhibit F
Page 32 of 41

BOOK **0550** PAGE **605**

1    AMENDMENT TO UNIT AGREEMENT

2    FOR THE DEVELOPMENT AND OPERATION OF THE

3    TRADING BAY UNIT AREA

4    STATE OF ALASKA

5    THIS AGREEMENT, entered into as of the 1st day of

6  September, 1970, by and between the parties subscribing, ratify-

7  ing, or consenting hereto, and herein referred to as the "par-

8  ties hereto".

9    WITNESSETH :

10    Paragraph 14 (ROYALTY SETTLEMENT) of the Unit Agreement

11  for the Development and Operation of the Trading Bay Unit

12  Area, State of Alaska, is amended to read:

13    14.  ROYALTY SETTLEMENT.  The State of Alaska and all

14  royalty owners who, under existing contract, are entitled

15  to take in kind a share of the substances now unitized here-

16  under produced from any tract, shall hereafter be entitled

17  to take in kind all or any portion of their share of the

18  unitized substances allocated to all tracts, and Unit Oper-

19  ator, or in case of the operation of a well by a working

20  interest owner as herein in special cases provided for, such

21  working interest owner, shall make deliveries of such royalty

22  share taken in kind in conformity with the applicable con-

23  tracts, laws and regulations.  Such royalty share taken in

24  kind may be borne by the working interest owners on the basis

25  prescribed in the Unit Operating Agreement.  The total amount

26  elected to be taken in kind may be increased or decreased

27  from time to time by not more than ten percent (10%) upon

28  six (6) weeks written notice and by more than ten percent

29  (10%) upon six (6) months written notice, to each working

30  interest owner of a tract to which unitized substances are

31  allocated or who operates a well as herein in special cases

32  provided for, provided, however, that nothing herein contained

RECEIVED

OCT 2? 19?

DIVISION OF OIL & GAS
ANCHORAGE

STATE RECORDING DISTRICT:
PLEASE RETURN TO:

KEVIN A. TABLER, LAND MANAGER
UNION OIL COMPANY OF CALIFORNIA
PO BOX 196247
ANCHORAGE, AK  99519-6247

**Exhibit** E
**Page** 34 **of** 41

BOOK **0550** PAGE **605**

AMENDMENT TO UNIT AGREEMENT

FOR THE DEVELOPMENT AND OPERATION OF THE

TRADING BAY UNIT AREA

STATE OF ALASKA

THIS AGREEMENT, entered into as of the 1st day of

September, 1970, by and between the parties subscribing, ratify-

ing, or consenting hereto, and herein referred to as the "par-

ties hereto".

WITNESSETH :

Paragraph 14 (ROYALTY SETTLEMENT) of the Unit Agreement

for the Development and Operation of the Trading Bay Unit

Area, State of Alaska, is amended to read:

14.  ROYALTY SETTLEMENT.  The State of Alaska and all

royalty owners who, under existing contract, are entitled

to take in kind a share of the substances now unitized here-

under produced from any tract, shall hereafter be entitled

to take in kind all or any portion of their share of the

unitized substances allocated to all tracts, and Unit Oper-

ator, or in case of the operation of a well by a working

interest owner as herein in special cases provided for, such

working interest owner, shall make deliveries of such royalty

share taken in kind in conformity with the applicable con-

tracts, laws and regulations.  Such royalty share taken in

kind may be borne by the working interest owners on the basis

prescribed in the Unit Operating Agreement.  The total amount

elected to be taken in kind may be increased or decreased

from time to time by not more than ten percent (10%) upon

six (6) weeks written notice and by more than ten percent

(10%) upon six (6) months written notice, to each working

interest owner of a tract to which unitized substances are

allocated or who operates a well as herein in special cases

provided for, provided, however, that nothing herein contained

STATE RECORDING DISTRICT:
PLEASE RETURN TO:

KEVIN A. TABLER, LAND MANAGER
UNION OIL COMPANY OF CALIFORNIA
PO BOX 196247
ANCHORAGE, AK  99519-6247

RECEIVED

OCT 23 1972

UNION OIL ... GAS
ANCHORAGE

BOOK 0550 PAGE 606

1    shall require delivery of unitized substances in excess of

2    such royalty share.

3        Settlement for royalty interest not taken in kind shall

4    be made by Unit Operator or by the working interest owners

5    responsible therefor under existing contracts, laws and reg-

6    ulations on or before the last day of each month for unitized

7    substances produced during the preceding calendar month.

8    Such settlement may be made by or on behalf of the working

9    interest owners on the basis prescribed in the Unit Operat-

10   ing Agreement.

