**EXECUTION COPY**

# MEMBERSHIP INTEREST PURCHASE AGREEMENT

**dated as of May 24, 2007**

**among**

**Forest Alaska Holding LLC,**

**As Seller:**

**Forest Alaska Operating LLC.**

**As the Company;**

**Forest Oil Corporation**

**(for purposes of Sections 7.6, 7.14, 10.1 and Article XII only)**

**AND**

**Pacific Energy Resources Ltd.**

**As Buyer**

TABLE OF CONTENTS


| | | Page |
|---|---|---|
| ARTICLE I | DEFINITIONS | 1 |
| ARTICLE II | EFFECTIVE DATE; CLOSING | 7 |
| 2.1 | Effective Date; Closing | 7 |
| 2.2 | Proceedings at Closing | 8 |
| ARTICLE III | SALE AND PURCHASE OF MEMBERSHIP INTERESTS; CONSIDERATION | 8 |
| 3.1 | Sale and Purchase of Membership Interests | 8 |
| 3.2 | Amount and Form of Consideration | 8 |
| 3.3 | Payment of Consideration | 8 |
| 3.4 | Price Adjustments | 8 |
| ARTICLE IV | REPRESENTATIONS AND WARRANTIES OF THE SELLER AND THE COMPANY | 9 |
| 4.1 | Organization and Power | 9 |
| 4.2 | Authorizations; Execution and Validity | 10 |
| 4.3 | Capitalization | 10 |
| 4.4 | Financial Statements; Other Financial Data | 10 |
| 4.5 | Consents | 11 |
| 4.6 | No Defaults or Conflicts | 11 |
| 4.7 | Agreements, Contracts and Commitments | 11 |
| 4.8 | Litigation | 12 |
| 4.9 | Taxes | 12 |
| 4.10 | Fees | 13 |
| 4.11 | Absence of Certain Changes or Events | 13 |
| 4.12 | Compliance with Laws | 14 |
| 4.13 | Transactions with Related Parties | 14 |
| 4.14 | Books and Records | 14 |
| 4.15 | Information Furnished | 14 |
| 4.16 | Directors and Officers | 14 |
| 4.17 | Bank Accounts | 14 |
| 4.18 | Owned Real Property | 15 |
| 4.19 | Leased Real Property | 15 |
| 4.20 | Intentionally left blank | 15 |
| 4.21 | Title to Oil and Gas Properties | 15 |
| 4.22 | Environmental Matters | 16 |
| 4.23 | Bonding Matters | 17 |
| 4.24 | Insurance | 17 |
| 4.25 | ERISA | 17 |
| 4.26 | Condition of Assets | 17 |
| 4.27 | Lease Operating Expenses | 17 |
| 4.28 | Hedging Transactions | 17 |
| 4.29 | Prepayment Premium; Total Company Debt | 18 |
| ARTICLE V | REPRESENTATIONS AND WARRANTIES OF SELLER | 18 |
| 5.1 | Organization and Good Standing | 18 |
| 5.2 | Authorization of Agreement | 18 |

Page

| | | |
|---|---|---|
| 5.3 | Conflicts, Consents of Third Parties | 18 |
| 5.4 | Brokers | 19 |
| 5.5 | Litigation | 19 |
| 5.6 | Ownership of Membership Interests | 19 |
| 5.7 | Tax Status | 19 |
| 5.8 | Marketable Title | 19 |
| ARTICLE VI | REPRESENTATIONS AND WARRANTIES OF BUYER | 19 |
| 6.1 | Organization and Good Standing | 19 |
| 6.2 | Authorization of Agreement | 20 |
| 6.3 | Conflicts, Consents of Third Parties | 20 |
| 6.4 | No Default | 20 |
| 6.5 | Litigation | 20 |
| 6.6 | Investment Intent | 20 |
| 6.7 | Disclosure of Information | 20 |
| 6.8 | Funding Commitments | 21 |
| 6.9 | Brokers | 21 |
| ARTICLE VII | ADDITIONAL AGREEMENTS | 21 |
| 7.1 | Further Actions | 21 |
| 7.2 | Conduct of Business Pending Closing | 21 |
| 7.3 | Title Defects | 22 |
| 7.4 | Environmental Defects | 24 |
| 7.5 | Gas Imbalances | 25 |
| 7.6 | Access to Information | 26 |
| 7.7 | Regulatory Approvals | 26 |
| 7.8 | Agreement to Defend | 26 |
| 7.9 | Other Actions | 26 |
| 7.10 | LIMITATION AND DISCLAIMER OF IMPLIED REPRESENTATIONS AND WARRANTIES OF THE COMPANY AND SELLER | 26 |
| 7.11 | Change of Company Name | 27 |
| 7.12 | Account Signatories | 27 |
| 7.13 | Cooperation with Financing | 27 |
| 7.14 | Hedge Assumption | 28 |
| ARTICLE VIII | CONDITIONS TO CLOSING | 28 |
| 8.1 | Buyer's Conditions | 28 |
| 8.2 | Seller's Conditions | 29 |
| ARTICLE IX | DELIVERIES AT CLOSING | 29 |
| 9.1 | Deliveries by Seller to Buyer | 29 |
| 9.2 | Deliveries by Buyer to Seller and the Company | 30 |
| ARTICLE X | TRANSITION OPERATIONS | 31 |
| 10.1 | Transition Operations | 31 |
| ARTICLE XI | TERMINATION | 31 |
| 11.1 | Termination | 31 |
| 11.2 | Effect of Termination | 32 |