11       Nothing herein contained shall operate to relieve any

12   working interest owner of its obligation for the payment of

13   any royalty, or for the delivery of royalty oil taken in

14   kind, except to the extent of deliveries in kind or payments

15   actually made hereunder for the accounts of the respective

16   working interest owners.

17       No deductions for dehydration and cleaning charges

18   shall be charged to the State's royalty except where royalty

19   is taken in kind, unless the State subsequently agrees to

20   such deductions as reasonable and proper.

21       If gas obtained from lands not subject to this agreement

22   is introduced into any participating area hereunder, for use

23   in repressuring, stimulation of production, or increasing ul-

24   timate recovery, which shall be in conformity with a plan

25   first approved by the Director, a like amount of gas, after

26   settlement as herein provided for any gas transferred from

27   any other participating area and with due allowance for loss

28   or depletion from any cause, may be withdrawn from the

29   formation into which the gas was introduced, royalty free

30   as to dry gas, but not as to the products extracted therefrom,

31   provided that such withdrawal shall be at such time as may be

32   provided in the plan of operations or as otherwise be consented

-2-

BOOK **0550** PAGE **607**

1    to by Director as conforming to good petroleum engineering

2    practice, and provided further that such right of withdrawal

3    shall terminate on the termination of this Unit Agreement.

4        Royalty due on account of the State of Alaska shall be

5    computed and paid as to all unitized substances on the basis

6    of the amounts allocated to such lands, and in accordance

7    with appropriate statutes and regulations.

8        This Agreement may be executed in any number of counter-

9    parts, no one of which needs to be executed by all parties,

10   and shall not become effective unless executed by all owners

11   of working interests in the unitized land and the Commissioner.

12

13                              UNION OIL COMPANY OF CALIFORNIA
                                Unit Operator

14

15   By _____
                                Its Attorney in Fact
16                              HERBERT S. HARRY

17                              STATE OF ALASKA

18   By _____
                                Thomas E. Kelly, Commissioner
19                              of Natural Resources

20

21                              MARATHON OIL COMPANY

22   By _____
                                Division Manager

23

24   By _____


                                ATLANTIC RICHFIELD COMPANY


UNITED STATES OF AMERICA  )
State of Alaska           ) ss.

        THIS IS TO CERTIFY that on the ___3rd___ day of ___November___, 1970,
before me the undersigned Notary Public, personally appeared Thomas E. Kelly,
known to me and known by me to be the ___Commissioner___ of the Department of
Natural Resources, and acknowledged to me that he executed the foregoing agreement
for and on behalf of said State, freely and voluntarily and for the use and pur-
poses therein set forth.

        IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed my official
seal, the day and year in this certificate first above written.

                                _____
                                Notary Public in and for the State of Alaska
                                My Commission Expires ___My Commission Expires March 20, 1973.___


                                                Exhibit F
                                                Page 31 of 41

STATE OF OKLAHOMA )
                 ) ss.
TULSA COUNTY     )

BOOK **0550** PAGE **608**

Before me, _____ RUTH STUEVE _____, a Notary Public in and for
said State, on this __25th__ day of September, 1970, personally appeared
_____ JUDD H. QUALLINE _____, to me known to be the identical person
who executed the within and foregoing instrument as attorney in fact of
SKELLY OIL COMPANY, and acknowledged to me that he executed the same as his
free and voluntary act and deed and as the free and voluntary act and deed
of SKELLY OIL COMPANY, for the uses and purposes therein set forth.

_____ Ruth Stueve _____
                              Notary Public

My commission expires   RUTH STUEVE
                        Notary Public, Tulsa County, Oklahoma
                        My Commission Expires November 3, 1971

RECEIVED

OCT 23 1970

DIVISION OF OIL AND GAS
ANCHORAGE

BOOK **0550** PAGE **609**

PHILLIPS PETROLEUM COMPANY

By _____
            ATTORNEY-IN-FACT

By _____

SKELLY OIL COMPANY

By _____
                    JUDD H. QUALLINE
                ATTORNEY-IN-FACT

By _____

STANDARD OIL COMPANY OF CALIFORNIA

By _____
                    Contract Agent

By _____
                Assistant Secretary

STATE OF CALIFORNIA          )
                             ) ss
City and County of San Francisco )

On _____, before me, the undersigned, a Notary Public in and for the City and County of San Francisco, State of California, duly commissioned and sworn, personally appeared GEO. D. ENGLISH and E. A. HANSEN to me known to be the Contract Agent and Assistant Secretary, respectively, of STANDARD OIL COMPANY OF CALIFORNIA, the corporation that executed the within and foregoing instrument and acknowledged said instrument to be the free and voluntary act and deed of said corporation, for the uses and purposes therein mentioned, and on oath stated that they were authorized to execute said instrument.