Page

ARTICLE XII INDEMNIFICATION....32
12.1 Seller and FOC Indemnification....32
12.2 Buyer Indemnification....32
12.3 Indemnification Procedures.....32
12.4 Limits on Indemnification....33
ARTICLE XIII TAXES....34
13.1 Sales and Use Taxes; Property Taxes....34
13.2 Tax Proceedings....35
13.3 Real and Personal Property Taxes....35
13.4 Property Tax Reporting....35
13.5 Production Taxes....35
13.6 Income Taxes....36
13.7 Purchase Price Allocation....36
ARTICLE XIV GENERAL....36
14.1 Governing Law; Choice of Forum....36
14.2 Amendments....36
14.3 Waivers....36
14.4 Notices....36
14.5 Successors and Assigns, Parties in Interest....37
14.6 Severability....37
14.7 Entire Agreement....37
14.8 Schedules....38
14.9 Remedies....38
14.10 Expenses....38
14.11 Release of Information; Confidentiality....38
14.12 Certain Construction Rules....38
14.13 Counterparts....39

**EXECUTION COPY**

## MEMBERSHIP INTEREST PURCHASE AGREEMENT

This Membership Interest Purchase Agreement dated as of May 24, 2007 (the "Agreement") is entered into by and among Pacific Energy Resources Ltd., a Delaware corporation ("Buyer"), Forest Alaska Operating LLC, a Delaware limited liability company (the "Company"), Forest Alaska Holding LLC, a Delaware limited liability company ("Seller"), and, for purposes of Sections 7.6, 7.14, 10.1 and Article XII only, Forest Oil Corporation, a New York corporation ("FOC") pertaining to the purchase and sale of 100% of the membership interests of the Company.

WHEREAS, the Seller owns all the outstanding membership interests (the "Membership Interests") of the Company; and

WHEREAS, Buyer desires to purchase from Seller and Seller desires to sell to Buyer all of the Membership Interests on the terms and subject to the conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the mutual agreements, representations, warranties and subject to the conditions contained herein, the parties hereto hereby agree as follows:

## ARTICLE I

## DEFINITIONS

As used in this Agreement:

"Affiliate" means, as to any Person, a Person that, directly or indirectly, controls, is controlled by, or is under common control with such Person.

"Aggregate Title Defect Value" has the meaning specified in Section 7.3(d).

"Aggregate Environmental Defect Value" has the meaning specified in Section 7.4(c).

"Agreement" has the meaning specified in the preamble hereof.

"Allocated Values" means the allocation of values of the Oil and Gas Properties included in the Ownership Interests set forth on Exhibit "A-2" attached hereto. The Allocated Values for each Oil and Gas Property has been agreed to by Buyer and Seller and represents a good faith allocation of value of the Oil and Gas Properties.

"Base Purchase Price" has the meaning specified in Section 3.2.

"Basket Amount" has the meaning specified in Section 11.4(a).

"Buyer" has the meaning specified in the preamble hereof.

**EXECUTION COPY**

"CERCLA" has the meaning specified in the definition of "Environmental Laws."

"CERCLIS" means the Comprehensive Environmental Response, Compensation and Liability Information System List.

"Closing" has the meaning specified in Section 2.1.