WITNESS my hand and official seal hereto affixed the day and year in this certificate above written.

EDMOND LEE KELLY
NOTARY PUBLIC - CALIFORNIA
My Commission Expires January 22, 1972

_____
EDMOND LEE KELLY
Notary Public in and for the City and
County of San Francisco, State of
California
residing at San Francisco

(Wash.)                                                    33

RECEIVED

OCT 2 7 1970

DIVISION OF OIL AND GAS
ANCHORAGE

-4-

STATE OF CALIFORNIA }
}ss.
County of.................................. }

On this............ .....day of....................................., A. D., 19........., before me,......................................,

a Notary Public in and for said County and State, personally appeared....................................................................,

known to me to be the.....................President, and........................................................., known to me to be

the............ ........Secretary of..............................................................,

the Corporation that executed the within Instrument, known to me to be the persons who executed the within Instrument, on behalf of the Corporation herein named, and acknowledged to me that such Corporation executed the same.

**IN WITNESS WHEREOF,** I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.

..............................................................
Notary Public in and for said County and State

BOOK **0550** PAGE **610**

---

UNITED STATES OF AMERICA )
) ss
STATE OF ALASKA )

The foregoing instrument was acknowledged before me this 2ND day of
SEPTEMBER , 1970, by Howard A. Slack, Attorney-in-Fact for

Atlantic Richfield Company.

My Commission Expires
November 21, 1972

..............................................................
Notary Public in and for the
State of Alaska

---

STATE OF CALIFORNIA )
) ss.
COUNTY OF LOS ANGELES )

On this 31st day of August 1970 , before me,
Edgar A. Gillett , a Notary Public in and for
said County and State, personally appeared L. P. Foote ,
known to me to be the Division Manager of the
Los Angeles Division of MARATHON OIL COMPANY, the corporation that
executed the within Instrument, known to me to be the person who
executed the within Instrument on behalf of the corporation therein
named and acknowledged to me that such corporation executed the within Instrument pursuant to its by-laws or a resolution of its board
of directors.

IN WITNESS WHEREOF, I have hereunto set my hand and
affixed my official seal.

..............................................................
Notary Public in and for said County
and State
My Commission Expires Jan. 20, 1971

RECEIVED
OCT 27 1970

..............................................................
Notary Public in and for said County and State

FORM 231-A 6-59 EM

воок **0550** расе **611**

ALASKA

STATE OF COLORADO )
                   : SS.
COUNTY OF DENVER )

THIS IS TO CERTIFY that on this _11th_ day of _December_, 19 _70_, personally appeared before me, the undersigned, a Notary Public in and for the State of Colorado, duly commissioned and sworn as such, _P. D. Rinaman_, known to me and by me known to be the identical person who subscribed the name of PAN AMERICAN PETROLEUM CORPORATION, a corporation, to the foregoing instrument as its Attorney in Fact and acknowledged to me that he executed the same freely and voluntarily as his free and voluntary act and deed, and as the free and voluntary act and deed of such corporation, for the uses and purposes therein mentioned.

IN WITNESS WHEREOF, I have hereunto set my hand and official seal the day and year hereinabove first written.

_Marian J. Nicholas_
Notary Public in and for the State of
Colorado

My commission expires:

My Commission expires Dec.  9, 1970

STATE OF CALIFORNIA }
                      } ss.
County of Los Angeles }

On this.................day of........................., A. D., 19........., before me,...................................,
a Notary Public in and for said County and State, personally appeared..................................................,
known to me to be the person whose name is subscribed to the within Instrument, as the Attorney-in-Fact of...............
.........................................................., and acknowledged to me that he subscribed the name of.................................
..............................................................thereto as principal and his own name as Attorney-in-Fact.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.

..............................................................
Notary Public in and for said County and State

STATE OF _California_ }
                       } ss.
County of _Los Angeles_ }

On this.._ith_.day of.._October_..., A. D., 19_70_, before me,_Edward J. Morris_,
a Notary Public in and for said County and State, personally appeared.._P. D. Rinaman_
known to me to be the person whose name is subscribed to the within Instrument, as the Attorney-in-Fact of.._Pan American_
_Petroleum Corporation_, and acknowledged to me that he subscribed the name of.._Pan American_
_Petroleum Corporation_thereto as principal and his own name as Attorney-in-Fact.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.

.._Edward J. Morris_.
Notary Public in and for said County and State

_My commission expires: 9-16-72_

FORM 231-A 6-15 6M

Exhibit __E__
Page __41__ of __41__