"Closing Date" has the meaning specified in Section 2.1.

"Closing Date Amounts" means the aggregate of the amounts set forth in Subsections 3.3(a)(i), (ii) and (iii).

"Code" means the Internal Revenue Code of 1986, as amended.

"Company" has the meaning specified in the preamble hereof.

"Company Debt" means (a) all indebtedness of the Company for the repayment of borrowed money, whether or not represented by bonds, debentures, notes or similar instruments, all accrued and unpaid interest thereon, and, solely with respect to the Credit Agreement, all unpaid premiums, prepayment penalties, fees and other amounts; (b) all other indebtedness of the Company evidenced by bonds, debentures, notes or similar instruments, including all accrued and unpaid interest thereon, including intercompany debt; and (c) all obligations of the Company as lessee under capital leases as determined in accordance with GAAP.

"Company's Senior Lender" means Credit Suisse.

"Confidentiality Agreement" means that certain Confidentiality Agreement by and between Forest Oil Corporation and Buyer dated March 8, 2007.

"Contract" means any contract, agreement, indenture, note, bond, loan, instrument, lease, conditional sale contract, mortgage, license, franchise, insurance policy or commitment, whether written or oral.

"Credit Agreement" means the First Lien Credit Agreement and the Second Lien Credit Agreement, each dated as of December 8, 2006 (together with all ancillary agreements) by and among the Company, as Borrower, the Company's Senior Lender, and certain other financial institutions, as Lenders (as amended and supplemented as of the date hereof).

"Defensible Title" means such right, title and interest that is (a) with respect to Ownership Interests of record, evidenced by an instrument or instruments filed of record in accordance with the conveyance and recording laws of the applicable jurisdiction to the extent necessary to give the Company and Buyer, through its ownership of the Membership Interests, the right to enjoy the benefits of possession of the Ownership Interests reflected on Exhibit "A", and, with respect to Ownership Interests not yet earned under a farmout agreement, if any, is described in and subject to a farmout agreement containing terms and provisions reasonably consistent with terms and provisions used in the domestic oil and gas business and under which there exists no default by the Company and (b) subject to Permitted Liens, free and clear of all Liens, claims, infringements, and other burdens.

**EXECUTION COPY**

"DGCL" means the Delaware General Corporation Law.

"Effective Date" has the meaning specified in Section 2.1.

"Environmental Defect" has the meaning specified in Section 7.4(b).

"Environmental Law" means any Law of any Governmental Authority whose purpose is to conserve or protect human health, the environment, wildlife or natural resources, including, without limitation, the Clean Air Act, as amended, the Federal Water Pollution Control Act, as amended, the Rivers and Harbors Act of 1899, as amended, the Safe Drinking Water Act, as amended, the Comprehensive Environmental Response, Compensation and Liability Act, as amended ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, as amended, the Resource Conservation and Recovery Act of 1976, as amended, the Hazardous and Solid Waste Amendments Act of 1984, as amended, the Toxic Substances Control Act, as amended, the Hazardous Materials Transportation Act, as amended, and Title 18 of the Alaska Administrative Code.

"Financial Statements" has the meaning specified in Section 4.4.

"FOC" has the meaning specified in the preamble hereof.

"GAAP" means accounting principles generally accepted in the United States of America, as in effect from time to time and applied on a consistent basis.

"Governmental Authority" means any federal, state, provincial, local or foreign government or governmental regulatory body and any of their respective subdivisions, agencies, instrumentalities, authorities, courts or tribunals.

"Hazardous Material" means (a) any "hazardous substance," as defined by CERCLA; (b) any "hazardous waste" as defined by the Resource Conservation and Recovery Act, as amended; or (c) petroleum, petroleum hydrocarbons, or any fraction or byproducts thereof.

"Hedging Transaction" means any futures, hedge, swap, collar, put, call, floor, cap, option or other contract that is intended to benefit from, relate to or reduce or eliminate the risk of fluctuations in the price of commodities, including Hydrocarbons, interest rates, currencies or securities.

"Hydrocarbons" means oil, condensate, gas, casinghead gas and other liquid or gaseous hydrocarbons.

"Income Taxes" means all taxes, assessments, levies or other charges, including any interest, penalties and additions thereto which are imposed upon a Party (whether disputed or not), and

i. which are based or assessed upon a Party's capital, income or receipts, including, without limitation, federal, state, local or foreign income, franchise and gross receipts Taxes assessed by a Governmental Authority (but only to the extent the same are assessed upon income or receipts), and

EXHIBIT K
PAGE 7 OF 17

**EXECUTION COPY**

ii. any payroll taxes, capital taxes or withholding taxes, or any other taxes, assessments, levies or other charges which are imposed by a Governmental Authority other than Property Taxes.

"Indemnified Party" has the meaning specified in Section 12.3(a).

"Indemnifying Party" has the meaning specified in Section 12.3(a).

"Injunction" means a temporary restraining order, preliminary or permanent injunction or other order issued by a court of competent jurisdiction, an order of a Governmental Entity having jurisdiction over any Party hereto, or any legal restraint or prohibition.

"Knowledge", with respect to any entity, means knowledge of such entity's executive officers, after reasonable investigation.

"Lands" has the meaning specified in the definition of "Oil and Gas Properties."

"Law" means any federal, state, provincial, municipal, local or foreign law, statute, rule, rule, writ, order, decree, ordinance, code or regulation.

"Leases" has the meaning specified the definition of "Oil and Gas Properties."

"Legal Proceeding" means any judicial, administrative or arbitral action, suit, proceeding (public or private), litigation, investigation, complaint, claim or governmental proceeding.

"Lien" means any lien, pledge, mortgage, deed of trust, security interest, attachment, right of first refusal, option, easement, covenant, encroachment, or any other adverse claim whatsoever.

"Litigation" means the Legal Proceedings, Orders and Official Actions listed on Schedule 4.8.

"Losses" has the meaning specified in Section 12.1.

"Material Adverse Effect" means:

(i) As to Buyer, any breach of Buyer's representations and warranties, which individually or in the aggregate with other breaches would materially impair Buyer's ability to consummate the transactions contemplated by this Agreement or prevent the consummation of any of the transactions contemplated hereby.

(ii) As to Seller, any breach of Seller's representations and warranties, which individually or in the aggregate with other breaches would materially impair Seller's ability to consummate the transactions contemplated by this Agreement or prevent the consummation of any of the transactions contemplated hereby.

(iii) As to the Company, (A) any breach of the Company's representations and warranties which individually or in the aggregate with other breaches, would result in a

decrease in the Company's value by an amount greater or equal to five percent (5%) of the Purchase Price, or (B) any change in its financial condition or results of operations which has or would, with the passage of time, result in a decrease in the Company's value by an amount greater or equal to five percent (5%) of the Purchase Price; provided, however, that any effect, direct or indirect, occasioned by a decline in the price of crude oil or natural gas, whether in global, national or local markets shall be excluded from any Material Adverse Effect calculation hereunder.

"Material Contracts" has the meaning specified in Section 4.7.

"Membership Interests" has the meaning specified in the preamble hereof.

"Notification Deadline" has the meaning specified in Section 7.3(a).

"Official Action" shall mean any domestic or foreign decision, order, writ, injunction, decree, judgment, award or any determination, both as presently existing and effective or presently existing and as may become effective in the future, by any court, administrative body, or other tribunal.

"Oil and Gas Properties" means all right, title, interest and estate, real or personal, recorded or unrecorded, movable or immovable, tangible or intangible, in and to: (i) oil and gas leases, oil, gas and mineral leases, subleases and other leaseholds, royalties, overriding royalties, net profit interests, mineral fee interests, carried interests and other properties and interests (the "Leases") and the lands covered thereby ("Land(s)") and any and all oil, gas, water or injection wells thereon or applicable thereto (the "Wells"); (ii) any pools or units which include all or a part of any Land or include any Well (the "Units") and including without limitation all right, title and interest in production from any such Unit, whether such Unit production comes from wells located on or off of the Lands, and all tenements, hereditaments and appurtenances belonging to, used or useful in connection with the Leases, Lands and Units; (iii) interests under or derived from all contracts, agreements and instruments applicable to or by which such properties are bound or created, to the extent applicable to such properties, including, but not limited to, operating agreements, gathering agreements, marketing agreements (including commodity swap, collar and/or similar derivative agreements), transportation agreements, processing agreements, unitization, pooling and communitization agreements, declarations and orders, joint venture agreements, and farmin and farmout agreements; (iv) easements, permits, licenses, servitudes, rights-of-way, surface leases and other surface rights appurtenant to, and used or held for use to the extent applicable to such properties; and (v) equipment, machinery, fixtures and other tangible personal property and improvements located on or used or obtained in connection with such properties. Attached hereto as Exhibit "A" is a description of the Oil and Gas Properties. The respective "net revenue interest" and "working interest" of the Company in the Oil and Gas Properties described on Exhibit "A" (the "Ownership Interests") shall be a part of the definition of "Oil and Gas Properties."

"Order" means any order, judgment, Injunction, ruling, writ, award, decree, statute, law, ordinance, rule or regulation.

"Ownership Interests" has the meaning specified in the definition of "Oil and Gas Properties."

"Party" mean Seller, the Company, FOC, the Buyer or any permitted successor or assignee thereof.

"Permit" means any permit, license, certificate (including a certificate of occupancy) registration, authorization, application, filing, notice, qualification, waiver of any of the foregoing or approval of a Governmental Authority.

"Permitted Liens" means: (a) Liens for Taxes that are not yet due and payable or that are being contested in good faith by appropriate proceedings and as to which adequate reserves have been established in accordance with GAAP, (b) operators' liens and statutory liens for labor and materials, where payment is not due (or that, if delinquent, are being contested in good faith); (c) operating agreements, unit agreements, unitization and pooling designations and declarations, gathering and transportation agreements, processing agreements, gas, oil and liquids purchase, sale and exchange agreements and other contracts, agreements and installments; (d) statutory or regulatory authority of governmental agencies; (e) easements, surface leases and rights, plat restrictions, pipelines, grazing, logging, canals, ditches, reservoirs, telephone lines, power lines, railways and similar encumbrances that have not materially affected or interrupted, and are not reasonably expected to materially affect or interrupt, the claimed ownership of the party, the operation of the Oil and Gas Properties or the receipt of production revenues from the Oil and Gas Properties affected thereby; (f) liens, charges, encumbrances and irregularities in the chain of title which, because of remoteness in or passage of time, statutory cure periods, marketable title acts or other similar reasons, have not materially affected or interrupted, and are not reasonably expected to materially affect or interrupt, the claimed ownership of the party, the operation of the Oil and Gas Properties or the receipt of production revenues from the Oil and Gas Properties affected thereby; and (g) other liens set forth in Schedule 4.21.

"Person" means any natural person, corporation, partnership, limited liability company, trust, unincorporated organization, Governmental Authority, or other entity.

"Property Taxes" means all federal, state or local taxes, assessments, levies or other charges, which are imposed upon the Oil and Gas Properties or other real and personal property owned by the Company, including, without limitation, ad valorem, property, documentary or stamp, as well as any interest, penalties and fines assessed or due in respect of any such taxes, whether disputed or not.

"Production Taxes" means all federal, state or local taxes, assessments, levies or other charges, which are imposed upon production from the Oil and Gas Properties, including, without limitation, excise taxes on production, severance or gross production, as well as any interest, penalties and fines assessed or due in respect of any such taxes, whether disputed or not.

"Purchase Price" has the meaning specified in Section 3.2.

"Real Property Leases" has the meaning specified in Section 4.19.

"Related Party" means (i) any Affiliate of the Company or Seller.

EXECUTION COPY

"Schedule" means a disclosure schedule provided by Seller to Buyer pursuant to this Agreement.

"Securities Act" means the Securities Act of 1933, as amended.

"Seller" has the meaning specified in the preamble hereof.

"Subsidiaries" means, with respect to any Person, each entity as to which such Person (either alone or through or together with any other Subsidiary) (i) owns beneficially or of record or has the power to vote or control, 50% or more of the voting securities of such entity or of any class of equity interests of such entity the holders of which are ordinarily entitled to vote for the election of the members of the Board of Directors or other persons performing similar functions, (ii) in the case of partnerships, serves as a general partner, (iii) in the case of a limited liability company, serves as a managing member or owns a majority of the equity interests or (iv) otherwise has the ability to elect a majority of the directors, trustees or managing members thereof.

"Taxes" means, collectively, Income Taxes, Property Taxes and Production Taxes.

"Tax Return" means any return, report, information statement, or similar statement required to be filed with respect to any Taxes (including any attached schedules), including, without limitation, any information return, claim for refund, amended return and declaration of estimated Tax.

"Title Defect" has the meaning specified in Section 7.3(a).

"Title Defect Value" means, with respect to each Title Defect, the reduction of the Allocated Value of the affected Ownership Interest as a result of such Title Defect as determined in Section 7.3.

"Units" has the meaning specified in the definition of "Oil and Gas Properties".

"Wells" has the meaning specified in the definition of "Oil and Gas Properties."

## ARTICLE II

## EFFECTIVE DATE; CLOSING

2.1 Effective Date; Closing. The effective date (for accounting purposes only) of the transactions contemplated hereby shall be at 7:00 a.m., Alaska Standard Time, on January 1, 2007 (the "Effective Date"). The Closing of the transactions contemplated hereby (the "Closing") shall take place at the offices of Seller, 707 Seventeenth St., Suite 3600, Denver, CO 80202 at 10:00 a.m., Mountain Standard Time, on the later of (i) two business days after satisfaction of all conditions to Closing (including agreement of the Parties on all Purchase Price adjustments pursuant to Section 3.4), or June 30, 2007 (the "Closing Date"). Notwithstanding any provision herein to the contrary, in no event shall the Closing occur later than July 31, 2007.

EXHIBIT K
PAGE 11 OF 17

Contract, except where any such breach, whether considered individually or in the aggregate, could not be reasonably expected to result in a Material Adverse Effect.

4.8 Litigation. There are no Legal Proceedings pending or, to the Company's Knowledge, threatened against or affecting the Company or any of its assets that are reasonably likely to have a Material Adverse Effect on the Company. The Company is not subject to any Order or Official Action. There are no Legal Proceedings pending against or, to the Company's or Seller's Knowledge, threatened in writing against, the Company that questions the validity or legality of any of this Agreement or any action taken or to be taken by the Company in connection herewith or therewith.

4.9 Taxes.

(a) Except as disclosed on Schedule 4.9:

(i) There are no Liens for Taxes upon any of the properties or assets of the Company (except for Permitted Liens).

(ii) No agreements relating to allocation or sharing of, or liability or indemnification for, Taxes exist between the Company and any other Person. Any internal tax allocation agreement shall terminate at the Closing.

(iii) The Company is not a party to any arrangement, nor does it hold any Oil and Gas Property in an entity treated as a tax partnership for Tax purposes.

(iv) Within the times and in the manner prescribed by law, the Company has filed all federal, state and local tax returns and all tax returns for foreign countries, provinces and other governing bodies having jurisdiction to levy taxes upon it.

(v) To the Company's and Seller's knowledge, all tax returns filed by the Company for the taxable years ending in 2000 through 2006 constitute complete and accurate representations of their respective tax liabilities for such years and accurately set forth all items (to the extent required to be included or reflected in such returns) relevant to their future tax liabilities, including the tax bases of its properties and assets.

(v) The Company has not waived or extended any applicable statute of limitations relating to the assessment of federal, state, local or foreign taxes.

(vi) No examination of the federal, state, local or foreign tax returns of the Company are currently in progress nor, to the Company's and Seller's knowledge, is any such examination threatened.

(b) The Company is a disregarded entity for federal income tax purposes under Section 7701 of the Code.

EXHIBIT K
PAGE 12 OF 17

5.4 Brokers. Seller has not paid or become obligated to pay any fee or commission to any broker, finder or intermediary in connection with the transactions contemplated hereby for which the Buyer shall have any liability following the Closing.

5.5 Litigation. As of the date of this Agreement there are no Legal Proceedings, or, to the Knowledge of Seller, threatened against or affecting Seller that is reasonably likely to have a Material Adverse Effect on Seller or the transactions contemplated by this Agreement, nor is there any judgment, decree, injunction, rule or order of any Governmental Entity or arbitrator outstanding against Seller that is reasonably likely to have a Material Adverse Effect on Seller or the transactions contemplated by this Agreement.

5.6 Ownership of Membership Interests. Seller is the record and beneficial owner of all of the Membership Interests, and those Membership Interests are owned by Seller free and clear of all Liens (other than those that shall be released at Closing), including, without limitation, voting trusts or stockholders agreements. Seller has full authority to transfer pursuant to this Agreement all of the Membership Interests, free and clear of all Liens (other than those that shall be released at Closing), including, without limitation, voting trusts or stockholders agreements.

5.7 Tax Status.

(a) Seller is a not a non-resident alien, foreign corporation, foreign partnership, foreign trust, or foreign estate (as those terms are defined in the Internal Revenue Code and income tax regulations).

(b) Seller shall provide to Buyer the Certificate of Non-Foreign Status in the form set forth in Exhibit "B".

(c) Seller is a disregarded entity for federal income tax purposes under Section 7701 of the Code, such that this transaction will be treated, for federal income tax purposes, as a sale of assets by its parent company, FOC.

5.8 Marketable Title. The delivery by Seller to Buyer at the Closing of the Membership Interests vest Buyer at such time of delivery with good and marketable title to all of the Membership Interests, free and clear of all Liens (other than restrictions on transfer pursuant to applicable securities laws).

## ARTICLE VI

## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to Seller and the Company as follows:

6.1 Organization and Good Standing. Buyer is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware. Prior to the Closing Date, Buyer shall be duly qualified to do business in and specifically to operate oil and gas properties in the State of Alaska. Buyer has all requisite power and authority to execute, deliver and

**EXECUTION COPY**

(c) a certificate of a duly authorized representative of Buyer attesting as to the incumbency and signature of each person who shall execute this Agreement or any other material document related to this transaction.

## ARTICLE X

## TRANSITION OPERATIONS

10.1 Transition Operations. With respect to any portion of the Oil and Gas Properties operated by Company or its agent, after Closing and until such time as Buyer may be recognized and approved by the applicable federal or state agency as Operator of such portion of the Oil and Gas Properties, FOC shall operate such portion of the Oil and Gas Properties for the account of Buyer, under the terms of the Intercompany Services Agreement listed on Schedule 4.7 between the Company and FOC. In connection with such operations under the Intercompany Services Agreement, the Company shall pay FOC consistent with the provisions of thereof, plus an additional fee equal to US$[redacted] per month, provided that such additional fees shall begin to accrue from the first day of the first month beginning at least 90 days after Closing. Upon Buyer being recognized as operator as to all of the Oil and Gas Properties, Buyer shall deliver to FOC written notice of its intention to assume operations, designating the date of its intended assumption. On such date, the Intercompany Services Agreement shall immediately terminate and be of no further force and effect, with no further liability thereunder on the part of either Buyer or the Company, except for reimbursements and a pro rata portion of the operating fee for the period through the date of termination and any indemnity protections that survive termination per the terms of the Intercompany Services Agreement.

## ARTICLE XI

## TERMINATION

11.1 Termination. This Agreement may be terminated and the transactions contemplated hereby may be abandoned at any time prior to the Closing Date:

(a) by mutual written consent of the Company, Seller and Buyer;

(b) by any of the Company, Seller or Buyer if any Governmental Entity shall have issued any Injunction or taken any other action permanently restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby and such Injunction or other action shall have become final and nonappealable;

(c) (i) by Seller in the event of a material breach by the Buyer of one or more provisions of this Agreement, in particular the representations and warranties in Article VI above and (ii) by Buyer in the event of a material breach by either the Seller or the Company of one or more provisions of this Agreement, in particular the representations and warranties in Articles IV and V above;

(d) by Seller or Buyer if the total amount of uncured and unwaived Title Defects and/or Environmental Defects exceeds 10% of the Base Purchase Price;

**EXECUTION COPY**

upon receipt) if sent by overnight mail, registered mail or certified mail, postage prepaid, or by hand, to the parties at the following addresses (or at such other address for a party as shall be specified by like notice):

(a) If to Buyer, to:
111 W. Ocean Boulevard
Suite 1240
Long Beach, CA 9080
Attn: President
Tel.: 562.628.1531
Fax: 562.628.1536

(b) If to Seller and/or the Company, to:

707 Seventeenth Street
Suite 3600
Denver, CO 80202
Attn: General Counsel
Tel.: 303.812.1701
Fax: 303.812.1445

14.5 Successors and Assigns. Parties in Interest. This Agreement shall be binding upon and shall inure solely to the benefit of the parties hereto and their respective successors, legal representatives and permitted assigns. Neither this Agreement nor any rights or obligations hereunder may be assigned without the written consent of the other parties, which consent shall not be unreasonably withheld, except that Buyer may make an assignment of its rights hereunder to its financing source for collateral security purposes. Nothing in this Agreement, express or implied, is intended to or shall confer upon any Person, other than the parties hereto and their respective successors, legal representatives and permitted assigns, any rights, benefits or remedies of any nature whatsoever under or by reason of this Agreement, and no Person shall be deemed a third party beneficiary under or by reason of this Agreement.

14.6 Severability. If any provision of this Agreement or the application of any such provision to any Person or circumstance, shall be declared judicially to be invalid, unenforceable or void, such decision shall not have the effect of invalidating or voiding the remainder of this Agreement, it being the intent and agreement of the parties that this Agreement shall be deemed amended by modifying such provision to the extent necessary to render it valid, legal and enforceable while preserving its intent or, if such modification is not possible, by substituting therefor another provision that is valid, legal and enforceable and that achieves the same objective.

14.7 Entire Agreement. This Agreement (including the Confidentiality Agreement, the Exhibits and Schedules hereto, and the documents and instruments executed and delivered in connection herewith) constitutes the entire agreement among the parties with respect to the subject matter hereof and supersedes all prior and contemporaneous agreements and understandings, whether written or oral, among the parties or any of them with respect to the subject matter hereof, and there are no representations, understandings or agreements relating to

the subject matter hereof that are not fully expressed in this Agreement and the documents and instruments executed and delivered in connection herewith. All Exhibits and Schedules attached to this Agreement are expressly made a part of, and incorporated by reference into, this Agreement.

14.8 Schedules. Nothing in the Schedules is intended to broaden the scope of any representation or warranty contained in the Agreement or to create any covenant unless clearly specified to the contrary herein. Any disclosure on one Schedule shall be deemed to be disclosed on all Schedules and under the Agreement. Inclusion of any item in the Schedules (a) shall be deemed to be disclosure of such item on all Schedules and under the Agreement, (b) does not represent a determination that such item is material nor shall it be deemed to establish a standard of materiality, (c) does not represent a determination that such item did not arise in the ordinary course of business, (d) does not represent a determination that the transactions contemplated by the Agreement require the consent of third parties and (e) shall not constitute, or be deemed to be, an admission to any third party concerning such item. The Schedules include descriptions of instruments or brief summaries of certain aspects of the Company and its business and operations. The descriptions and brief summaries are not necessarily complete and are provided in the Schedules to identify documents or other materials previously delivered or made available.

14.9 Remedies. Each of the parties hereto acknowledges and agrees that (i) the provisions of this Agreement are reasonable and necessary to protect the proper and legitimate interests of the other parties hereto, and (ii) the other parties hereto would be irreparably damaged in the event any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached. It is accordingly agreed that the parties hereto shall be entitled to preliminary and permanent injunctive relief to prevent breaches of the provisions of this Agreement by other parties hereto without the necessity of proving actual damages upon posting of a suitable bond, and to enforce specifically the terms and provisions hereof and thereof, which rights shall be cumulative and in addition to any other remedy to which the parties hereto may be entitled hereunder or at law or equity.

14.10 Expenses. The Seller, on the one hand, and Buyer, on the other hand, shall bear their respective expenses (including, without limitation, fees and disbursements of counsel, accountants and other experts) incurred in connection with the preparation, negotiation, execution, delivery and performance of this Agreement, each of the other documents and instruments executed in connection with or contemplated by this Agreement and the consummation of the transactions contemplated hereby and thereby.

14.11 Release of Information; Confidentiality. The parties shall cooperate with each other in releasing information concerning this Agreement and the transactions contemplated hereby. No press releases or other public announcements concerning the transactions contemplated by this Agreement shall be made by any party without prior consultation with and written consent of each other party, except for any legally required communication by any party and then only with prior consultation and at least 12 hours notice together with copies of all drafts of the proposed text, prior to the time the communication is made public.

14.12 Certain Construction Rules. The article and section headings and the table of contents contained in this Agreement are for convenience of reference only and shall in no way

EXECUTION COPY

* * *

IN WITNESS WHEREOF, this Agreement has been duly executed as of the date first above written.

BUYER:

PACIFIC ENERGY RESOURCES LTD.

By: ______________________
Name: Darren Katic
Title: President

COMPANY:

FOREST ALASKA OPERATING LLC

By: ______________________
Name: Glen J. Mizenko
Title: Vice President, Business Development

SELLER:

FOREST ALASKA HOLDING LLC

By: ______________________
Name: Cyrus D. Marter IV
Title: Vice President & Secretary

FOC (for purposes of Sections 7.6, 7.14, 10.1 and Article XII only):

FOREST OIL CORPORATION

By: ______________________
Name: David H. Keyte
Title: Executive Vice President & Chief Financial Officer